UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6117-CR-HUCK(s)
18 USC 371
18 USC 1010
18 USC 1014
18 USC 1341
18 USC 1343
18 USC 1344
18 USC 1956
18 USC 2

UNITED STATES OF AMERICA,  :
                            :
            Plaintiff,      :
                            :
v.                          :
                            :
MARK ROSEMAN,               :
                            :
            Defendant.      :
_____ :



FILED by ___ D.C.

JAN 2 3 2001

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

### SUPERCEDING INFORMATION

The United States Attorney charges that:

### COUNT I

### CONSPIRACY TO COMMIT BANK FRAUD, HUD FRAUD
### MAIL FRAUD, WIRE FRAUD, AND MONEY LAUNDERING

1.      From in or about 1993, and continuing until in or about November 1996, the

exact dates being unknown to the United States Attorney, in Broward County, in the Southern

District of Florida, and elsewhere, the defendant,

MARK ROSEMAN,

did knowingly and willfully combine, conspire, confederate, and agree with persons known and

unknown to commit the following offenses against the United States:

1

(a)    bank fraud, in violation of Title 18, United States Code, Section 1344;

(b)    defrauding the Department of Housing and Urban Development ("HUD"), in violation of Title18, United States Code, Section 1010;

(c)    filing false loan applications with financial institutions, in violation of Title 18 United States Code, Section 1014;

(d)    mail fraud, in violation of Title 18, United States Code, Section 1341;

(e)    wire fraud, in violation of Title 18, United States Code, Section 1343; and

(f)    money laundering, in violation of Title 18, United States Code, Section 1956.

## **BACKGROUND**

At all times material to this indictment:

2.    SunBank/South Florida, N.A., (now known as SunTrust Bank), Barnett Bank (now known as Bank of America), and Savings of America (now known as Washington Mutual) (hereinafter the "the Banks") are nationally chartered banks whose deposits are insured by the Federal Deposit Insurance Corporation. World Savings and Loan is a nationally chartered savings and loan association whose deposits are insured by the Federal Deposit Insurance Corporation.

3.    First Bankers Mortgage Services, Mortgage Dynamics, National Mortgage, Bennett Financial, Preferred Funding, CFI Mortgage Corporation, First Choice Lenders, Sunshine Financial, and Advantage Financial are mortgage brokers (hereafter referred to as the "Mortgage Brokers"). The Mortgage Brokers are in the business of finding lenders for persons who need a loan to purchase real estate. During the course of funding a loan for the buyer, the Mortgage Brokers would send

2

documents and other items to the lender and receive documents and other items from the lender, including funds for closing, by facsimile, wire transfer, and by commercial interstate carrier.

4.    The Department of Housing and Urban Development (HUD) is an agency of the United States government whose duties include guaranteeing loans to low income home buyers in order to enable them to buy homes, and selling foreclosure properties to individuals who intend to live in the property as an owner-occupant.

5.    Defendant ROSEMAN would purchase and sell real estate, in the manner more fully described below, both individually and through his corporation, Mark Roseman, Inc.

### OBJECT OF THE CONSPIRACY

6.    It was the object of the conspiracy for the defendant and his coconspirators to unlawfully profit through the sale of real property by submitting and causing to be submitted false information and false documentation to the Banks, the Mortgage Brokers, and HUD in order to purchase low income property and to induce the Banks and Mortgage Brokers to make loans totaling in excess of $15,000,000 to in excess of 150 people who could not otherwise qualify for a loan.

### MANNER AND MEANS OF THE CONSPIRACY

7.    It was part of the conspiracy that defendant ROSEMAN and his coconspirators would and did obtain and finance the purchase of residential real estate, which real estate included purchases of foreclosures from HUD.

8.    It was further part of the conspiracy that defendant ROSEMAN solicited or caused to be solicited "straw buyers" to purchase HUD foreclosures, because for the first twenty-one (21) days after certain HUD homes were offered on the market the homes were only offered to owner-occupants, that is, persons who agreed to live in the property as their primary residence.

3

9.      It was further part of the conspiracy that defendant ROSEMAN and his coconspirators would and did pay or cause to be paid, generally from $200 to $500, in order for the "straw buyers" to pose as the purchaser of the HUD home.

10.     It was further part of the conspiracy that defendant ROSEMAN and his coconspirators would and did conspire with real estate brokers to submit bids to HUD on their behalf claiming that the "straw buyers" would be the owner-occupants of the home.

11.     It was further part of the conspiracy that immediately after the real estate closing wherein the "straw buyers" had purchased the HUD home and after the closing agent for HUD had left, defendant ROSEMAN and his coconspirators would and did cause the "straw buyers" to sign a quit claim deed transferring the HUD home to defendant ROSEMAN, or one of his coconspirators, or one of their corporations.

12.     It was further part of the conspiracy that, even before the closing on the purchase of the HUD home by the "straw buyers," defendant ROSEMAN and his coconspirators, through their corporations, would and did execute contracts selling the property to third parties.

13.     It was further part of the conspiracy that, after the homes were purchased by defendant ROSEMAN and his coconspirators through HUD, they would spend some money improving the homes, and then sell the homes for approximately double the price to unsophisticated buyers.

14.     It was further part of the conspiracy that the buyers would not have sufficient income or assets or too many liabilities to qualify for a loan and to pay the down payment and closing costs to purchase the property.

4

15.     It was further part of the conspiracy that defendant and his coconspirators would and did complete or caused to be completed loan applications for each of the buyers at one of the Banks or Mortgage Brokers, which loan applications contained false information.

18.     It was further part of the conspiracy that defendant ROSEMAN would and did submit or caused to be submitted with the loan application to the Banks and Mortgage Brokers false documents in order to qualify the buyers for their loan.

19.     It was further part of the conspiracy that if the income of a buyer was insufficient to qualify for a loan, defendant ROSEMAN would and did prepare or caused to be prepared false W-2's and pay stubs which were then submitted to the Banks and Mortgage Brokers on behalf of the buyer.

20.     It was further part of the conspiracy that defendant ROSEMAN would create or caused to be created phony paychecks which purported to be issued by the employer for the buyer and which were then submitted to the Banks and Mortgage Brokers on behalf of the buyer.

21.     It was further part of the conspiracy that defendant ROSEMAN would deposit or caused to be deposited into the bank account of the buyer, cash or checks in the amount of the phony paychecks issued and provide bank statements showing those deposits to the Banks and Mortgage Brokers in order to make the Banks and Mortgage Brokers believe that the buyer was earning the income set forth in the phony paychecks.

22.     It was further part of the conspiracy that, if the income of a buyer was insufficient to qualify for a loan, defendant ROSEMAN and his coconspirators would have tax preparers falsify Form 1040's overstating the annual income of the buyer, which were submitted to the Banks and Mortgage Brokers on behalf of the buyer.

5

23.    It was further part of the conspiracy that, if the assets of a buyer were insufficient to reflect the ability to make a down payment on a loan, then defendant ROSEMAN and his coconspirators would and did create or caused to be created a "gift letter," which falsely represented that the down payment had been gifted to the buyer by a relative, and would then submit the fraudulent "gift letter" to the Banks and Mortgage Brokers on behalf of the buyer.

24.    It was further part of the conspiracy that the defendant's coconspirators would and did create or cause to be created bank statements or alter existing bank statements which would show balances for the buyer or a person gifting the down payment to the buyer, either greatly over-representing the true balance in the account or a substantial balance in a bank where the person had no account, and would then submit the fraudulent bank statements to the Banks and Mortgage Brokers.

25.    It was further part of the conspiracy that defendant ROSEMAN and his coconspirators would and did issue checks to the buyer, which checks were cashed and deposited into the buyer's bank account, in order to make it appear to the Banks and Mortgage Brokers as if the buyer had sufficient funds to pay the down payment and the closing costs on the purchase of the house.

26.    It was further part of the conspiracy that defendant ROSEMAN and his coconspirators would and did negotiate a down payment from the buyer that was less than the Banks and the Mortgage Brokers would accept, and would then deceive the Banks and Mortgage Brokers by having the buyer issue them checks in the amount of the required down payment which was submitted to the Banks and Mortgage Brokers and then they would reimburse the buyer for those checks in full or in part.

27.    It was further part of the conspiracy that, if the buyer had little or no credit history, defendant ROSEMAN and his coconspirators would and did create or caused to be created credit reference letters from Bell South, Florida Power and Light and other businesses falsely stating the buyer had an excellent credit history, and would then submit or caused to be submitted the credit reference letters to the Banks and Mortgage Brokers on behalf of the buyer.

28.    It was further part of the conspiracy that defendant ROSEMAN and his coconspirators would and did submit or caused to be submitted to the Banks and Mortgage Brokers fraudulent letters created to fill in the gaps in employment and other questions the Banks and Mortgage Brokers may have on the loan application.

29.    It was further part of the conspiracy that, in order to prevent the Banks and Mortgage Brokers from uncovering the false information, such as the false Form W-2's, false bank statements, and false rental information, defendant ROSEMAN and his coconspirators would and did include names, telephone numbers and addresses in the loan applications submitted to the Banks and Mortgage Brokers of persons who would, at the direction of the defendants and their coconspirators, provide false verifications as to the employment, bank deposits or rental information of the buyers to the Banks and Mortgage Brokers.

30.    It was further part of the conspiracy that the defendants' coconspirators would and did conspire with loan officers and loan processors in order that the written verification of employment forms and verification of deposit forms would be given directly to the defendants or their coconspirators instead of being mailed directly to the employers or the banks, which forms would then be falsely completed and sent back to the Banks and Mortgage Brokers.

31.    It was further part of the conspiracy that defendant ROSEMAN and his coconspirators would and did falsely represent or caused to be represented to the Banks and the Mortgage Brokers that the closing costs came from the buyer, when as they well knew, the closing costs were paid or caused to be paid by the defendants.

32.    It was further part of the conspiracy that defendant ROSEMAN and his coconspirators would and did pay or cause to be paid up to $5,000 after the closing to some of the buyers for purchasing the properties.

33.    It was further part of the conspiracy that defendant ROSEMAN would receive checks at closing from the proceeds of the loans obtained through fraud and deposit those checks in bank accounts which he controlled.

34.    It was further part of the conspiracy that defendant ROSEMAN would and did engage in financial transactions with the proceeds from the fraudulently obtained loans and did thereby promote the conspiracy by continuing to purchase new properties and making payments to coconspirators and others for activities done in furtherance of the scheme.

OVERT ACTS

35.    In furtherance of the conspiracy and to effect the objects thereof, at least one of the following overt acts, among others, was carried out by at least one co-conspirator in the Southern District of Florida, and elsewhere:

A.  On or about June 28, 1993, defendant ROSEMAN issued a check for $275.00 to SunBank, which was an application fee for a loan for Tracye Rozier.

B. On or about July 1, 1993, defendant ROSEMAN caused a loan application to be submitted to SunBank. The loan application falsely reflected that Tracy Rozier was employed as a manager for Ivory's and that Efrain Darshan was her landlord.

C. On or about July 15, 1993, defendant ROSEMAN caused a verification of employment to be submitted to SunBank falsely stating that Tracye Rozier earned income from M.S. Stores of $25,018 for 1992 and $23,460 for 1991.

D. In or about July 1993, defendant ROSEMAN caused another person to prepare a false letter purporting to be from FP&L stating that Tracye Rozier had good credit with FP&L.

E. In or about July 1993, defendant ROSEMAN submitted to SunBank, in support of a loan for Tracye Rozier, payroll checks falsely stating that she earned $426.53 from M.S. Stores.

F. On or about June 28, 1993, defendant ROSEMAN gave Tracye Rozier $426.53 cash, which was then deposited into her account at SunBank to make it appear that she received a payroll check for that amount.

G. On or about July 20, 1993, defendant ROSEMAN gave Tracye Rozier $426.53 cash, which was then deposited into her account at SunBank to make it appear that she received a payroll check for that amount.

H. On or about July 10, 1993, defendant ROSEMAN caused a verification of rental form purporting to be executed by Efraim Darshan falsely stating that he had been the landlord for Tracye Rozier to be submitted to SunBank.

I. On or about June 28, 1993, defendant ROSEMAN issued a check through his corporation to Tracye Rozier in the amount of $500.

J. On or about June 28, 1993, defendant ROSEMAN received a check for $1000 from Tracye Rozier.

K. On or about July 15, 1993, defendant ROSEMAN issued a check through his corporation to Tracye Rozier in the amount of $1000.

L. On or about July 15, 1993, defendant ROSEMAN received a check for $1000 from Tracye Rozier.

M. In or about July 1993, defendant ROSEMAN caused a person other than Tracye Rozier's husband to stand in for her husband at closing.

N. On or about January 26, 1994, defendant ROSEMAN caused a loan application to be submitted to SunBank. The loan application falsely reflected that Jimmy Murray was employed by Carlos DelValle at Quality Parts.

O. In or about January 1994 defendant ROSEMAN caused fraudulent W-2 forms for Jimmy Murray to be submitted to SunBank.

P.    In or about February 1994, a coconspirator caused a verification of employment form to be submitted to SunBank falsely stating that Jimmy Murray earned income from Quality Parts of $24,433.72 for 1993 and $23,884.38 for 1992.

Q. In or about January 1994, defendant ROSEMAN caused a letter to be submitted to SunBank which falsely stated that Jimmy Murray received a bonus check from Quality Parts.

R.  In or about January 1994, defendant ROSEMAN caused another person to prepare a false letter purporting to be from FP&L stating that Jimmy Murray had good credit with FP&L.

S.  In or about February 1994, defendant ROSEMAN caused to be submitted in support of a loan for Jimmy Murray from SunBank payroll checks, each check falsely stating that Jimmy Murray earned $360.81.

T.  In or about January 1994, defendant ROSEMAN caused to be submitted to SunBank a verification of rental form falsely stating that Lynn D'Amico is Jimmy Murray's landlord at 4391 NW 19th Street, Lauderhill, Florida.

U.  On or about January 16, 1994, defendant ROSEMAN issued a check through his corporation to Jimmy Murray in the amount of $500.

V.  On or about January 14, 1994, defendant ROSEMAN received a check for $1000 from Jimmy Murray.

W.  On or about February 13, 1994, defendant ROSEMAN issued a check through his corporation to Jimmy Murray in the amount of $1000.

X.  On or about February 14, 1994, defendant ROSEMAN received a check for $1000 from Jimmy Murray.

Y.  On or about February 28, 1994, defendant ROSEMAN, through his corporation, issued a check to Mimi Lawrence and Associates for $400 with respect to the Jimmy Murray property.

11

Z.  On or about June 1, 1994, defendant ROSEMAN caused a loan application to be submitted to SunBank. The loan application falsely reflected that Everett Bennett was employed by Steel Tires.

AA. In or about June 1994 defendant ROSEMAN caused fraudulent Form 1040's for 1992 and 1993 for Everett Bennett to be submitted to SunBank.

BB. In or about June 1994, defendant ROSEMAN caused a verification of employment form to be submitted to SunBank falsely stating that Everett Bennett earned income from Steel Tires of $25,720 for 1993 and $24,460 for 1992.

CC. In or about June 1994, defendant ROSEMAN caused to be submitted in support of a loan for Everett Bennett from SunBank a payroll check dated June 17, 1994, falsely stating that Everett Bennett earned $813.50.

DD. On or about June 20, 1994, defendant ROSEMAN issued a check through his corporation to Everett Bennett in the amount of $813.50.

EE.  On or about January 10, 1994, defendant ROSEMAN caused a loan application to be submitted to SunBank. The loan application falsely reflected that Willie Johson's landlord was a coconspirator.

FF. On or about January 20, 1994, defendant ROSEMAN caused to be submitted to SunBank a verification of rental form falsely stating that a coconspirator had been the landlord for Willie Johnson.

GG. On or about February 18, 1994, defendant ROSEMAN caused a loan application to be submitted to SunBank. The loan application falsely reflected that the landlord for Max Vassor and Marlene Nicholas was Billy Dobbs.

12

HH. On or about March 2, 1994, defendant ROSEMAN and defendant LAWRENCE caused a verification of rental form falsely stating that Billy Dobbs had been the landlord for Max Vassor and Marlene Nicholas to be submitted to SunBank.

II. On or about March 10, 1994, defendant ROSEMAN caused a letter that falsely stated the reason for the gap in the employment of Marlene Nicholas to be submitted to SunBank.

JJ. On or about February 18, 1994, defendant ROSEMAN issued a check through his corporation to Max Vassor in the amount of $1000.

KK. On or about February 18, 1994, defendant ROSEMAN received a check for $1500 from Max Vassor.

LL. On or about March 22, 1994, defendant ROSEMAN, through his corporation, issued a check to Mimi Lawrence and Associates for $50 with respect to the Max Vassor property.

MM. On or about March 4, 1994, a coconspirator caused a loan application to be submitted to SunBank. The loan application falsely reflected that Edgar Felix was employed by Southern Cleaning Services.

NN. In or about March 1994 a coconspirator caused fraudulent Form 1040's for 1992 and 1993 for Edgar Felix to be submitted to SunBank.

OO. On or about March 17, 1994, a coconspirator caused a loan application to be submitted to Sunshine Financial. The loan application falsely reflected that Edgar Felix was employed by Southern Cleaning Services.

13

PP.   In or about March 1994 a coconspirator caused fraudulent Form 1040's for 1992 and 1993 for Edgar Felix to be submitted to Sunshine Financial.

QQ.   On or about May 24, 1994, defendant ROSEMAN submitted a letter to Sunshine Financial that falsely stated that his corporation is holding a $1000 deposit with respect to 3709 SW 13th Ct., Fort Lauderdale, Florida.

RR.   On or about April 28, 1994, a coconspirator caused a false verification of employment for Edgar Felix to be submitted to Sunshine Financial.

SS.   On or about April 13, 1994, a coconspirator caused a loan application to be submitted to Savings of America. The loan application falsely reflected that: Edgar Felix was employed by Southern Cleaning Services; a coconspirator was Edgar Felix' landlord; and that defendant ROSEMAN's corporation was holding $1000 for the purchase of 204 N.W. 9th St., Fort Lauderdale, Florida.

TT.   On or about May 31, 1994, a coconspirator caused to be issued a check in the amount of $4,725 to Edgar Felix.

UU.   On or about June 13, 1994, a coconspirator caused to be issued a check in the amount of $5,000 to Edgar Felix.

VV.   On or about May 6, 1994, a coconspirator caused a loan application to be submitted to SunBank. The loan application falsely reflected that Jonathan Scott was employed by Scott Electrical Service.

WW. In or about May 1994, a coconspirator submitted to SunBank fraudulent Form 1040's for 1992 and 1993 for Jonathan Scott.

14

XX.  In or about May 1994, a coconspirator submitted a check dated May 13, 1994, to SunBank falsely stating that Jonathan Scott earned $464.00 working for CW Fischer.

YY.  On or about May 13, 1994, defendant ROSEMAN issued a check through his corporation to Jonathan Scott in the amount of $464.00.

ZZ.  On or about May 13, 1994, defendant ROSEMAN issued a check through his corporation to Jonathan Scott in the amount of $542.00.

AAA. On or about May 13, 1994, defendant ROSEMAN received a check for $1000 from Jonathan Scott.

BBB. On or about May 9, 1994, defendant ROSEMAN, through his corporation, issued a check to a coconspirator for $60 with respect to the Jonathan Scott property.

CCC.  On or about June 19, 1994, a coconspirator submitted a loan application to SunBank.  The loan application falsely reflected that Tomas Marquez had been employed for two years by Mr. B's Construction.

DDD.  On or about January 12, 1995, defendant ROSEMAN caused a bid to be submitted to HUD to purchase the property at 531 Alabama Ave., Fort Lauderdale, Florida as an owner-occupant.

EEE.  On or about March 9, 1995, a coconspirator paid a person $500 for acting as a straw purchaser with respect to 531 Alabama Ave.

FFF.    On or about April 25, 1995, a coconspirator caused a loan application to be submitted to First Bankers Mortgage Services. The loan application falsely reflected that Belinda Scott was employed by Mr. B's Construction.

GGG.    In or about May 1995, a coconspirator caused a verification of employment form to be submitted to First Bankers Mortgage Services falsely stating that Belinda Scott earned income from Mr. B's Construction of $21,762 for 1994 and $21,073 for 1993.

HHH.    On or about May 1995, a coconspirator caused a loan application to be submitted to Barnett Bank. The loan application falsely reflected that Belinda Scott was employed by Mr. B's Construction.

III.    On or about June 8, 1995, a coconspirator issued a check for $5,000 to Jonathan Scott for purchasing a property.

JJJ.    On or about April 13, 1995, defendant ROSEMAN caused a contract to be submitted in the name of Monica Secaira to purchase the property at 1612 NW 6th Ave., Fort Lauderdale, Florida as an owner-occupant from HUD.

KKK.    On or about June 14, 1995, a coconspirator caused a quit claim deed to be executed transferring the property from Monica Secaira to Royaline Realty.

LLL.    On or about June 23, 1995, defendant ROSEMAN, through his corporation, paid an application fee of $450 to Mortgage Dynamics for Belinda Scott to obtain a loan to purchase 1612 NW 6th Ave., Fort Lauderdale, Florida.

MMM.    On or about June 24, 1995, a coconspirator caused a loan application to be submitted to Mortgage Dynamics. The loan application falsely reflected that Belinda Scott was employed by VC Electronics, 1590 NE 28th Street, Pompano Beach, Florida.

NNN.    On or about July 3, 1995, defendant ROSEMAN caused HUD to sell the house at 1612 NW 6th Ave., Fort Lauderdale, Florida, to Monica Secaira.

OOO.  On or about August 17, 1995, defendant ROSEMAN received a check for $65,000 upon closing on 1612 NW 6th Ave.

PPP.  On or about February 11, 1995, a coconspirator caused a loan application to be submitted to First Bankers Mortgage Services. Submitted on or about the time of the loan application were Form 1040's which falsely reflected that Eddie Weaver had business income on Schedule C of $34,154 for 1994 and $33,191 for 1993.

QQQ.  On or about February 11, 1995, a conspirator received $75.00 from Granite Properties.

RRR.  On or about January 27, 1995, defendant ROSEMAN caused a contract to be submitted to HUD in the name of William Cooper to purchase the property at 1525 NE 5th Ave., Fort Lauderdale, Florida as an owner-occupant.

SSS.  On or about March 11, 1995, a coconspirator caused a loan application to be submitted to First  Bankers Mortgage Services. Submitted on or about the time of the loan application were Form 1040's which falsely reflected that Ramon Elgue had adjusted gross income of $29,934 for 1994 and $27,762 for 1993.

TTT.  On or about April 24, 1995, a coconspirator was paid $100.00 from Granite Properties.

UUU.  On or about April 24, 1995, defendant ROSEMAN, through his corporation, paid an application fee of $330 to First Bankers Mortgage Services for Jerome Walker to obtain a loan to purchase 424 SW 24th Ave., Fort Lauderdale, Florida.

VVV. On or about April 24, 1995, a coconspirator caused a loan application to be submitted to First Bankers Mortgage Services. The loan application falsely reflected that

17

Jerome Walker was employed during 1993 and 1994 at P.D.E. Security, and included fraudulent Form W-2's reflecting that Jerome Walker earned income from P.D.E. Security for 1994 of $13,120 and for 1993 of $12,840.

WWW. On or about May 10, 1995, a coconspirator caused a loan application to be submitted to First Bankers Mortgage Services. Submitted on or about the time of the loan application were form W-2's which falsely reflected that Fred Lambert earned $22,374 for 1994 and $21,228 for 1993 from Sun Belt Janitorial.

XXX.    On or about May 30, 1995, defendant ROSEMAN, through his corporation, paid an application fee of $475 to Mortgage Dynamics for Fred Lambert to obtain a loan to purchase 841 NW 19th Ave., Fort Lauderdale, Florida.

YYY.    On or about June 1, 1995, a coconspirator caused a loan application to be submitted to Mortgage Dynamics. Submitted on or about the time of the loan application were Form W-2's which falsely reflected that Fred Lambert earned $22,374 for 1994 and $21,228 for 1993 from Sun Belt Janitorial.

ZZZ.    On or about July 3, 1995, defendant ROSEMAN, through his corporation, paid an appraisal fee of $347 to Barnett Bank for Fred Lambert to obtain a loan to purchase 841 NW 19th Ave., Fort Lauderdale, Florida.

AAAA.    On or about July 3, 1995, a coconspirator caused a loan application to be submitted to Barnett Bank. Submitted on or about the time of the loan application were form W-2's which falsely reflected that Fred Lambert earned $22,374 for 1994 and $21,228 for 1993 from Sun Belt Janitorial.

BBBB.  On or about July 21, 1995, defendant ROSEMAN issued a check in the amount of $500 with respect to 841 NW 19th Ave.

CCCC.  On or about August 18, 1995, a coconspirator caused a loan application to be submitted to Barnett Bank.  The loan application falsely reflected that Kawanza Jackson had approximately $4,300 in an account at Citizens Federal Bank.

DDDD.  On or about September 12, 1995, a coconspirator caused a loan application to be submitted to Mortgage Dynamics.  The loan application falsely reflected that Kawanza Jackson had approximately $6,000 in an account at NationsBank, and failed to reflect the mortgage obtained in August 1995 from Barnett Bank.

EEEE.  On or about May 2, 1995, a coconspirator caused a loan application to be submitted to First Bankers Mortgage Services. Submitted on or about the time of the loan application was a tax return that falsely reflected that Lathon Miller had adjusted gross income of $30,668 for 1994.

FFFF.    On or about April 24, 1995, a coconspirator received a check for $100.

GGGG.  On or about June 6, 1995, a coconspirator caused a loan application to be submitted to Mortgage Dynamics. Submitted on or about the time of the loan application was a tax return that falsely reflected that Lathon Miller had adjusted gross income of $30,668 for 1994.

HHHH.  On or about August 18, 1995, a coconspirator caused a loan application to be submitted to Mortgage Dynamics.  The loan application falsely reflected that Luis Orozco had approximately $11,000 in an account at First Union Bank and that Sheila Garcia was the landlord for Louis Orozco.

19

IIII.  On or about August 23, 1995, a coconspirator submitted a loan application to First Choice Funding.  The loan application falsely stated that Michael Grabowski had been a supervisor for Mr. B's Construction for three years.

JJJJ.  In or about October 1995 a coconspirator caused a fraudulent verification of employment to be sent to First Choice Funding for Michael Grabowski.

KKKK.  On or about October 27, 1995, a coconspirator caused a loan application to be submitted to  Savings of America.  The loan application falsely reflected that Devon Fullerton had approximately $11,800 in an account at First Nationwide Bank.

LLLL.    On or about November 21, 1995, defendant ROSEMAN submitted a check for $125 to Mortgage Dynamics for a loan for Devon Fullerton.

MMMM. On or about November 27, 1995, a coconspirator caused a loan application to be submitted to  Mortgage Dynamics.  The loan application falsely reflected that Devon Fullerton had approximately $12,000 in an account at First Nationwide Bank.

NNNN.  On or about December 11, 1995, defendant ROSEMAN and defendant LAWRENCE caused a bid to be submitted to HUD to purchase 1409 NE 3rd Avenue, Fort Lauderdale, Florida on behalf of Billy Dobbs as an owner-occupant.

OOOO.    On or about March 8, 1996, a coconspirator caused a loan application to be submitted to CFI Mortgage Corporation.  The loan application falsely reflected that Ertha Dorsin had approximately $9,000 in an account at First Union Bank.

PPPP.      On or about June 27, 1996, a coconspirator caused the closing costs to be paid on a loan for Jackson Lucius and Suzette Fleurant with respect to their purchase of 5901 NE 2nd Ave., Fort Lauderdale, Florida.

QQQQ.    On or about July 24, 1996, defendant ROSEMAN issued a check in the amount of $500 with respect to 5901 NE 2nd Ave., Fort Lauderdale, Florida.

RRRR.    On or about July 24, 1996, defendant ROSEMAN issued a check in the amount of $280 with respect to 5901 NE 2nd Ave., Fort Lauderdale, Florida.

SSSS.    On or about June 27, 1996, a coconspirator caused a loan application to be submitted to Advantage Financial.  The loan application falsely reflected that Johnny Donfred had $100,000 in his account at Savings of America.

TTTT.    On or about February 26, 1996, defendant ROSEMAN deposited a check from the closing on a fraudulently obtained loan in the amount of $25,221.94 into an account at Nationsbank, which he controlled.

UUUU.    On or about March 18, 1996, defendant ROSEMAN issued a check from an account he controlled at NationsBank to purchase a property in furtherance of the scheme.

All in violation of Title 18, United States Code, Section 371.

## COUNT II-MAKING FALSE STATEMENTS TO HUD

36.    The allegations contained in paragraphs two through thirty-four of Count I of this information are realleged and incorporated by reference as though fully set forth herein.

37.    On or about March 21, 1996, at Broward County, in the Southern District of Florida, defendant,

MARK ROSEMAN,

did for the purpose of influencing in any way the action of the Department of Housing and Urban Development caused to be made, passed, uttered, and published a false statement knowing the same

21

to be false, that is, the defendant caused to be submitted a bid on a foreclosure property being sold by HUD, falsely claiming that Christina Curry was purchasing the property as an owner-occupant who intended to live in the property as her primary residence, when defendant ROSEMAN well knew that she never intended to live in the property as her primary residence and that the property was to be transferred immediately after closing to a corporation of one of the defendant's coconspirators.

All in violation of Title 18, United States Code, Sections 1010 and 2.


_Steven B. Otin_

GUY LEWIS
UNITED STATES ATTORNEY


JEFFREY N. KAPLAN
ASSISTANT UNITED STATES ATTORNEY

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

v.

MARK ROSEMAN
_____

CASE NO. 00-6117-Cr-HUCK(s) _____

### CERTIFICATE OF TRIAL ATTORNEY*
**Superseding Case Information:**

New Defendant(s)    Yes ____    No ____
Number of New Defendants _____
Total number of counts _____

**Court Division:** (Select One)

____ Miami    ____Key West
X___ FTL    ____ WPB    ___FTP

I do hereby certify that:

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3. Interpreter:    (Yes or No)  NO_____
   List language and/or dialect    _____

4. This case will take    0    day for the parties to try.

5. Please check appropriate category and type of offense listed below:
   (Check only one)                          (Check only one)

| | | | | | |
|---|---|---|---|---|---|
| I | 0 to 5 days | X____ | Petty | _____ |
| II | 6 to 10 days | _____ | Minor | _____ |
| III | 11 to 20 days | _____ | Misdem. | _____ |
| IV | 21 to 60 days | _____ | Felony | X____ |
| V | 61 days and over | _____ | | |

6. Has this case been previously filed in this District Court? (Yes or No)    YES
If yes:
Judge: ____HUCK_____    Case No. 00-6117_____
(Attach copy of dispositive order)

Has a complaint been filed in this matter? (Yes or No)    NO_____
If yes:
Magistrate Case No.    _____
Related Miscellaneous numbers: _____
Defendant(s) in federal custody as of _____
Defendant(s) in state custody as of _____
Rule 20 from the _____ District of _____

Is this a potential death penalty case? (Yes or No)  NO_____

7. Does this case originate from a matter pending in the U. S. Attorney's Office prior to April 1, 1999? __ Yes X_ No    If yes, was it pending in the Central Region? __ Yes_ No

_____
JEFFREY N. KAPLAN
ASSISTANT UNITED STATES ATTORNEY
FLA BAR NO. A5500030

*Penalty Sheet(s) attached

REV.4/7/99

DPC:hkp

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA
# <u>PENALTY SHEET</u>

Defendant's Name: <u>MARK ROSEMAN</u>          No.:   <u>00-6117-Cr-HUCK</u>

<u>Count #1:</u>

<u>Conspiracy to commit bank fraud, defrauding the Department of Housing & Urban</u>
<u>Development, filing false loan applications with financial institutions; mail fraud, wire fraud &</u>
<u>money laundering, all in violation of 18:371</u>

<u>*Max Penalty:     $250,000 fine; Five years' maximum imprisonment</u>

<u>Count #2:</u>

<u>False statements to HUD, in violation of 18:1010</u>

 <u>*Max Penalty:     $250,000 fine; Two years' imprisonment</u>