UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6117-CR-HUCK

01 MAR 13 PM 3:45

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA - MIA

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

MARK ROSEMAN,

        Defendant.

_____/

## OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT

The Defendant, Mark Roseman, files the following objections to the presentence investigation report.

1. At paragraph 3, the Report sets forth the exempt assets that are not subject to forfeiture. Roseman's pension plan (IRA) is an exempt asset.

2. Paragraph 7 sets forth the negotiated plea that was negotiated Co-Defendant, John Kudron. Kudron's negotiated plea included a provision that he would perform "substantial assistance." **Roseman's decision to plead guilty was not influenced by the fact that Kudron was a witness.** Roseman was aware that Kudron was cooperating with the Government before Roseman was indicted. The day that Roseman was scheduled to begin trial, the Government finally disclosed the Jencks materials, which included the testimony of Al Adessi. As related to the Government, the day he decided to change his plea, Roseman's decision to plead guilty was caused by the fact that that Government disclosed to him that Al Adessi would be a witness against him. After Roseman plead guilty, the government filed a Rule 35 Motion seeking a



reduction of Kudron's sentence on the grounds that he provided "substantial assistance" in the prosecution of Roseman. **The Government's Rule 35 motion clearly indicates that Kudron's prospective testimony had a bearing on Roseman's decision to plead guilty. Based on the fiction that Kudron was instrumental in Roseman's decision to plead guilty, which the Government knew was a fiction before it filed its Rule 35 motion to reduce Kudron's sentence, the Government allowed Kudron's sentence to be reduced from 60 months to 39 months. Apparently the Government did not inform the Court that the prospect of Kudron being a witness did not influence Roseman's decision to pled guilty.** (emphasis added)

3.  At paragraph 8, the Report outlines the terms and conditions of James Lowe's Plea Agreement. Like Kudron, Lowe's plea agreement included a provision whereby he agreed to provide "substantial assistance". The prospect of Lowe testifying against Roseman did <u>not</u> cause him to plead guilty. **The Government did <u>not</u> inform the Court that Lowe continued to commit real estate fraud after he agreed to cooperate with the Government and record conversations for the Government. After Lowe became an informant, Lowe sold approximately 22 properties in Broward County and about 10 of those sales have defaulted.** (emphasis added)

4.  At paragraph 12 of the Report, it relates that Stanley Lerner was charged with one count of conspiracy to commit mail and wire fraud. The report does not reflect that Lerner was also charged in another separate and distinct conspiracy to commit mail and wire fraud in the Christenson-Kratenstein conspiracy. Lerner was charged with the same type of conduct in that conspiracy, which involved a substantial number of real estate transactions. For being involved in two separate and distinct multi-million dollar frauds, the Government agreed to a recommendation that Lerner be sentenced to concurrent prison terms of 24 months.

2

5.  Paragraph 15 states that Kudron and Roseman were "partners." Kudron and Roseman were involved in real estate transactions with each other. In some of the real estate transactions with Kudron, Roseman lent Kudron the money to purchase the property and to refurbish the property. In other real estate transactions with Kudron, Roseman participated in an arrangement known as a "shared appreciation mortgage." Roseman lent the money to purchase and refurbish the property. When it was sold, he shared in the profit. On the other hand, Kudron was involved in the sale of approximately 40 other properties, in which Roseman did not participate, which from Kudron derived an estimated profit of in excess of $500,000.

6.  At paragraph 15, the Report states that signs were placed in front of the properties which read "$500 down, $500 at closing, no credit, poor credit." Regarding the properties that Roseman was involved with, the signs read, "$650 or $750, or $1000 down, 2 years working, good credit or no credit." The Report goes on to state, "the buyers' housing costs could be no greater than one-third of the buyer's monthly income." This is an incorrect statement. Some of the homebuyer loan programs allowed the buyers' housing cost to exceed one-third of the buyers' monthly income.

7.  At paragraph 15, the Report states that the buyers were "almost always uneducated first time homebuyers." The CRA Lending Programs of SunBank, Barnett Bank, etc., were designed for and targeted the uneducated, first time homebuyer. These programs had a requirement that the prospective homebuyer take a course in managing their finances and operating a home, because they were first-time, uneducated homebuyers.

8.  At paragraph 15, the Report states, "the buyer needed to have enough money in the bank to cover the down payment and the closing costs of the purchase." The SunBank CRA program allowed for all the closing costs and prepaid items to be paid by the sellers, instead of

the buyers. The SunBank CRA program allowed the buyers to save the money for the down payment during the time it took to approve their loan. The buyers were not required to have all the money on deposit in the bank at the time they made their application. At one point in time, SunBank allowed even the down payment to be a gift.

9. At paragraph 16, the Report states:

> Most of the buyers were not employed by the same employer for two consecutive years. They often work in cash businesses and did not have sufficient income to qualify for a loan...

The Report states that the buyers "worked in cash businesses and did not have sufficient income to qualify for a loan." Many of the buyers did work in businesses wherein they were paid in cash. While they had sufficient income to buy a home, their total income had not been "reported or declared" on income tax forms, such that it appeared they did not have sufficient income to pay a mortgage.

10. Paragraph 16 of the Report states that "another tactic was that Roseman and Kudron would use the names of businesses whom Roseman and Kudron knew would lie for them." The discovery provided by the Government reflects that Kudron did this. Kudron used Charlie Terek at European Craftmasters to do this. When questioned by the F.B.I., Charlie Terek denied that Roseman asked him to falsely verify employment.

12. Paragraph 17 of the Report, states "hardly any of the buyers had sufficient funds in the bank to cover the down payment and closing costs." At the time the loan application was made, the buyers were not required to have all the funds on deposit. The buyers were allowed to save the necessary funds during the loan-processing period.

13. Paragraph 17 of the Report discusses a procedure whereby Roseman and Kudron wrote checks to the buyers, which they cashed. Roseman wrote checks to the buyers so that they

would be able to pay their living expenses, while they saved their paycheck. Aileen Hudgins of Sun Bank suggested this procedure to Roseman, and told him it was an acceptable means by which the buyers could establish that they were saving the funds for their deposit to purchase the property.

14.    Paragraph 17 of the Report states, "as the conspiracy evolved, Roseman and Kudron began using a different fraudulent method. They created fraudulent bank statements on word processors and altered existing cashiers' checks in order to fool the banks." Roseman did not do this. The discovery provided by the Government reflects that Kudron and Lowe did this.

15.    At paragraph 19, the Report states, "in 1994, Roseman and Kudron hired individuals to find buyers and to monitor the properties. They hired Marc Gordien, and later James Lowe." Roseman did not hire either of these individuals; he did participate in real estate transactions with these individuals.

16.    Paragraph 20 of the Report states that after Liz Velazquez was fired that Roseman and Kudron hired her to prepare their loan packages. Roseman did not hire her; Kudron hired her to assist him. The paragraph goes on to state, "whenever a buyer failed to qualify, Velazquez would leave a note for Kudron or the others, as to what was needed." The term "others" implies Roseman. Valezquez did not leave notes for Roseman as to what was needed.

17.    Paragraph 23 of the Report states that Roseman, Kudron and the other co-conspirators started using Stanley Lerner to process their loans. Roseman had no relationship with Stanley Lerner.

18.    Paragraph 25 of the Report states that Roseman and his co-conspirators, submitted or caused to be submitted to the banks and mortgage brokers false information with respect to

more than 150 loans, totaling approximately $15 million. Roseman objects to the number of loans and the amount of the loans.

19. Paragraphs 24, 25 and 26 of the Report concern the purchase of real estate from HUD. Roseman used a strawbuyer to purchase real estate from HUD. The use of a strawbuyer did <u>not</u> deprive a first time, low-income person from buying the homes that Roseman bid on. The HUD properties that Roseman purchased through a strawbuyer were so deteriorated and in such a state of disrepair that the properties did <u>not</u> qualify for FHA financing. Most of the properties were in such a state of deterioration and disrepair that the properties did <u>not</u> qualify for a government subsidized repair loan. Given that the properties Roseman purchased through a strawbuyer did not qualify for FHA financing, a low-income, first time homebuyer would have to purchase the property for "cash," because no conventional lender would make a loan to a first time, low-income homebuyer if the property did not qualify for FHA financing. A review of the HUD documents pertaining to the HUD properties that Roseman purchased through a strawbuyer will reflect that the only bids HUD received on those properties were from other investors, like Roseman.

20. Paragraph 27 of the Report states that Roseman "had co-conspirators create loan packages with false information and prepare bogus tax returns." The paragraph goes on to state that "he recruited others to create false employment records, credit histories and tax returns in order to obtain mortgages. He was involved in at least 150 property transactions with fraudulently obtained loans totaling $15 million. The losses associated with these loans was $3,049,686.89. Since he acted as an organizer/leader of an offense involving five or more participants, a four level aggravating role adjustment is appropriate." Roseman was not an

organizer/leader of an offense involving 5 or more participants. Therefore, Roseman should not be assessed a four level aggravating role adjustment.

21.     Regarding paragraph 32 of the Report, relating to an adjustment for acceptance of responsibility, Roseman has submitted an acceptance of responsibility statement to the probation officer.

22.     Paragraph 36 of the Report, relating to specific offense characteristics, provides that the value of the funds was more than $10 million, but less than $20 million, therefore, a nine level upward adjustment is appropriate. Roseman disputes the amount of the funds; therefore, Roseman disputes the nine level upward adjustment.

23.     Paragraph 37 of the Report, relating to adjustment for role in the offense, assesses a four level upward adjustment, on the grounds that Roseman was an organizer and a leader of a criminal activity that involved five or more participants. Roseman objects to this four level upward adjustment.

24.     Paragraph 79 of the Report relates to Roseman's wife's residence located at 3201 N.E. 57th Court, Ft. Lauderdale, Florida. The Report states "although the Defendant and his wife's current residence is also deeded in her name only, he undoubtedly has a one-half interest." Notwithstanding the fact that the Government has agreed not to forfeit this residence, Roseman does not have a one-half interest in the residence.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of this document was mailed and faxed March 13, 2001 to:

Jeffrey N. Kaplan, Esq.
Assistant United States Attorney
500 E. Broward Blvd., 7th floor
Fort Lauderdale, FL 33301

                H. DOHN WILLIAMS JR. P.A.
                Suite 2402 New World Tower
                100 N. Biscayne Boulevard
                Miami, Florida 33132
                954-523-5432; 305- 372-8038 (fax)

BY: _____
        H. Dohn Williams Jr.
        Fla. Bar #166087

c/rosemanobjectionspsi