UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6117-CR-HUCK

UNITED STATES OF AMERICA,

   Plaintiff,

vs.

MARK ROSEMAN,

   Defendant.

_____/



## SENTENCING MEMORANDUM

  The Defendant, Mark Roseman (Roseman), files a sentencing memorandum to assist the Court in evaluating his objections to the presentence investigation report, and to assist the Court in arriving at a just and equitable sentence.

### History of the Plea Agreement

  Regardless of any agreement between the government and Roseman, the Court may impose any sentence it feels is appropriate within the Federal Sentencing Guidelines (guidelines) and within the statutory maximum sentence. Mindful of this, the Court should have a complete history of this case and the key participants.

  Long before the Indictment was returned, Roseman sought a resolution of this case. In April 1997, Roseman complied with a grand jury subpoena and produced all of his business records. In May 1998, Roseman, through his attorney, provided the government an unheard of detailed written analysis of approximately 175 real estate transactions.



Early on Roseman was willing to enter a plea and to immediately pay restitution, if his conduct was limited to the fraudulent solo transactions where he directly dealt with the buyers, and if the government allowed him to contest the amount of the "loss" sustained by the lenders. The government insisted on plea to a charge with a statutory maximum sentence of 60 months incarceration, and a non-negotiable loss calculation of approximately $2.8 million. This meant Roseman was held accountable for every transaction, regardless of his involvement, and it meant he could not contest the amount of the "loss." Additionally, the government wanted all of Roseman's assets forfeited for restitution, including his residence.

Roseman had considerable wealth before he got involved in these real estate transactions; otherwise, he would not have been able to lend money. Roseman's "net worth" did not drastically increase because of these real estate deals. The government failed to realize that he was lending the same money over and over again within the same year. The modest increase in his wealth was the 18% interest earned on the short-term loans, or the reduced interest payment on the short-term loans plus a percentage of the profits of the sale of the homes. Yet, the government wanted all the wealth he had accumulated in a lifetime.

Thus, the scope and breadth of his conduct, how the "loss" would be calculated, and the amount of his assets that would be forfeited as restitution were the stumbling blocks to resolving the case.

By the terms of the Plea Agreement, the government increased the term of incarceration by insisting that he plead to 2 charges with a maximum statutory term of incarceration of 84 months, if the terms are imposed consecutively. Aside from increasing the maximum term of incarceration, the government added money laundering to the conspiracy charge. The

government agreed to exempt the residence, which belongs to his wife, from forfeiture, so that his family would have a place to live.

## Background Giving Rise to The Loans

In December 1992, The Miami Herald reported that many of Florida's biggest banks engaged in a practice known as "redlining" and rejected black mortgage applicants at a higher rate based on Federal Reserve Board records. The records showed blacks in Florida in 1990 were almost twice as likely to be turned down as non-Hispanic whites, even when income was taken into account. Banks thereby discouraged home ownership in low-income neighborhoods by a practice known as "redlining," because the applicants were hard to qualify and the foreclosure rate was greater. Loan officers do not want to waste time on such loans, because many loan officers work on a commission, bonus system, or merit system based on the amount of the loan. Additionally, a high foreclosure rate adversely affected the loan officer's promotions, raises, etc.

In the early 1990's the Federal Reserve Board issued an edict to local banks to make loans in neighborhoods previously "redlined," or suffer severe financial penalties. Local banks were directed to make a specific dollar amount of loans within a specific time-period. If the banks failed to do so, then they might be obligated to donate money, equal to the amount of loans not made, to local charities servicing the "redlined" area.

Tom Bambenek- Senior Vice-President of residential real estate at SunBank said to staff writers in a Sun Sentinel article dated June 23, 1992, entitled "LENDERS EAGERLY SEEK MINORITY, LOW-INCOME CUSTOMERS". "Thom Bambenek said his bank is sincere in its efforts to do more business in minority communities. He said last year the bank pledged $8 million dollars in loans for those with low to moderate incomes. It lent that amount and this year will make another $8 to $10 million available." The article goes on to say, " Still, about 70

3

percent of bankers responding to an American Bankers Association poll said the 'CRA' worried them most because they resent having government tell them where to lend money." Regulators rate banks' community involvement in a way similar to the way teachers grade report cards: outstanding, satisfactory, needs improvement, and the lowest rating – substantial noncompliance.

Given they were told to make loans, SunBank and Barnett aggressively made loans to persons in "redlined" areas. Most of the home sales that are the subject of this case were within the former "redline" areas. The banks did not scrutinize the buyers, because they were under-the-gun to make home loans. **The banks took the position that it was better to make loans, any loans, and hope they performed; rather than suffer the financial penalties for not making loans, or suffer "bad press."** (Emphasis added)

**The banks did not act prudently in checking out the prospective buyers.** The most imprudent act was that the loan officers rarely, if ever, interviewed the borrowers. The loan officers lied to their superiors when they filled out forms that they conducted a face-to-face interview of the borrowers. Their lie was also a federal crime.

The banks were obligated to verify whether the prospective borrower had funds on deposit in a bank account. If the buyer's bank account was in another bank, the bank supplying the information charged the requesting bank a fee for this verification of deposit information. Remarkably, not wanting to pay this fee, the lending banks, such as SunBank, settled for the prospective borrowers supplying copies of bank statements or printouts. The banks did not independently verify the borrowers' employment, housing, etc. The banks allowed the investors to submit the forms.

As with any loan, the borrowers' income was a major factor. The banks had the borrowers sign an IRS 4506 form that allowed the banks, free of charge or for a nominal fee, to

4

obtain the borrowers' income tax records within 10 days. These official IRS records would verify income, including place of employment if the W-2 forms were obtained. The banks did not use these forms to acquire the information. Why find out the truth. We are under a mandate to give loans.

## The Un-indicted Co-conspirators - The Bank Officials

The mainstream bank officials, who were under a federal edict to give CRA loans, were not indicted. Instead, lending officials from the secondary market, like Stanley Lerner, were indicted. It appears that because most of the CRA borrowers were black, SunBank had a black loan officer, Aileen Hudgins, service these mortgages. She is married to a Federal official; she escaped Indictment.

She knowingly facilitated the wrongdoing by providing the investors, like Roseman, with blank loan applications. The investors completed the loan applications in longhand and submitted them for approval. **All of the handwritten loan applications submitted to Hudgins are signed by her. She checked the box on the loan application that all of the homebuyer/borrower's information had been obtained by her in a "face-to-face interview." This was untrue. She never interviewed any of the borrowers submitted by Roseman. Thus, each time she signed the loan application that she had conducted a "face-to-face interview" she committed a federal crime.** (Emphasis added)

She was just as motivated as the investors for the loan to be approved, because she worked on a commission. She often boasted about how much she was paid in commissions. She boasted at holiday party, "Everyone is going to get a house next year." At trial, Roseman was going to pursue the question of whether Hudgins' commissions were equal to, or greater than her salary.

Mignon Lamar was a black loan officer with Barnett Bank. She had a close relationship with co-defendant James Lowe. Lowe lent her money. She called Lowe when she had a flat tire. Lamar routinely gave Lowe or Kudron quantities of original blank verification forms used to verify the borrower's bank deposit, rent and employment. The government is in possession of original blank verification forms that it seized from Roseman's co-conspirators in this case. These form are suppose to be sent directly to the person being asked to verify the information. Instead, Lamar gave these forms to Kudron and/or Lowe, who returned the completed forms to her.

If Hudgins and Lamar had verified the information, their superiors would never have approved the loans. Their most glaring abuses were rarely, if ever, interviewing the borrowers and failing to use the IRS 4506 form to verify the borrowers' income and employment information. Instead, so the deal would go through and they would make their commissions, they received from the investors unverified copies of the borrower's income tax returns and financial records.

The bank loan application frauds could not have been perpetrated without the cooperation of these bank officials. It would be interesting to see if the lenders collected against their fraud insurance policies. Did the banks wrongfully collect insurance for Roseman, Lowe, Kudron and Gordien's when their own bank officials were part of the fraudulent conduct? As discussed later, we know of an incident where a lender collected mortgage insurance, even though the lender's mortgage insurance application was untruthful.

### Roseman's Involvement in the Real Estate Transactions

Roseman was involved in over 100 home buying transactions. About 15 were solo transactions with Roseman buying the property, marketing the property, dealing with the

6

prospective buyers, and selling the property. Concerning the 15 solo transactions there was no involvement in these transactions by Kudron, Lowe, Gordien, etc. The remainder of the transactions involved Kudron, Gordien or Lowe.

For purposes of discussion and analysis, the transactions have been put into groups designating the person Roseman did business with and how the loan was structured. All the transactions are set forth in Exhibit A, which sets forth the loan amount, the amount the bank resold the property for after the foreclosure, and the new buyer-investor's resale price to a new homebuyer.

Group 1 – Roseman is Solely Responsible

There were 15 solo transactions. Of the 15 transactions, 5 went into foreclosure. To Roseman's knowledge and based on our review of the public records, 10 of the transactions are good, performing home loans. **Group 1 is the only group that Roseman had actual dealings with the homebuyers and where he was actually involved in the loan application process.** (emphasis added)

Overt Acts A through M, concern a home that Roseman sold to Tracye Rozier. As alleged, Roseman issued a check for $275 to SunBank, which was an application fee for the loan to Tracye Rozier (i.e., $225 for the property appraisal and $50 for a credit check on the buyer). Roseman was told that was permissible for him to pay these costs. There was no mystery about the check, because it was drawn on his bank account.

As alleged, Roseman caused a loan application to be submitted to SunBank that stated Rozier was employed, as a manager at Ivory's Market, and that Ephraim Darshan was her landlord. Roseman was responsible for the false verification of rent (VOR) that Darshan was her landlord. **SunBank loan officer Aileen Hudgins never interviewed Rozier, even though she**

**signed that loan application that all the information was obtained by her in a face-to-face interview.** (emphasis added)

Roseman was responsible for the preparation of a false letter purporting to be from FPL stating that Rozier had good credit with FPL.

Regarding Rozier's employment, the false verification of employment (VOE) and the checks from Ivory's Market were her doing. The VOE was sent to Rozier's place of work. Someone, unknown to Roseman, signed the name of Myrtis Blanco as the owner of the store. Rozier supplied Roseman with checks from Ivory's Market. Rozier signed an IRS 4506 form to get income tax information. She had a checking account at SunBank. Apparently the bank did not check to see if she had ever deposited her Ivory's Market paychecks in her account, or if she paid her utility bills, or if she paid rent to Darshan. **The loan officer, Aileen Hudgins, knew Rozier's aunt and was familiar with Ivory's Market, so no cross checks were performed.** (emphasis added)

Regarding the allegations: (1) that Roseman gave Rozier $426.53 cash which was then deposited into her account at SunBank to make it appear that she received a payroll check for that amount; (2) Roseman issued checks through his company to Tracye Rozier (i.e., for groceries): and (3) that Roseman received a $1000 check (i.e., an extra down payment), all of these actions were taken with the knowledge and approval of the SunBank loan officer Aileen Hudgins, an unindicted co-conspirator.

Overt Acts N through Y, concern a home that Roseman sold to Jimmie Murray. As alleged, there were improprieties in the documentation submitted to Aileen Hudgins, the SunBank loan officer. The most significant improprieties concerned the documentation supporting Murray's employment and income. Even though Murray signed an IRS 4056 form,

so that SunBank could get his income tax information, it never used the form. Use of this form would have immediately revealed the improprieties regarding his place of employment and the amount of his income.

His mother-in-law Lynn D'Amico facilitated the improprieties concerning his former place of residence. Lynn's daughter was pregnant with Jimmie's child, and Lynn wanted him to get a house.

The loan should have never closed because Jimmie did not complete the Home Buyer's Program, which was a prerequisite for the loan closing. Aileen Hudgins, the SunBank loan officer, overlooked this requirement, so she could make her commission. Interestingly, the appraiser appraised this particular property as being worth more than its selling price.

After Murray defaulted on the loan, SunBank sold the property to RAJ Data for $41,300.00. RAJ Data sold the property three months later for $79,900.00. As discussed previously, SunBank did nothing to mitigate its loss.

Overt Acts Z - DD concerns a home that Roseman sold to Everett Bennett. As alleged, the loan application was submitted with documentation that falsely reflected that Steel Tires employed Bennett. Bennett earned a sufficient income to obtain a mortgage, but he was paid off the books. So, his income was not reported on his income tax return. His wife, Deborah, worked in a salaried job and her income was correctly reflected on her income tax return. However, she had gone through a foreclosure during her previous marriage. Thus, she was risk.

A short time after Bennett bought the house, he went to prison. He left his wife, who had small children, to pay the mortgage. Naturally, his wife had a hard time making payments. She contacted Roseman. Roseman learned that she had recently purchased a stereo for $1,000.00 cash, instead of making her mortgage payment. Roseman took the stereo, gave her $1,000.00

9

and drove her to the bank so that she could make her mortgage payment. Roseman told her that she could redeem the stereo for $800.00. She never did. With her husband in prison, she was unable to make the mortgage payment. The property went into foreclosure.

SunBank sold the property to Joseph Mondelli, for $31,500.00. The same day he bought the property, he sold it to another investor for $51,000.00. This investor sold the property to an owner/occupant for $87,000.00, which was over $50,000.00 more than SunBank sold the property for after the foreclosure.

Predicate Acts EE and FF, concern a home that Roseman sold to Willie Johnson. As alleged, the loan application stated that Leo Brovillette was Johnson's landlord. Johnson was an older man and this was the first home he had ever owned. Johnson was working, but his wife was not. SunBank gave him a mortgage whereby he was paying close to 40% of his pre-tax income for his house payment.

According to the discovery documentation provided by the Government, Johnson's loan did not meet the CRA requirements, because the loan amount exceeded the guidelines. The loan should have never been made, because the loan amount exceeded the guidelines, and because Johnson's income to debt ratio exceeded the guidelines. **To get the loan approved, Aileen Hudgins, the SunBank loan officer, figured Johnson's income to debt ratio, including over-time pay, which increased his gross pay by more than 25%.** (emphasis added)

Overt Acts GG - LL concern a home that Roseman sold to Max Vassor and Marlene Nicolas. As alleged, the loan application falsely reflected that their landlord was Billy Dobbs. There was also submitted to the bank a letter, which falsely reflected the reasons for the gap in Nicolas' employment. This young Haitian couple, with children, were working, but not much

above minimum wage. Their debt to income ratio resulted in the foreclosure, because they did not earn enough to pay all their bills.

<u>Group 2 – Roseman Owned the Property and Kudron Sold It</u>

Roseman found these properties and bought them. Roseman was simply the owner of properties, and Kudron had all dealings with the buyers. Kudron's company, Royaline Realty South Inc., marketed the properties and dealt with the buyers for a percentage of the profit. There were 12 transactions of this type and 9 of the transactions eventually went into foreclosure.

Overt Acts MM - NN concern a home that Roseman bought, but which Kudron sold for a percentage of the profit. Kudron located the buyer, Edgar Felix. Kudron submitted a loan application, which falsely reflected that Southern Cleaning employed Felix. Felix signed an IRS 4506 form, so that the bank could obtain income tax information about him. The bank never used this form. His income tax information would have reflected that he did not work for Southern Cleaning for 5.5 years as alleged.

The initial loan application was denied, because the property consisted of two detached units, built in different years on different lots. Felix lied when he said he bought the house to be used as his primary residence. He bought the house as an investment. Felix' wife's cousin, Sam Lubin, collected the rent, but he did not apply it to the mortgage payments. Roseman tried to assist Felix by getting the tenants to pay Felix directly, but the tenants were afraid of Lubin. So, the tenants continued to pay Lubin; Lubin continued to spend the rent money and not pay the mortgage payments. In frustration, Felix gave the property back to the bank.

Overt Acts OO - RR, concern a home owned by Roseman, but sold by Kudron for a percentage of the profit. Kudron acquired the buyer, Edgar Felix. As alleged, Kudron submitted a loan application, which falsely reflected that Southern Cleaning employed Felix. The lender

11

did not use the IRS 4506 form to verify his income, which would have revealed that the amount of his income and the place of his employment were false.

Overt Acts - SS - UU concern a home that Roseman owned, but which Kudron sold for a percentage of the profit. Kudron located a buyer, Edgar Felix. As alleged, Kudron submitted a loan application, which falsely reflected that Southern Cleaning employed Felix. It also reflected that Mimi Lawrence was Felix' landlord. Again, the Lender did not use the IRS 4506 form to verify Felix's income, which would immediately have revealed the improprieties regarding the amount of his income and the place of his employment.

### Group 3 – Roseman Gave Kudron a Shared-Appreciation Mortgage

Roseman gave Kudron a shared-appreciation mortgage. This is a mortgage loan in which the lender, in exchange for a loan with a favorable interest rate, participates in the profits the borrower receives when the property is sold. All of the cash from start to finish that was invested belonged to Roseman. Roseman was paid zero interest on his investment therefore while the profit may have been divided equally, Kudron's profit was far greater than Roseman's. Also, because Kudron was not paying any interest to Roseman he tended to steer the buyers toward his own solo deals on which he was paying interest. Therefore, the deals in this group tended to remain unsold for a longer time, sometimes six months or longer. In hindsight, Roseman would have been better off by just lending the money at the usual interest rate. There were 20 transactions of this type and 12 of the transactions eventually went into foreclosure, or have a notice of lis pendins filed against the property. As the lender, Roseman did not solicit the prospective buyer, or have any contact with the buyer, except incidental contact. Roseman was present at the closing to get his loan repaid. The buyer was present to sign the loan papers and take custody of the property.

Overt Acts VV - BBB concern a home sold to Jonathon Scott. Kudron acquired the buyer, Jonathan Scott. As alleged, Kudron submitted a loan application, which falsely reflected that Scott was employed by Scott Electrical Service. Kudron's accountant, E-Z Accounting prepared false tax returns. Aileen Hudgins, the SunBank loan officer, never used the applicable IRS 4506 form to obtain his income tax information, which would have immediately revealed the false nature of his employment and the amount of his income.

Interestingly, Scott did have electrical training. Roseman paid him to install items in the house that he was buying.

The loan should have never closed, because Scott did not complete the Home Buyers Program, which was prerequisite to the loan closing. Aileen Hudgins overlooked this requirement so the loan would close and she would receive her commission.

Overt Acts JJJ - OOO concern another home sold to Belinda Scott, Jonathan Scott's wife. As alleged, Rosen caused a HUD bid to be submitted in the name of Monica Secaira. The HUD records reflect that two bids were received on this property. Both bids were from investors, like Roseman. No bid was received from a real owner-occupant. The bid by investor, Kevin Rossignol, was actually the winning bid. However, HUD rejected his bid when it learned that he purchased another HUD property the month before. The property was in such deteriorated condition, that it was not eligible for FHA insured financing. The property was not eligible for a federal 203K fix up loan. No owner/occupant was deprived of the property because no owner/occupant bid on the property. An owner occupant would have had to pay cash for the property, because a conventional lender would not have lent money on a property in such poor condition that was not eligible for FHA insured financing.

Overt Acts UUU - VVV concern a property purchased by Jerome Walker. Roseman

gave Kudron a shared appreciation mortgage so that he could purchase the property. Kudron found the buyer, Jerome Walker. Kudron submitted a loan application, which falsely reflected Walker's employer and income. Apparently, the lender made no attempt to verify Walker's employment. In the documents supplied by the government, there was no verification of employment form. Again, the Lender never used the IRS 4506 form to obtain Walker's income tax transcript to verify his income. There is no charge for the transcript and it is supplied within 10 days.

Overt Acts WWW - AAAA, concern a property purchased by Fred Lambert. Roseman gave Kudron a shared appreciation mortgage so that he could purchase the property. Kudron found the buyer, Fred Lambert. Kudron submitted a loan application, which falsely reflected Lambert's employer and income. Kudron submitted the loan application to three lenders.

Mortgage Dynamics did what a lender is supposed to do. It sought to verify the information. It learned that SunBelt Janitorial did not employ Walker as indicated in the loan application. It rejected his loan application.

The loan was eventually obtained from Barnett Bank through unindicted co-conspirator, Mignon Lamar. Unlike Mortgage Dynamics, Barnett Bank did not properly check the information.

**A condition of the loan was that Lambert have private mortgage insurance. Barnett Bank made a false application to the mortgage insurance company, because Barnett Bank did not disclose the sales concessions paid by the seller. The mortgage insurance application requested this information; the loan application clearly reflected that the seller was paying concessions, but Barnett did not disclose the information. Barnett Bank committed fraud by withholding this information, which the mortgage insurance company**

14

requested. **Barnett Bank wanted the mortgage insurance so that its mortgage would be paid in the event of foreclosure. Barnett Bank made 11 loans that defaulted, but it did not lose any money because the mortgage insurance paid off the loans. Thus, Barnett Bank is not listed as victim in the PSI, instead the mortgage insurance company is listed as the victim. Barnett Bank was not charged with any wrongdoing for defrauding the mortgage insurance company.** (Emphasis added)

Overt Acts PPPP - RRRR concern a property purchased by Suzette Fleurant. Roseman gave Kudron a shared appreciation mortgage to purchase the property. The overt acts were Kudron paying the closing costs for the buyer, Roseman issuing a check for $500, and Roseman issuing a check for $280. The sales contract reflected the seller was going to pay the closing costs. Roseman wrote a $500 check and Kudron was suppose to reimburse him; he did not. Roseman wrote a $280 check to pay Sharon Tamayo for costs she incurred.

This was one of the few times after a foreclosure that the lender sold the property to a new owner-occupant, instead of an investor. By selling the property to an owner-occupant the lender lost $9000.

### Group 4 – Roseman Lent Kudron the Money to Buy the Property

Roseman lent Kudron the money to buy the properties and charged 18% interest. Roseman was simply a lender. As the lender, Roseman did not solicit the prospective buyer, or have any contact with the buyer, except incidental contact. Roseman was present at the closing to get his loan repaid. The buyer was present to sign the loan papers and take custody of the property. There were 40 transactions of this type, and 20 of the transactions eventually went into foreclosure and/or a notice of lis pendins has been filed against the property.

Roseman was not a partner in the profit. Roseman would have actually made more interest income had the houses taken longer to sell to more qualified buyers

Overt Acts FFF - III concern a loan that Roseman made to Kudron. Kudron acquired the buyer, Belinda Scott. As alleged, Kudron submitted a loan application, which falsely reflected that Scott was employed by Mr. B's Construction. This was one of three properties that Scott and her husband purchased from Kudron. The buyer, Scott, falsely indicated that she was going to be the owner-occupant of the property, whereas the property was bought for investment purposes.

Overt Acts NNNN - OOOOO concern a property purchase by Ertha Dorsin. Roseman leant Kudron the money to buy the property. A HUD bid was submitted with Billy Dobbs, Co-Defendant Mimi Lawrence's husband as the "straw buyer." The property was in terrible condition; it needed a new roof. The property was not eligible for an FHA insured loan. It was not eligible for a federal 203K fix-up loan. Consequently, there was only one bid on the property, Roseman's bid. Any owner-occupant seeking to buy the property would have to pay cash for the property plus have cash for the repairs. No conventional lender would have given an owner-occupant a loan on the property, because it did not qualify for FHA insured financing.

After the property was rehabilitated, Kudron found the buyer, Dorsin. Kudron submitted a loan application that falsely reflected that Dorsin had approximately $5,000 in a bank account at First Union Bank. Obviously, the lender did not attempt to independently verify the bank account. If it had, it would have discovered that the bank account was non-existent.

### Group 5 –Roseman Lent Gordien the Money to Buy the Property

Roseman lent Mark Gordien the money to buy the properties and charged 18% interest. Roseman was simply a lender. He did not solicit the prospective buyer, or have any contact with

the buyer, except incidental contact. Roseman was present at the closing to get his loan repaid. There were 11 transactions of this type, and 2 of the transactions eventually went into foreclosure.

<u>Group 6- Roseman Gave Gordien a Shared-Appreciation Mortgage</u>

Roseman gave Gordien a shared-appreciation mortgage. This is a mortgage loan in which the lender participates in the profits the borrower receives when the property is sold. Roseman did not solicit the prospective buyer, or have any contact with the buyer, except incidental contact. Roseman was present at the closing to get his loan repaid. There were 19 transactions of this type and 7 of the transactions eventually went into foreclosure or have a notice of lis pendins filed against the property.

Overt Act CCCC concern a property purchased by Marc Gordien. Roseman gave Gordien a shared appreciation mortgage. Mr. Gordien submitted a loan application that falsely reflected that the buyer, Jackson, had approximately $4,300 in a bank account at Citizens Federal. Unindicted co-conspirator Mignon Lamar, the Barnett Bank Loan officer, accepted a photocopy of a phony bankbook as proof of the deposit. Again, the hand-written loan application reflected that the Barnett Bank loan officer, Mignon Lamar, obtain the information from Jackson via a face-to-face interview. This was not true. Again, the Bank did not independently check to see if Jackson had a bank account at Citizens Federal.

Overt Act DDDD concerns one of two properties purchased by Jackson. Roseman gave Gordien a shared appreciation mortgage so that he could purchase the property. Gordien obtained the buyer, Jackson. Gordien submitted a loan application that falsely reflected that Jackson had $6,000 in a bank account at NationsBank. The loan application reflected that the loan officer conducted a face-to-face interview with Jackson; this was not true. Again, the lender

did not independently check to verify if Jackson had a bank account at NationsBank.

Group 7 - Roseman Lent Lowe the Money to Buy the Property

Roseman lent James Lowe the money to buy the properties and charged 18% interest. Roseman was simply a lender; he did not solicit the prospective buyer, or have any contact with the buyer, except incidental contact. Roseman was present at the closing to get his loan repaid. There were 4 transactions of this type, and 2 of the transactions eventually went into foreclosure.

Group 8 - Roseman Gave Lowe a Shared-Appreciation Mortgage

Roseman gave Lowe a shared-appreciation mortgage. This is a mortgage loan in which the lender, in exchange for a loan with a favorable interest rate, participates in the profits the borrower receives when the property is sold. Roseman did not solicit the prospective buyer, or have any contact with the buyer, except incidental contact. Roseman was present at the closing to get his loan repaid.

The wholesale value of the property Roseman acquired and turned over to Lowe to rehabilitate and sell was greater than the purchase price suggested. This is important because Roseman feels that his share of the profit (typically $4,000) was similar to what he would have made by wholesaling the property to another investor like Lowe. Additionally he could have charged the full 18% interest had he been required to make the loan. In other words, **Roseman feels that he did not derive any additional financial benefit from Lowe's forging of loan documents and that Lowe was the primary beneficiary of the fraud** (emphasis added). Roseman can show many other examples of properties he has wholesaled.

There were 51 transactions of this type and 34 of the transactions eventually went into foreclosure or have a notice of lis pendins filed against the property.

Overt Acts DDD - EEE, concern a home sold to Maggie Laster. The nature of this transaction was a shared appreciation mortgage with Lowe. As alleged, Roseman caused to be submitted a HUD bid which reflected Michael Balboni as the owner-occupant. The property was sold "as is." The property was not eligible for FHA insured financing, because of its poor condition. The property was not eligible for a federal 203K loan for repairs. Thus, an owner-occupant would have to pay cash to purchase this property because no conventional lender would give a loan on a deteriorated piece of property ineligible for FHA insured financing.

After the property was rehabilitated, it was sold to Maggie Laster. Kudron acquired the buyer. A loan should have never been made to Laster. She was a school custodian. The lender allowed her to include in her qualifying income the foster care payments that she received for taking care of 7 foster care children. Her foster care payments increased her income to $2,376.00 per month, so long as the foster children were at her house. Her income of $2,376.00 per month income was supposed to support 8 people plus a mortgage payment. This was a foreclosure waiting to happen.

Overt Acts PPP - QQQ concern a property where Roseman and Kudron leant Lowe the money to purchase the property. They gave him a shared appreciation mortgage. Lowe found a buyer, Eddie Weaver. Lowe submitted a loan application that falsely reflected Weaver's income. Again, the lender never used the IRS 4506 form to verify Weaver's income. The income tax transcript would have been furnished within 10 working days and would have immediately detected the discrepancy in Weaver's claimed income.

Overt Acts RRR - TTT concern a property that Lowe purchased. Roseman gave him a shared appreciation loan. As alleged, Roseman submitted a contract to HUD that falsely reflected that William Cooper was purchasing the property. The property was in poor condition;

it needed a new roof plus other repairs. Because of the poor condition, the property did not qualify for FHA insured financing. Because of its poor condition, the property did not qualify for a federal 203K fix-up loan. The property was sold "as is." No owner-occupant was deprived of the property, because an owner-occupant would have had to pay cash for the property; no conventional lender would give a first-time HUD buyer a loan on this property, because it did not qualify for a FHA insured loan.

After the property was rehabilitated, it was sold to Ramon Elgue and Isabel Eiora. Lowe submitted a loan application, which falsely reflected Elgue's income. Again, the lender never used the IRS 4506 form to obtain income tax transcripts to verify Elgue's income, even though there was no charge and the information would be provided within 10 days.

Overt Acts EEEE - GGGG concern a property purchased by Lathon Miller. Roseman gave Lowe a shared appreciation mortgage to purchase the property. Lowe obtained the buyer, Miller. Lowe submitted a loan application that falsely reflected Miller's income. It appears that Miller had a towing business, but given that towing services are often paid in cash, Miller did not report all his income. Again, the lender did not use the IRS 4506 form to obtain Miller's income tax information to verify his income.

Overt Acts KKKK - MMMM concern a property purchased by Devon Fullerton. Roseman gave Lowe a shared appreciation mortgage so he could purchase the property. Lowe obtained the buyer, Fullerton. Lowe submitted a loan application that falsely reflected that Fullerton had approximately $11,800 in a bank account at First Nationwide Bank. Savings of America did what a bank is supposed to do; it made sure that the funds were on deposit. Savings of America denied the loan after it ascertained the irregularities regarding the bank account, and the buyer's social security number.

Thereafter Lowe submitted a loan application to Mortgage Dynamics that falsely reflected that Fullerton had approximately $12,000.00 in a bank account at First Nationwide Bank. Mortgage Dynamics, unlike Savings of America, did not attempt to verify the bank deposit. Nor did the loan officer, Evan Kaiser, properly verify Fullerton's income from Morton Roofing, because there are two verification of employment forms in the government's discovery that list different amounts of income. **Additionally, the loan should have never been made because the monthly payment exceeded $825, which was the most allowed per the debt to income ratio.** (emphasis added)

Overt Act SSSS concerns a property purchased by Johnnie Donfred. Roseman gave Lowe a shared appreciation mortgage to purchase the property. Lowe obtained a buyer, Donfred. Lowe submitted a loan application that falsely reflected that Donfred had $100,000.00 in his bank account at Savings of America. Donfred listed his occupation as a produce truck driver. **The lender never sought an independent verification from Savings of America to verify that this truck driver had $100,000.00 in his bank account.** (emphasis added)

The government has a tape recording of another person, who was not indicted, wherein that person confesses to falsely verifying the employment and income for Donfred.

### Group 9 – Roseman Found the Property and Was Paid a Finder's Fee

No loan was actually made by Roseman to Lowe. By the time Roseman was ready to close on the property, Lowe found a buyer, who assumed Roseman's contract. Roseman accepted a finder's fee for locating the property.

### Group 0 –Miscellaneous Transactions

This is an additional group of real estate transactions that the government contends that Roseman's involvement was mainly in the capacity of a lender, and these properties went into

foreclosure, or they had a notice of lis pendens filed.

Overt Act HHHH concerns a loan Roseman made to Leo Brovillette.   Brovillette obtained the buyer. Brovillette submitted a loan application that falsely reflected that the buyer had approximately $11,000 in a First Union Bank account. Again, the lender did nothing to independently verify the bank deposit.

Additionally, 15 of the 26 properties in Group 0 have not defaulted.

**The Banks' "Loss," or
How the Banks Gave Away the Properties
<u>After the Foreclosures to Get Out of the "Redline" Areas</u>**

The government wanted Roseman to be responsible for the losses reported by the banks/lenders, which amounted to about $2.8 million.  The Federal Reserve keeps track of each bank's loans in the "redline" areas, commonly referred to as CRA loan. The banks made their government mandated CRA loans. Once the banks got credit for their CRA loans, they did not want to give more mortgages in the "redline" areas. The banks made no real attempt to recoup their losses, or to mitigate their losses, or to get real value for the properties after the foreclosures by reselling the properties to new CRA borrowers.  Instead the banks let the properties become some other lenders headache; they wholesaled the properties to investors.

Instead of listing the foreclosed properties on the Multiple Listing Service, commonly referred to as the MLS, the banks, particularly SunBank, sold the properties to an <u>elite group</u> of investors for <u>ridiculously cheap prices</u>. Joseph Mondelli and Perry Frost were 2 of the insiders that made a 'killing' buying SunBank foreclosures. The insiders wholesaled the properties within a few days of the foreclosure sale to another investor for $7,000 to $20,000 profit, <u>or</u> they held the properties for a few months and sold them to new owner-occupants for much larger profits.

Nearly all the foreclosed properties bought after the foreclosure by other investors, like Frost, were resold for even more money than Roseman sold the properties for.

Before the foreclosure sale at the courthouse steps, SunBank gave instructions to its attorney to bid up to the amount of the full judgment. SunBank did not try to mitigate its "loss" through the competitive bid process. In fact there is one instance where a bank rejected a foreclosure bid of approximately $35,000 and resold it to one of its insider investors for about $7000. SunBank created its own "loss" in the amount of $28,000.

The following examples show banks "gave away" the foreclosed properties to other investors, instead of making new CRA loans:

   (1)    The property at 847 NW 2 Avenue, Fort Lauderdale sold for $64,000 with a $60,800 mortgage. The buyer gave the property back to the bank. **In August 1996, the bank sold it to Cohen for $20,000.** In September 1996, Cohen sold it to Green for $25,000. In September 1996, Green sold it for $85,000.

   (2)    The property at 1432 NW 5 Avenue, Fort Lauderdale sold for $82,000 with $77,900 mortgage. In September 1997, the bank sold the property to Drake for $50,000. That same month Drake sold the property to Clarke for $84,900 with an $80,600 mortgage.

   (3)    The property at 437 NW 14 Way, Fort Lauderdale sold for $45,000 with a $42,750 mortgage. **After the foreclosure, the bank sold the property to a new investor for $20,100, and he resold for $45,000.**

The above examples show the banks unloaded the properties for a fraction of their true value or market value. Yet, the government insisted that Roseman be penalized for the banks' "give-away" or "fire sale."

## When the Banks sold the Properties to
## New Owner-Occupants, the "Loss" was Significantly Less

When the banks sold their foreclosed properties to new owner-occupants, instead of investors, like Frost, the losses averaged about 13.08%. Using this figure to calculate the amount of the "loss," the "loss" fell from $2.4 million to about $1 million. No wonder the government did not want Roseman contesting the amount of the "loss."

1773 NE 50 St – Leo Brovillette was the seller. Roseman loaned him the money to buy the property. After the foreclosure, the property was sold directly to an owner-occupant, who obtained financing; the loss was only $10,150 (11.56%).

5901 NE 2 Ave. - After the foreclosure the property was sold directly to an owner-occupant, who obtained financing; therefore the loss was only $9,600 (11.26%).

2121 SW 1 Ct. - The original loan amount was $74,000. An owner-occupant bought the foreclosed property from the lender for $62,000. The loss was $12,000.

1517 NW 19 Ave. - The original loan amount was $77,900. After the foreclosure an owner-occupant bought the property for $68,000. The loss to the lender was $9,900 (12.7%).

5348 NE 2 Terr. - The original loan amount was $90,250. After the foreclosure, an owner-occupant bought the property for $77,900 from the bank. The loss to the bank was $12,350 (13.68%).

## Roseman Was Not an Leader and Organizer

The following example is vivid evidence that Roseman was not a "leader and organizer" as defined by the Guidelines. The losses from the 20 transactions in Group 4 (G4) amount to $497,803. Kudron probably netted $300,000 profit (i.e., about $15,000 per deal), whereas Roseman was paid $34,644 in interest. A "leader and organizer" of a criminal activity does not

make 1/10 the amount of money his underlings make. Yet, Roseman is considered by the government to be a "leader and organizer."

Roseman was not the leader of Marc Gordien, who was a real estate salesman in California when he moved to Florida. He soon began working as a realtor for McGee & Whiddon. Gordien heard from an associate that Kudron was successful in the business of rehabilitating and selling low-income housing. After several meetings it was verbally agreed that Kudron and Roseman would locate property for Gordien to rehabilitate and sell, and they would finance the project. Gordien would pay no interest to Roseman and Kudron. In exchange, Gordien would share the profit. Gordien was not bound by a contract. At anytime he desired, he would locate his own property and arrange his own financing through other lenders. Gordien was a smart businessman; he borrowed money from people other than Roseman on 26 occasions, because he wanted to build relationships with other lenders and he did not want to be obligated to share any part of other deals with Roseman or Kudron. A break down of Gordien's deals is as follows: There were 18 deals with Roseman and Kudron as 25% each partners.

There were 37 deals, which Gordien did as solo deals and kept 100% of the profit (11 with loans from Roseman at 18% loan and 26 with loans from either Hightower or Brad Emmer at 18%). **Gordien most likely made a net profit of approximately $555,000 from these 37 solo deals ($15,000 per deal), whereas Roseman made $19,000 in interest.** Gordien's net worth increased drastically from the approximately $40,000 that he had in the bank when he started. Soon after Gordien received a subpoena, he moved his family back to California where he went into partnership with his twin brother and sold houses. Gordien told Roseman in a November 1999 telephone conversation that most of the 20 houses they sold in California defaulted. Gordien was sentenced to 2 years in prison. (emphasis added)

### Restitution

In determining "actual loss," the victim cannot sell the property to an insider for below market value and thereby increase the amount of the "loss." When the bank/lender sold the properties on the "open market" after the foreclosure, the "loss" to the bank/lender was substantially less, usually in the $9000 to $12,000 range. Whereas, when the bank/lender sold the property to an "insider," the amount of the "loss" doubled and/or tripled. Besides doubling or tripling the amount of restitution, it substantially increased the potential sentence. In fraud cases, if the "actual amount of the loss" can be calculated, that amount controls.

The following samples of real estate transactions demonstrate Roseman's objections to the government's restitution calculation based on "loss."

1312 NE 1 St. – The loan did not default. Moreover, it was a loan that Roseman made himself.

1401 NE 15 Ave - The $19,104.92 loss to SunBank was incurred when another investor, not Roseman, sold the property and the buyer defaulted.

1621 NW 7 Terr. – Roseman had no financial involvement whatsoever. After the foreclosure a new investor bought the property from SunBank for $48,600 and resold it for $79,900.

5728 Wiley St. - Roseman was not involved in this transaction. Co-conspirator Gordien's father-in-law, William Hightower, loaned him the money to buy the property at the same rate as Roseman. Hightower loaned Gordien money on 18 other separate occasions, and 10 of the properties have gone into default.

1229 NW 1 Ave. - SunBank loaned Jimmie Murray $58,900. After the foreclosure, SunBank sold the property to RAJ Data for $41,300. RAJ Data sold it to a new owner-occupant for $79,900, which is $38,600 more than SunBank sold it for.

3165 NW 3 St. - After the foreclosure SunBank sold the property to Joe Mondelli for $31,500, and he immediately wholesaled the property to another investor, Danny Goldstein, for $51,000; thus, he made a profit of $19,500 the same day he bought it from the bank. Goldstein put approximately $5000 to $7000 in repairs to the property before reselling it 5 months later for $87,000. This is $55,500 more than SunBank sold it for.

**Given that punishment and restitution are linked directly to the "loss" calculation, it is easy to see why Roseman wanted to contest the "loss" calculation. Mondelli bought at least 32 properties from SunBank for approximately $1.2 million that he resold (sometimes the same day) for just over $2 million.** (emphasis added)

1231 NW 14 Ct. - SunBank loaned $75,525. After the foreclosure, SunBank sold the property to L & L Housing for $45,000. L & L resold the property 4 months later for $89,000. This was twice the amount SunBank sold it to the investor for.

1016 NW 6 Ave. - SunBank loaned $76,000. After the foreclosure, SunBank sold the property to Frost, one of the elite group that bought SunBank foreclosures. Frost bought the property from SunBank for $47,800. That same day, Frost sold the property to Carl Green for $57,000. Carl Green also sold it the same day for a staggering increase -- $89,000 -- with a $71,000 mortgage.

824 NW 15 AVE – SunBank loaned $58,900. After the foreclosure, SunBank sold the property to an investor for $29,800. He sold it to an owner-occupant for $85,000, which was almost 3 times what the bank sold it to the investor for.

204 NW 9 St. aka 844 NW 10 Terr. - Cohen purchased the property from Savings of America for $30,000. Cohen turned around and sold the property for twice what the bank sold it to him for.

1132 NW 7 Terr. – SunBank loaned $56,900. After the foreclosure SunBank sold it to CSG Development for $41,500, who sold it to an owner-occupant for $75,000, which was $33,500 more than SunBank sold it to the investor for.

1148 NW 16 Ct – The original loan was $85,500. After the foreclosure, the lending institution sold the property for $48,500 to a new investor, who resold it for $97,000, which was twice what the lending institution sold it to the investor for.

1245 NW 6 Ave – The original loan amount was $58,900. After the foreclosure a new investor bought the property for $38,000 and turned around and sold it for almost twice amount he bought it for.

1540 N. Andrews Ave. – The original loan amount was $83,600. After the foreclosure, Kudron re-purchased the property for $71,000. He borrowed the money from another investor, Brad Emmer. The property was sold for $97,000 with a $96,576 mortgage.

2855 NW 5 St – The original loan amount was  $58,900. **At the foreclosure sale SunBank turned down a cash offer of $36,000. Several months later SunBank sold the property to Horace Greeley III for $7,000. The property has subsequently sold for $56,000.** (emphasis added)

832 NW 15 Ave. - The original loan amount was $49,400. After the foreclosure the bank sold the property for $5,000.  The loss to the bank is $44,400. Roseman's only involvement in this deal was that he loaned Kudron $16,000 for the purchase and received  $402.39 in interest payments. ($16,000 x 18% = $7.89 per diem x 51).

500 NW 6 Ave. - The original loan amount was $64,600. After the foreclosure, the new investor resold the property for $77,000, which was $28,000 more than the bank sold it to the investor for.

5627 SW 26 St. - The original loan amount was $71,250. After the foreclosure the new investor resold the property for $87,000, which was $23,000 more than the bank sold it to him for.

109 SW 22 Ave. - The original loan amount was $70,300. After Lowe's buyer defaulted, Kudron bought it back from the lender for $55,000. Kudron resold the property for $82,000.

1091 Alabama Ave. - The original loan amount was $93,350. After the foreclosure, the new investor resold the property for $97,000.

1536 NW 15 Ave. - The original loan amount was $77,900. After the foreclosure the new investor bought the property for $55,000 and sold the property for $95,000, which was $40,000 more than the bank sold it to him for.

1606 NW 4 Ave. - The original loan amount was $85,500. After the foreclosure the new investor bought the property for $48,000 and sold the house for $93,000, which was $45,000 more than the bank sold it to him for.

1700 NW 15 Ave. - The original loan amount was $77,900. After the foreclosure the new investor bought the property for $50,000 and sold the property for $105,000, which was $45,000 more than the bank sold it to him for.

531 Alabama Ave. - The original loan amount was $85,954. After the foreclosure the new investor resold the property for $98,3000, which was $42,300 more than the bank sold it to him for.

Thus, assessment of restitution should take into account that the lenders purposely did not

mitigate their losses. Restitution should be assessed at a rate of between $9000 and $12,000 per property or an average of $10,500 per property.

### Money Laundering

Roseman, individually and/or his companies, received proceeds totaling approximately **$953,086** from all the real estate transactions from 1993 through 1996, including the transactions that have not defaulted. This amount excludes his money that was lent to buy the property.[1] Regarding the properties that defaulted, wherein the government has demonstrated criminal activity, Roseman received proceeds totaling approximately **$553,237**; again this amount excludes his money that was lent to buy the property.

### Lowe's Criminal Conduct After He Joined the Government's Team

After Lowe joined the government's team and became an informant, Lowe sold approximately 22 properties in Broward County and about 10 of those sales have defaulted. For a listing of those transactions see Exhibit B attached hereto and incorporated herein. Lowe's continued criminality should be taken into consideration in determining a proportionately just sentence for Roseman. Lowe received a sentence of 57 months. **It does not appear that his sentence was enhanced for his post-cooperation criminal conduct, as provided by the Guidelines.** (emphasis added)

### Co-Defendant Kudron's Sentence was Reduced Based on a Fiction

After Roseman plead guilty, the government filed a Rule 35 Motion seeking a reduction of Kudron's sentence on the grounds that he provided "substantial assistance" in the prosecution of Roseman. **The Government's Rule 35 motion clearly indicates that Kudron's prospective**

_____

[1] The same "seed" money was lent over and over again to buy the properties. For example, if a property was purchased for $50,000, when that property was sold the same $50,000 was used to buy another property.

testimony had a bearing on Roseman's decision to plead guilty. **Based on the fiction that Kudron was instrumental in Roseman's decision to plead guilty, which the Government knew was a fiction before it filed its Rule 35 motion to reduce Kudron's sentence, the Government allowed Kudron's sentence to be reduced from 60 months to 39 months. Apparently the Government did not inform the Court that the prospect of Kudron being a witness did not influence Roseman's decision to plead guilty.** (emphasis added)

### The Aleph Institute

Rabbi Sholom D. Lipskar of the Aleph Institute, a not-for-profit, national religious, educational, humanitarian and advocacy organization, was commissioned to review Roseman's situation and to make a recommendation. The Aleph Institute was founded in 1981 at the direction of Rabbi Menachem M. Schneerson, the Lubavitcher Rebbe, of blessed memory, the first religious leader to be awarded the Congressional Gold Medal of Honor, and headquartered here in Miami, Florida. Aleph's goal is to serve a pressing societal need by addressing significant issues relating to our criminal justice system. In furtherance of that mission, Aleph has created and implemented a host of programs over the past twenty years that are designed to rehabilitate offenders, counsel and assist them and their families, reduce necessary periods of incarceration and provide moral and ethical educational programs designed to inculcate universal truths and act as a preventative long-term solution to ameliorate society's criminal justice needs.

Aleph's innovative alternative sentencing concepts integrate educational and counseling programs that focus on moral and ethical teachings that are universal. The main goal is to transform improper perspectives to the right way, provide an opportunity for the restructuring of personal priorities and goals, and maintain the integrity of essential family ties while promoting deterrence through fostering respect for the criminal justice system. In most cases, intensive

instruction and counseling is combined with community service work performed in the surrounding area.

Aleph's programs have been recognized as effective in:

reducing recidivism, by providing "rehabilitation through education";

reducing ancillary societal costs resulting from stresses to the spouses, children and families of incarcerated persons, by providing needed educational and counseling services;

addressing jail population management, by providing workable alternatives to institutional incarceration; and

promoting respect for the law and deterrence, by designing innovative programs around the offender that helps inculcate universal values of ethics and morality to the widest possible audience in the offender's community.

Aleph's programs have been submitted to federal and state courts across the country. Indeed, with respect to Aleph and its many programs for persons facing sentencing, inmates and their families, Jack B. Weinstein, Senior Judge of the United States District Court for the Eastern District of New York, has publicly noted:

"The Aleph Institute is doing extraordinary fine work. Its . . . assistance to defendants and their families provide standards of compassion and aid worthy of emulation. . . . Aleph helps in three ways. First, it explains to judges and the judicial system when and how alternatives to prison, which protect the public, are possible. Second, it helps those in prison develop their spiritual lives and maintain contact with their families and the world beyond their bars and barbed wire. Third, it assists those outside, particularly the children of prisoners, to retain their ties with prisoners. As a result of its good work, Aleph is widely known and respected by penal and judicial authorities."

In this district, it has appeared before Senior Judges King, Kehoe, Gonzalez and Roettger, and Judges Hoeveler, Hurley, Rodriguez, Scott, Ungaro-Benages, Zloch, Seitz, Lenard and Gold.

The proposals prepared by The Aleph Institute are designed to redirect a person's entire value structure through social, therapeutic and religious counseling and education, together with substantive punishment. Every proposal submitted by it to the federal courts carefully considers

the factors outlined in 28 U.S.C. § 3553(a), including, but not limited to, "the history and characteristics of the defendant," id. at § 3553(a)(1), and the legislative directive to provide "correctional treatment in the most effective manner," Id. at § 3553(a)(1)(D). Moreover, it works to assist the Court in fashioning a particularized sentence "sufficient, but not greater than necessary, to comply with the purposes set forth" in the sentencing statute. 18 U.S.C. § 3553(a).

Aleph's multifaceted alternative sentencing proposals are consistent with sentencing goals of incapacitation, deterrence, punishment, restitution and rehabilitation, and are submitted on behalf of individuals who have demonstrated their capacity to reevaluate their lives, values and priorities and whose individual characteristics, including family responsibilities and otherwise, warrant consideration.

Rabbi Sholom D. Lipskar and Aleph's sentencing recommendation is:

Mr. Roseman is a 48-year-old father of two who immigrated to this country approximately 12 years ago from his birthplace in England to be with his ailing parents. He has resided in Broward County ever since. Mr. Roseman sold his share of a family-owned British jewelry business when he moved to Florida, and apparently has always been self-employed in this country in the real estate field, primarily loaning money and purchasing and selling real estate properties.

Mr. Roseman appears to have earned his living primarily by locating distressed properties in need of rehabilitation, and then locating, and loaning funds to, third parties who would repair the properties and share in whatever profits could be earned. In many cases, it appears that income was more reliably earned from interest generated on loans made to property owners.

Mr. Roseman appears to be an extremely bright, hardworking, personable individual who has extended himself to family, friends and even strangers. We understand that a number of individuals have taken the time and effort to write to Your Honor with testimonials to Mr. Roseman's character, good deeds and devotion to family and community.

In light of all this, it is difficult to understand how Mr. Roseman found himself embroiled in the offenses to which he has pleaded guilty. Certainly, it appears that, to some extent, he was working to assist first-time homebuyers to realize the dream of owning a home. It also appears that overzealous lending practices by

33

many banks eager to lend to previously-"redlined" areas may have also contributed to the circumstances.

None of these circumstances, of course, justifies illegal activities. Our recommendations attempt neither to excuse nor justify Mr. Roseman's past behavior, and are presented with full recognition of the serious nature of the crimes he committed. Specifically, we are informed that Mr. Roseman has pleaded guilty to conspiracy, in violation of 18 U.S.C. § 371, and making false statements to the U.S. Department of Housing and Urban Development, in violation of 18 U.S.C. § 1010. We understand that the Presentence Investigation Report computes a Total Offense Level of "36" under the Sentencing Guidelines. The plea agreement in this case does not provide any detailed analysis of Guidelines calculations for Mr. Roseman, but simply provides for an agreement that the sentence shall be a term of 84 months, but expressly provides that such sentence is not binding on the Court or the Probation Office.

However, we also understand that any Guidelines figure is based upon the Probation Department's calculation of loss, which we understand will be addressed by Mr. Williams at the hearing before Your Honor. We are also informed that, despite Mr. Roseman's plea and efforts to provide information to the Government, including his production of all business records in 1997 (long before the indictment) and his provision of a detailed written analysis of approximately 175 real estate transactions, he has been granted no adjustment by the Probation Office for acceptance of responsibility.

More important: we are not experts in the field of real estate, but understand that the principles of equity and fairness would dictate that Mr. Roseman's period of punishment should not substantially exceed that imposed on other individuals involved in this matter who appear to be far more culpable. Based on our review of Mr. Williams' Sentencing Memorandum, it appears that Mr. Roseman's ultimate role in the offense was, in almost all but 15 transactions, was simply as a lender (not a principal). Moreover, it appears that many other participants in this affair, whose offense conduct, according to the PSI itself, "is the same as noted in the instant offense," have received sentences far below what may be considered in Mr. Roseman's case.

Finally, our primary concern now is that Mr. Roseman's excellent rehabilitative progress to date, and his relationship with his wife and children, not be destroyed by an inordinate amount of incarceration. We respectfully submit that Mr. Roseman's problems reflected an obvious emotional and spiritual void. Rabbi Lipszyc informs me that Mr. Roseman now has appeared regularly for counseling and has made excellent progress in his ethical studies. Letters from the teachers of Mr. Roseman's young son, Ben, clearly indicate the psychological damage that an extended period of incarceration would likely create.

It is in light of all of the above that we submit this alternative sentencing proposal.

**The Aleph Institute's Alternative Punishment Proposal**

Confinement:  We propose a term of incarceration, equal to, but not greater, than the sentence imposed on individuals who appear equally, if not more, culpable, than Mr. Roseman in this matter.  We also propose a recommendation by this Court to the Federal Bureau of Prisons ("BOP") that Mr. Roseman be designated to FPC Miami, Florida.  Such designation would (1) allow Mr. Roseman contact with his wife and children, as well as rabbinical counseling from his rabbi and current counselor, Rabbi Lipszyc, and (2) allow Mr. Roseman a reasonable opportunity to exercise his religious needs as an observant Jew.  The BOP has just recently hired a full-time Chaplain/Rabbi (one of only four throughout the entire country) to service the needs of their population in Miami.  Such incapacitation seems adequate to send an appropriate message to his community as to the consequences of unlawful behavior, which will further the sentencing policy of deterrence.

Supervised Release:  Mr. Roseman will be required to serve three years of supervised release, which will include the other elements of our proposal as indicated below.

Education and Counseling:  Mr. Roseman must undergo 100 hours of ethical counseling to be provided by a professional Rabbi/counselor under Aleph's direction, stressing business ethics and the obligation strictly to adhere to the rule of law -- and the need to conduct one's affairs so as to avoid even the appearance of impropriety.

Financial Monitoring: We propose that, as part of this alternative punishment proposal, Mr. Roseman will submit during his period of supervised release to monitoring by an accounting firm approved by this Court.  This firm will supervise all of Mr. Roseman's financial activities for a period of three years and approve all expenditures over $1,000.00, thus furthering the sentencing goal of incapacitation and deterrence.

Community Service:  Mr. Roseman will be required to provide a total of 1,000 hours of community service to be performed during his three-year period of supervised release.  Such service may include menial labor, and can be provided as directed by The Aleph Institute under the supervision of the Probation Department for the Southern District of Florida.

Restitution: As we understand the application of the Sentencing Guidelines, restitution is mandated in this case for all amounts of loss ultimately determined by the Court to be attributable to Mr. Roseman.
Fines: In light of the restitution order that we are informed must be imposed by Your Honor, we agree with the Probation Department that it does not appear that

35

Mr. Roseman can pay a fine. We understand that a special assessment of $150 is mandatory, pursuant to 18 U.S.C. § 3013; and

Costs of Alternative Punishment Program: Mr. Roseman will be responsible to pay all costs involved in the design and implementation of this program.

We respectfully submit that such an alternative sentencing program would address the specific needs of Mr. Roseman, structured around his social and spiritual rehabilitation. It would also effectuate the purposes of and be consistent with sentencing goals enumerated in 18 U.S.C. § 3553 and would offer all of the benefits underlying a sound corrections policy while avoiding negative, harmful consequences to him and his family.

### Roseman's Character

Attached hereto as Exhibit C are numerous letters attesting to Roseman's character.

### CONCLUSION

If Roseman's guidelines are calculated per § 2S1.1(a)(1), he received accumulated proceeds in the amount of approximately **$553,237** from all the transactions wherein the government has established criminal activity, which is the perquisite for money laundering. His base level offense is 23, plus 3 levels for the amount of money he received, with no upward adjustment for being a leader, minus 3 levels for acceptance of responsibility equals a total offense level of 23. With a criminal history category I, **the recommended guideline range is 46-57 months.**

However, if the Court uses as its calculation the amount of **$953,086**, which is the accumulated proceeds from all the transactions, including those that did not default and in which there has been no showing of criminal activity, his base level offense is 23, plus 4 levels for the amount of money he received, with no upward adjustment for being a leader, minus 3 levels for acceptance of responsibility equals a total offense level of 24. With a criminal history category I, the recommended guideline range is 51-63 months.

Lowe continued his criminal conduct <u>after</u> agreeing to cooperate with the government, but the government did not move increase his sentence on this ground. Kudron's sentence was reduced from 60 months to 39 months per a legal fiction. Other putative defendants, like the banking officials, who were integral to the transactions, have gone unpunished. Even though their seal of approval was necessary for the loans to be given and even though they lied on bank loan applications, the government simply chose not to indict them; they are home safe in the suburbs. It is up to the Court to fashion an appropriate sentence.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of this document was mailed and faxed April 27 , 2001 to:

Jeffrey N. Kaplan, Esq.
Assistant United States Attorney
500 E. Broward Blvd., 7th floor
Fort Lauderdale, FL 33301

Edward Cooley
U.S. Probation Officer
299 E. Broward Blvd. #409
Fort Lauderdale, FL 33301

H. DOHN WILLIAMS JR. P.A.
799 Brickell Plaza, 9th floor
Miami, Florida 33131
954-523-5432; 305- 372-8038 (fax)


BY: _____
        H. Dohn Williams Jr.
        Fla. Bar #166087

# EXHIBIT A

| | ADDRESS | CAT. | BANK LOAN AMOUNT | BANK LOSS | BANK RESALE | WHOLESALE | RETAIL |
|---|---|---|---|---|---|---|---|
| 1 | | | | | | | |
| 2 | 1009 NW 4 AVE | GO | $42,000.00  NO INV/MT | $- | $44,000.00 | | $95,000.00 |
| 3 | 1018 NW 6 AVE | GO | $81,700.00 | $37,423.00 | | | $95,000.00 |
| 4 | 1211 S 24 TER | GO | $85,500.00 | $26,700.00 | $55,000.00 | | $99,000.00 |
| 5 | 1301 NW 2 AVE | GO | $85,500.00  LIS PENDING | $27,360.00 (loss calc 32%) | | | |
| 6 | 1312 NE 1 ST | GO | $56,513.00  MY LOAN!! | $- | | | |
| 7 | 1401 NW 15 AVE | GO | $58,900.00  NO LOSS | $- | | | |
| 8 | 1417 NW 4 AVE | GO | $76,950.00  NO LOSS | $- | | | |
| 9 | 1501 NW 8 AVE | GO | $94,000.00 | $38,000.00 | $56,000.00 | | |
| 10 | 1612 NW 6 AVE | GO | $79,200.00  LIS PENDING | $25,344.00 (loss calc 32%) | | | |
| 11 | 1621 NW 7 TER | GO | $76,000.00  NO INV/LMT | $- | $48,600.00 | $52,000.00 | |
| 12 | 1726 NW 9 AVE | GO | $72,650.00 | $12,650.00 (17.4%) | $60,000.00  with Fin. | | $79,900.00 |
| 13 | 1773 NE 50 ST | GO | $75,050.00 | $10,150.00 | $64,900.00 | | |
| 14 | 2336 NW 15 CT | GO | $68,400.00  NO LOSS | $- | | | |
| 15 | 2342 RALEIGH ST | GO | $49,400.00  NO LOSS | $- | | | |
| 16 | 2830 NW 12 CT | GO | $89,100.00  NO LOSS | $- | | | |
| 17 | 2911 NW 24 CT | GO | $58,900.00  NO LOSS | $- | | | |
| 18 | 39 NEWTON RD | GO | $79,800.00  NO LOSS | $- | | | |
| 19 | 4021 SW 26 ST | GO | $74,000.00  NO LOSS | $- | | | |
| 20 | 5606 BRANCH ST | GO | $74,100.00  NO LOSS | $- | | | |
| 21 | 5616 SW 20 ST | GO | $75,000.00  NO LOSS | $- | | | |
| 22 | 5638 (5640) SW 26 ST | GO | $69,800.00  NO LOSS | $- | | | |
| 23 | 5728 WILEY ST | GO | $74,100  NOT MY LOAN | | | | $88,000.00 |
| 24 | 5901 NE 2 AVE | GO | $85,500.00 | $9,600.00 (11.26%) | $75,900.00  with Fin. | | |
| 25 | 6316 POLK ST | GO | $72,200.00  NO LOSS | $- | | | |
| 26 | 6812 SW 22 ST | GO | $76,500.00  NO LOSS | $- | | | |
| 27 | 961 E DAYTON CIR | GO | $91,200.00  NO LOSS | $- | | | |
| 28 | 1212 NW 13 CT | G1 | $66,500.00 | $24,350.00 | $42,150.00 | | $75,000.00 |
| 29 | 1229 NW 1 AVE | G1 | $58,900.00 | $17,600.00 | $41,300.00 | | $79,900.00 |
| 30 | 1231 NW 14 CT | G1 | $75,525.00 | $30,525.00 | $45,000.00 | | $89,000.00 |
| 31 | 3165 NW 3 ST | G1 | $66,500.00 | $35,000.00 | $31,500.00  1/28/97 | $51,000.00  1/29/97 | $87,000.00 |
| 32 | 428 SW 24 AVE | G1 | $74,100.00 | $20,100.00 | $54,000.00 | | $86,900.00 |
| 33 | 1016 NW 6 AVE | G2 | $76,000.00 | $28,200.00 | $47,800.00  5/21/97 | $55,000.00  5/21/97 | $89,000.00  5/21/97 |

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 34 | 104 NE 5 ST | G2 | $76,500.00 | $25,600.00 | $50,900.00 | | |
| 35 | 1117 NW 3 AVE | G2 | $70,300.00 | $28,470.00 | $35,500.00 | | $84,000.00 |
| 36 | 1432 NW 5 AVE | G2 | $77,900.00 | $27,900.00 | $50,100.00 | | $84,900.00 |
| 37 | 204 NW 9 ST | G2 | $32,000.00 | $2,000.00 | $30,000.00 | | $60,000.00 |
| 38 | 3709 SW 13 CT | G2 | $71,932.00 | $28,932.00 | $43,000.00 | | N/A |
| 39 | 437 NW 14 WAY | G2 | $42,750.00 | $22,650.00 | $20,100.00 | | $45,000.00 |
| 40 | 627 NW 9 AVE | G2 | $54,150.00 | $26,150.00 | $28,000.00 | | N/A |
| 41 | 847 NW 2 AVE | G2 | $60,800.00 | $40,800.00 | $20,000.00 | | $85,000.00 |
| 42 | 1106 NW 14 ST | G3 | $75,000.00 | $- | $81,500.00  at courtsale | | |
| 43 | 1137 NE 1 AVE | G3 | $79,800.00 | $23,800.00 | $56,000.00 | | $79,000.00 |
| 44 | 1146 NW 19 CT | G3 | $78,850.00 | $25,232.00  (loss calc 32%) | UNSOLD | | |
| 45 | 1161 ARIZONA AVE | G3 | $87,400.00 | $18,200.00 | $69,200.00 | | $90,000.00 |
| 46 | 1205 NW 3 AVE | G3 | $90,250.00 | $41,250.00 | $49,000.00 | | $90,000.00 |
| 47 | 1213 NW 18 CT | G3 | $83,600.00 | $23,600.00 | $60,000.00 | | $94,900.00 |
| 48 | 1428 NW 4 AVE | G3 | $73,150.00 | $25,150.00 | $48,000.00 | | $95,000.00 |
| 49 | 1620 NW 5 AVE | G3 | $74,100.00 | $29,600.00 | $44,500.00 | $52,300.00 | |
| 50 | 2321 NW 14 ST | G3 | $75,950.00 | $29,950.00 | $36,000.00 | | $42,500.00 |
| 51 | 424 SW 24 AVE | G3 | $79,800.00 LIS PENDINS | $29,536.00 (loss calc 32%) | | | |
| 52 | 824 NW 15 AVE | G3 | $58,900.00 | $29,100.00 | $29,800.00 | | $85,000.00 |
| 53 | 841 NW 19 AVE | G3 | $58,900.00 | $22,900.00 | $36,000.00 | | $72,000.00 |
| 54 | 1100 NW 19 ST | G4 | $76,000.00 | $21,000.00 | $55,000.00 | | $87,900.00 |
| 55 | 1120 NW 17 AVE | G4 | $81,953.00 | $31,953.00 | $50,000.00 | $57,000.00 | N/A |
| 56 | 1132 NW 7 TER | G4 | $56,900.00 | $15,400.00 | $41,500.00 | | $75,000.00 |
| 57 | 1146 NW 16 CT | G4 | $85,500.00 | $37,000.00 | $48,500.00 | | $87,000.00 |
| 58 | 1164 ARIZONA AVE | G4 | $86,400.00 | $20,400.00 | $66,000.00 | | $98,000.00 |
| 59 | 1245 NW 6 AVE | G4 | $58,900.00 | $20,900.00 | $38,000.00 | | $74,500.00 |
| 60 | 1409 NE 3 AVE | G4 | $78,200.00 | $22,700.00 | $55,500.00 | $59,000.00 | N/A |
| 61 | 1441 N ANDREWS | G4 | $77,400.00 | $17,400.00 | $60,000.00 | | N/A |
| 62 | 1540 N. ANDREWS AVE | G4 | $83,600.00 | $11,700.00 | $71,900.00 | | $97,000.00 |
| 63 | 1600 NW 4 AVE | G4 | $76,000.00 | $20,000.00 | $56,000.00 | | $88,900.00 |
| 64 | 1612 NE 15 AVE | G4 | $79,800.00 | $12,200.00 | $67,600.00 | $74,500.00 | $90,000.00 |
| 65 | 1624 NW 2 AVE | G4 | $74,100.00 | $18,100.00 | $56,000.00 | | $90,100.00 |
| 66 | 1712 SW 44 TER | G4 | $52,250.00 | $20,250.00 | $32,000.00 | | $60,200.00 |

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 67 | 1818 SW 30 TER | G4 | $84,550.00 | $39,050.00 | $45,500.00 | | $93,000.00 |
| 68 | 2704 NW 7 ST | G4 | $61,750.00 | $20,750.00 | $41,000.00 | | $76,000.00 |
| 69 | 2855 NW 5 ST | G4 | $58,900.00 | $51,900.00 | $7,000.00 | | $70,000.00 |
| 70 | 3460 BERKELEY BL | G4 | $74,100.00 | $21,100.00 | $53,000.00 | | $81,000.00 |
| 71 | 3801 NW 7 CT | G4 | $68,400.00 | $21,400.00 | $47,000.00 | | $82,000.00 |
| 72 | 4050 SW 19 ST | G4 | $72,200.00 | $30,200.00 | $42,000.00 | $52,000.00 (INVESTOR) | KEPT AS RENTAL |
| 73 | 832 NW 15 AVE | G4 | $49,400.00 | $44,400.00 | $5,000.00 | | N/A |
| 74 | 2121 SW 1 CT | G5 | $74,000.00 | $12,000.00 (16.21%) | $62,000.00  with Fin. | | |
| 75 | 3920 SW 59 TER | G5 | $73,150.00 | $16,150.00 | $57,000.00 | | $73,000.00 |
| 76 | 107 MARION RD | G6 | $85,838.00 | $23,138.00 | $62,700.00 | | $84,800.00 |
| 77 | 1705 RODMAN ST | G6 | $81,700  NO LOSS | $- | | | |
| 78 | 242 SW 15 ST | G6 | $72,200  LIS PENDINS | $23,104.00 (loss calc 32%) | | | |
| 79 | 2628 FLETCHER ST | G6 | $78,850.00 | $24,350.00 | $54,500.00 | | $80,000.00 |
| 80 | 3650 SW 12 PL | G6 | NO DATA | NO DATA | $38,000.00    4/30/98 | $53,000.00    4/30/98 | $86,000.00 |
| 81 | 500 NW 6 AVE | G6 | $64,600.00 | $15,600.00 | $49,000.00 | | $77,000.00 |
| 82 | 5627 SW 26 ST | G6 | $71,250.00 | $16,750.00 | $54,500.00 | | $87,000.00 |
| 83 | 1304 NW 1 AVE | G7 | $68,550.00 | $29,550.00 | $39,000.00 | | $54,800.00 |
| 84 | 1650 NW 1 WAY | G7 | $90,250.00 | $30,150.00 | $60,100.00 | | $79,900.00 |
| 85 | 1001 ALABAMA AV | G8 | $93,916.00 | $20,916.00 | $73,000.00 | | $94,000.00 mtg |
| 86 | 1033 NW 4 AVE | G8 | $82,600.00 | $19,100.00 | $63,500.00 | | $96,000.00 |
| 87 | 1041 NW 7 TER | G8 | $78,850.00 | $36,850.00 | $42,000.00 | $55,000.00 | $110,000.00 |
| 88 | 109 SW 22 AVE | G8 | $70,300.00 | $15,300.00 | $55,000.00 | | $82,000.00 |
| 89 | 1091 ALABAMA AVE | G8 | $93,350.00 | $24,850.00 | $68,500.00 | | $97,000.00 |
| 90 | 1118 NW 8 AVE | G8 | $89,100.00 | $23,100.00 | $66,000.00 | | $85,000.00 |
| 91 | 1133 NE 1 AVE | G8 | $83,600.00 | $30,600.00 | $53,000.00 | | $79,900.00 |
| 92 | 1217 NW 5 AVE | G8 | $79,200.00 | $37,700.00 | $41,500.00 | | $71,500.00 |
| 93 | 1217 NW 6 AVE | G8 | $83,600.00 | $- | $83,600.00 | | $86,000.00 |
| 94 | 1342 NE 7 AVE | G8 | $81,000.00 | $28,000.00 | $53,000.00 | | N/A |
| 95 | 1401 NW 15 AVE | G8 | $71,250.00 | $18,750.00 | $52,500.00 | | $82,500.00 |
| 96 | 1517 NW 19 AVE | G8 | $77,900.00 | $9,900.00  (12.7%) | $68,000.00  with Fin. | | $82,000.00 |
| 97 | 1525 NW 4 AVE | G8 | $74,100.00 | $25,600.00 | $48,500.00 | | N/A |
| 98 | 1536 NW 15 AVE | G8 | $77,900.00 | $22,900.00 | $55,000.00 | | $95,000.00 |
| 99 | 1606 NW 4 AVE | G8 | $85,500.00 | $37,500.00 | $48,000.00 | | $93,000.00 |

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 100 | 1637 NW 4 AVE | G8 | $70,300.00 | $25,300.00 | $45,000.00 | | $93,000.00 |
| 101 | 1671/73 SW 44 AV | G8 | $80,750 | $30,850.00 | $49,900.00 | | $86,981.00 MTG |
| 102 | 1700 NW 15 AVE | G8 | $77,900.00 | $17,900.00 | $60,000.00 | | $105,000.00 |
| 103 | 1736 SW 44 AVE | G8 | $81,000.00 | $39,000.00 | $42,000.00 | | N/A |
| 104 | 2129 MADISON ST | G8 | $164,000.00 | $81,000.00 | $83,000.00 | | N/A |
| 105 | 2233 MADISON ST | G8 | $184,500.00 | $76,500.00 | $108,000.00 | | $144,500.00 |
| 106 | 2310 NW 23 LN | G8 | $69,350.00 | $21,850.00 | $47,500.00 | | N/A |
| 107 | 2840 NW 12 CT | G8 | $81,000.00 | $27,500.00 | $53,500.00 | | |
| 108 | 3140 NW 14 ST | G8 | $67,450.00 | $13,450.00 | $54,000.00 | | N/A |
| 109 | 501 NW 8 AVE | G8 | NO SUCH ADDRESS | | | | |
| 110 | 531 ALABAMA AVE | G8 | $85,954.00 | $29,954.00 | $56,000.00 | $67,000.00 | $98,300.00 |
| 111 | 5320 NE 9 AVE | G8 | $69,350.00 | $19,750.00 | $49,600.00 | | N/A |
| 112 | 5348 NE 2 TER | G8 | $90,250.00 | $12,350.00  (13.68%) | $77,900.00 with Fin. | | N/A |
| 113 | 827 NE 14 CT | G8 | $75,000.00 | $19,800.00 | $55,200.00 | | $90,000.00 |
| 114 | 1045 NW 2 AVE | G9 | $70,450.00 | $15,450.00 | $55,000.00 | | $100,000.00 |
| 115 | 1100/02 NW 3 AVE | G9 | $68,500.00 | $16,400.00 | $52,100.00 | | N/A |
| 116 | 1341 NE 7 AVE | G9 | $87,900.00 | $10,500.00 | $77,400.00 | | $89,000.00 |
| 117 | 1343 NE 7 AVE | G9 | $81,000.00 | $29,500.00 | $51,500.00 | | N/A |
| 118 | 2441/45 ADAMS ST | G9 | $179,550.00 | $83,550.00 | $96,000.00 | | $170,000.00 |
| 119 | | | $7,258,591.00 | $2,450,087.00 | | | |

# EXHIBIT B

CHART LOWE.xls

| | A | B | C | | D | E |
|---|---|---|---|---|---|---|
| | ADDRESS | BUYER - MTG CO. | BOUGHT | - SOLD | PRIV LENDER | STATUS |
| 1 | | | | | | |
| 2 | 450 NW 30 AVE | WRIGHT - DMR | 2/97-$32,000 - 6/97-$75,000 | | BUD FEIN | FORECLOSED |
| 3 | 1133 NE 16 TER | POSEY - DELMAR | 11/97 - 12/97-$143,000 | | | |
| 4 | 4866 NE 14 TER | ORTEGA | 3/97-$53,000 - 6/97-$75,000 | | BUD FEIN | |
| 5 | 3480 NW 5 CT | LOTT - DMR | 11/97-$30,000 - 2/98-$75,000 | | CACCIATORE | |
| 6 | 1341 N 65 TER | WYATT - HOMECOMINGS | 4/28/97-$62,500 -4/29/97-$99,000 | | NO LOAN | |
| 7 | 2240 MC CLELLAN ST | BRYANT - DMR | 3/97-$31,000 - 5/97-$58,000 | | BUD FEIN | LIS PENDINS |
| 8 | 3070 NW 17 ST | ST AUBURN - DMR | 1/97-$32,000 - 4/97-$65,000 | | BUD FEIN | FORECLOSED |
| 9 | 4031 NE 4 AVE | TRAVIS - DMR | 3/97-$60,000 - 6/97-$100,000 | | BUD FEIN | FORECLOSED |
| 10 | 2345 NW 13 CT | THOMPSON - HOMECOMINGS | 6/97-$32,000 - 8/97-$50,000 | | BUD FEIN | |
| 11 | 3410 NW 33 CT | PRYCE - DMR | 2/97-$52,000 - 7/97-$88,000 | | BUD FEIN | |
| 12 | 2780 NW 15 CT | KELLEY - DMR | 5/97-$11,500 - 12/97-$50,000 | | BUD FEIN | |
| 13 | 2731 NW 9 CT | JANICE FULLWOOD - DMR | 1/97-$30,000 - 5/97-$65,000 | | BUD FEIN | FORECLOSED |
| 14 | 3412 NW 43 PL | WALKER - N. AMERICAN MTG | 8/97-$55,000 - 10/97-$122,000 | | BUD FEIN | |
| 15 | 441 NW 1 WAY | FOWLER - DMR | 4/97-$38,000 - 9/97-$75,000 | | BUD FEIN | LIS PENDINS |
| 16 | 208 NW 28 AVE | COPELAND - DMR | 2/98-$49,000 - 8/98-$65,000 | | BUD FEIN | |
| 17 | 4032 SW 52 ST | BOIS - FLORIDA'S BEST MTG | 8/97-$59,000 - 5/98-$97,000 | | BUD FEIN | |
| 18 | 390 NE 31 CT | LUCIEN - DMR | 7/97-$61,000 - 3/98-$84,400 | | BUD FEIN | |
| 19 | 2250 NW 27 ST | SMITH - DMR | 10/97-$44,000 - 3/98-$88,900 | | BUD FEIN | FORECLOSED |
| 20 | 2110 MONROE TER | FLANDERS - BANCPLUS HOME | 11/98-$39,400 - 3/99-$72,000 | | BUD FEIN | |
| 21 | 1106 NW 7 TER | WITHERSPOON - IRWIN MTG | 4/99-$42,000 - 5/99-$56,500 | | BUD FEIN | FORECLOSED |
| 22 | 418 E. EVANSTON CIR | LEWIS - ADVANTAGE FIN. | 9/96-$62,200 - 11/96-$105,000 | | BUD FEIN | LIS PENDING |
| 23 | 2120 NW 64 TER | LENEUS - RESOURCES BANC. | 10/96-$64,200 - 11/96-$105,000 | | BUD FEIN | FORECLOSED |

# EXHIBIT C

Ft Lauderdale
FL 33308
3.24.2001

To the Honourable
Paul. C. Huck.

Dear Sir

Re Mark Roseman.

With regard to the above person, I first met Mark Roseman through my wife's friendship with his wife Lyn Roseman, who met about eight years ago when his son Ben and my daughter Emma were two years old. They have been friends ever since, seeing each other for social events connected with our children.

On December 29th 1997 my daughter Emma was critically injured in a accident at a local cinema. I have enclosed 2 brief doctors reports as it distresses me even reviewing the events in a letter. On the day I arrived at the emergency room, Lyn Roseman was there, she spent the whole evening and the early hours of the following day helping and comforting myself and my wife Ursula. In the most critical hours prior to Emma's surgery when the Doctors were explaining her injuries, Lyn Roseman was by my side the whole time and never left. The following day Mark Roseman came to the hospital and spent the whole day with

... myself helping me. The following day he offered to drive me to Miami airport to pick up my son, who was flying in and had no idea of what had happened until we arrived at the hospital. He spent the day helping me and later in the afternoon spent that time with my son Neil who had become very distressed. My daughter Emma was in a coma for about 8 days, it seemed like 8 months, after she came out of her coma it became clear that she would recover. 3 weeks after, she left hospital, we regard it as a miracle.

In that time Mark and Lyn Roseman were there every day and evening helping us in the family room, I later found out that each afternoon Mark would leave the hospital in the afternoon to pick up his son from school, he would then go home and take care of both his son and daughter for the evening, to enable his wife Lyn to stay at the hospital.

When this tragedy happened, dozens of people in the local community showed a degree of kindness, concern and help towards my family that even today we still can not yet over. Mark and Lyn Roseman were two of those people. they came to our help and never gave up hope that Emma would

recover. Mark spent hours each day with me, mostly walking hospital corridors, helping me in the most distressing times imagineable. When Emma came home, Mark and Lyn would come and visit, and on several occasions after. Mark would phone me and ask after Emma and how I was.

Your honour, I am writing this letter to give you my knowledge and experience of Mark and Lynn Roseman, two people who, on hearing of our daughters injuries, stopped what they were doing, and in effect gave up 2 weeks of their lives to come and help us in the worst event of my life. We will never forget what they did for us.

Yours
Respectfully

Roger Dunning

Ursula Dunning.

Rm: PICUPICU02

**DUNNING, EMMA**                    **JOSEPH A. LA SPADA, M.D.**
**MR# 836740**

**Date of Consultation:** 12/29/97
**Attending Physician:** JULIE LONG, M.D.

I was called to the Emergency Room for this seven-year-old female who was admitted as a trauma alert after while playing at the cinema at the Galleria and swinging on a concrete divider, the divider fell on her and crushed her chest and neck. The patient never lost consciousness, however, took some time before the object could be removed. 911 was called and the patient was brought to the Emergency Room at Broward General Medical Center.

In the Emergency Room, the patient was noted to have severe subcutaneous emphysema and in moderate respiratory distress with some grunting respirations. Chest x-ray showed the presence of right and left pneumothoraces. Dr. Guarneri placed a 10 French Argyle chest tube in the right chest. After this, the patient's condition deteriorated and the patient was beginning to have difficulty moving air through her airway.

As a result, decision was made to intubate the patient. After the anesthesiologist arrived, decision was made to bring the patient to the Operating Room in case of the need of urgent tracheostomy. In the Operating Room, the patient was intubated without difficulty by the anesthesiologist. Afterwards, I placed an 8.5 pigtail "Ferman" catheter in the chest with return of air and improvement of SP02 to 100 from 70s.

The patient was transported to the CT scan suite. CT scans of the head and neck, chest, and abdomen were performed. The CTs of the head were unremarkable except for the presence of severe subcutaneous emphysema. Also the neck CT was unremarkable except for subcutaneous emphysema, however, the CT scan of the chest showed the presence of large bilateral pulmonary contusions. There were no fractured ribs noted and CT of the abdomen showed the presence of a hepatic contusion.

The patient was transported then to the Pediatric Intensive Care Unit for further management. The patient at that time had an SIMV volume control with tidal volumes of 250, PEEP of 6, and respiratory rate of 20. The patient was stable on that rate, however, after Dr. Long arrived, decision was made to perform bronchoscopy to look for the possibility of tears in the trachea and bronchus. On bronchoscopy, Dr. Long noted a tear at the level of the junction of the right main stem bronchus and the trachea near the carina.



**Broward General Medical Center**
**Fort Lauderdale, Florida**

**Consultation Report**
**1 of 4**

**Original**

Rm: PICUPICU02

**DUNNING, EMMA**
**MR# 836740**

**JOSEPH A. LA SPADA, M.D.**

suture lines and to promote healing of of the tear.  The patient will be placed NPO, placed on Norcuron drips, as well as Fentanyl drips with doses of Ativan to be given q. four hours.  This patient is in extremely grave condition and I will help manage with Dr. Julie Long.

cc:   JOSEPH A. LA SPADA, M.D.
      JULIE LONG, M.D.

_____
JOSEPH A. LA SPADA, M.D.

JL:19  8626
d: 12/30/97
t: 12/30/97 12:34 P

**Broward General Medical Center**
**Fort Lauderdale, Florida**

**Consultation Report**
**4 of 4**

**Original**

DUNNING, EMMA                          ROOM
MR# 836740                        JULIE LONG, M.D.

DATE OF ADMISSION:  12/29/97
DATE OF DISCHARGE:  01/12/98

**HOSPITAL COURSE:**  This seven-year-old girl was brought into the hospital as a pediatric trauma after a heavy object fell on her at a movie theater. When she presented to the emergency room, she was able to talk but she had respiratory distress with subcutaneous emphysema up to her midface and severe dysphonia.

She was initially evaluated by Dr. Guarneri and Dr. La Spada and I saw her after she had come up to the Pediatric Intensive Care Unit. Initial evaluation included a CT Scan of the neck and chest which revealed massive subcutaneous emphysema. She had bilateral chest tubes. The airway was secured in the operating room by Dr. Guarneri.

I performed a flexible bronchoscopy on her the night of admission. This revealed a tear in her right mainstem bronchus. She was taken to the operating room the evening of 12/29/97 and surgery extended over to the morning of 12/30/97. She was found to have a tear of her membranous trachea that extended across the right mainstem bronchus to the carina and over to the left mainstem bronchus.

She was unstable during the latter part of the operation and postoperatively had marked respiratory difficulty characterized by an inability to ventilate the patient. She had extremely high CO2's.

Dr. La Spada, who had been consulted prior to her trip to the operating room, and assisted in the initial management, tried several ventilators and finally put her on a Bunnell ventilator and with this he was able to finally ventilate her with a resolution of her marked hypercapnia and acidosis.

For the next week, she was relatively stable and kept paralyzed and sedated. She had resolution of her subcutaneous air, sealing of her air leak, and resolution of her pulmonary contusions. A week after the initial admission, she underwent a flexible bronchoscopy again in the PICU.

This showed the suture line with no evidence of leak. There was no bubbling to the chest tubes. After this time, the patient was allowed to wake up from her paralysis. She had previously been weaned off the jet ventilator a couple days prior to the bronchoscopy.

**BROWARD GENERAL MEDICAL CENTER**              **DISCHARGE SUMMARY**

**FORT LAUDERDALE, FLORIDA**                       **PAGE ONE**



Rm: PICUPICU02

**DUNNING, EMMA**                              **JULIE LONG, M.D.**
**MR# 836740**

**IMPRESSION:**
Crush injury to the upper torso.

In the ICU I performed flexible bronchoscopy and this revealed a
laceration to the membranous portion of the right main stem bronchus.
For this reason I have recommended to the parents emergent thoracotomy
for repair of this injury. I have discussed the lifethreatening nature
of her injuries with them.

cc:  HOWARD S GILL, M.D.
     STEVEN B. ISKOWITZ, M.D.
     JOSEPH A. LA SPADA, M.D.
     JULIE LONG, M.D.

                                        _____
                                        JULIE LONG, M.D.

JL:bb  8616
d: 12/29/97
t: 12/30/97  6:23 A

**Broward General Medical Center**              **History and Physical**
**Fort Lauderdale, Florida**                               **3 of 3**
                    Original

# ALLIED REALTY & MORTGAGE

18083 Clear Brook Circle
Boca Raton, FL 33498-1941

Phone 561-488-3236
Fax 561-488-9614

Licensed Mortgage Brokerage Business
Licensed Real Estate Brokerage Business
Myer T. Berkowitz, Lic. Real Estate and Mortgage Broker

March 12, 2001

To: Hon. Paul C. Huck

Dear Judge Huck:

I have known Mark Rosema ~~DOWN'~~ e years.
I have relied on him more tha ~~Your Choice !!~~ he has
always been there for me.

I have twice been a day not
dunned me for a late charge. d as a
money-hungry thief, I know th

In recent years, Mark ha He has
shown me that he is very diff e troubled
years in the early 90's.

Therefore, I personally ; entire
man. Perhaps someday we can a t they
once were, but by what they have become.

Very truly yours,

Myer T. Berkowitz

B"H

# CHABAD LUBAVITCH

## FORT LAUDERDALE

3500 N. Ocean Blvd. • Fort Lauderdale, FL 33308 • Tel: (954) 568-1190 • Fax: (954) 566-0450 • E-Mail: CHABADGALT@AOL.COM

Rabbi Moishe Meir Lipszyc
Chabad Lubavitch of Fort Lauderdale
3500 North Ocean Boulevard
Fort Lauderdale, Florida 33308

March 14, 2001

Dear Judge Huck,

This letter is the hardest letter I ever had to write in my life, but because I know the real Mark I am going to try to write a letter regarding Mr. Roseman, a man I respect, a man I look up to, a man I love and Cherish his friendship and advice.

My name is Rabbi Moishe Meir Lipszyc, I am the Rabbi of Synagogue Ben Ish Chai, Executive Vice president of Chabad Lubavitch of Greater Fort Lauderdale, and Founder of Chabad Torah Center Downtown Fort Lauderdale.

I met Mark Roseman ten and a half years ago, the first week that I moved to Fort Lauderdale. When we met he was not keen on meeting me, not knowing what I wanted. He hesitated meeting me and by the time we walked out after a four and half hour meeting a lifelong friendship had started. One, which I cherish to this day.

I will not be able to go into all the details of the phenomenal person he is for three reasons:

1. Words are limitations, what kind of great person he is.

2. There is not enough paper in this world.

3. He has asked me to promise him many years ago that all his work for a fellow human being should not be publicized.

So therefore I will only say one thing, there was never a time that I remember when he was asked to help somebody or to go visit elderly people in the old age home or people in the hospital or even to pick up a small thing the Synagogue needed or to drop off something to make a function nicer. He is always there even when everybody left he would always be the one to stay behind to make sure the place was spotless and ready for the next morning.
On a personal note he was always for me. When he found out I had a tumor and I have a very difficult time with my twins that are developmentally and physically delayed, he had an ear to listen and a shoulder to lean on. In short he is the kind of person you can't find these days.

---

**DIRECTOR**
Rabbi Moishe M. Lipszyc

**SPECIAL PROJECTS**
Mendy Wilhelm

B"H

# CHABAD LUBAVITCH

## FORT LAUDERDALE

3500 N. Ocean Blvd. • Fort Lauderdale, FL 33308 • Tel: (954) 568-1190 • Fax: (954) 566-0450 • E-Mail: CHABADGALT@AOL.COM

I can keep going and going, never and end to what he does. I will just tell you there are many different types of people. There are those that when they do something they want their name all over, some give charity with no personal involvement, and those people that have personal involvement and give no money.

Mark Roseman is a person that does not look for honor. A person who stays behind the scenes, sits in the rear of the Temple, stays to help cleanup, helps people find a seat or whatever they need.

You cannot find a person like him. Based on that plus what the Bible tells us "an eye for an eye" punishment has to fit the crime. By putting him in an institution is not appropriate.

Based on that I am asking Your Honor, he should please be put on probation, plus make any financial restitution required. Plus due to the fact that he has helped thousand of people, all the good that he did in the world, a great husband that he is, a great father. He is needed at home to be a terrific father, a loving husband, to be a friend to whomever in need. To be the great mentor he is to All.

I therefore ask Your Honor, to give him probation, for there is no second person in the world like him.

Respectfully submitted,

His Rabbi, His Friend, His admirer
Someone who loves him and respects him

---

**DIRECTOR**
Rabbi Moishe M. Lipszyc

**SPECIAL PROJECTS**
Mendy Wilhelm



PHILIP A. PINE, D.D.S.
& ASSOCIATES

**Cosmetic & Family
Dentistry**

- Preventive Care
- Crown & Bridge
- Veneers & Cosmetic
  Bonding
- Tooth Bleaching
- Implants
- Root Canals
- Braces
- Full & Partial
  Dentures

**All In One**

- Periodontics
- Endodontics
- Orthodontics
- Oral Surgery

**For Your Convenience**

- Evening Hours
- Insurance Accepted
- Financing

1600 E. Atlantic Blvd.
Pompano Beach, FL 33060
(954) 782-1992
Fax: (954) 782-0425

To Honorable Judge Paul C. Huck,                    March 22, 2001

    Re: Mark Roseman

Dear Judge Huck,

My Name is Philip A. Pine. I have been a dentist in the Ft. Lauderdale area for 17 years. I am a loyal husband and devoted father of two beautiful children. I own my own home in Fort Lauderdale.

The reason I am writing to you today is on behalf of a dear friend of mine, Mark Roseman. I have personally known Mark and his family for over twelve years. I consider him to be the truest and dearest of friends, part of my own family. Mark possesses all the characteristics I strive to achieve; loyalty, devotion and compassion for others, just to name a few. His character and strengths are unparalleled.

I find it sad and ironic that Mark has arrived at a place, in his personal life, which has exposed him to much trouble and strife, because of his innate sense of fairness and loyalty, both in business and family life. These very honorable traits are indeed, the very same traits that have gotten him embroiled in legal hardships. He was trusting and a bit naïve, to believe that Jack Kudron and James Lowe would do the right thing, and act with the same honorable intentions as he.

Unfortunately, deceit and dishonor was their moral code, and it has all come down on Mark, with blame, finger pointing and scapegoating.

Over the years, I have witnessed many of Mark's philanthropic pursuits, always ready and willing to help others improve the quality of life, and more importantly their family's well being. Mark felt he was assisting these first time home buyers achieve the "American dream". Like a doctor working on a cure for an incurable disease, Mark was diligent and honorable in his pursuits. He felt the joy and elation that these first time buyers felt when they pulled up to their new home and unlocked their very own door, with their very own key. He felt he was "giving back" to those less fortunate and denied, for all that he himself had been blessed with. He felt a certain sense of pride and accomplishment with each new family he helped.

PHILIP A. PINE, D.D.S.
& ASSOCIATES

**Cosmetic & Family Dentistry**

- Preventive Care
- Crown & Bridge
- Veneers & Cosmetic Bonding
- Tooth Bleaching
- Implants
- Root Canals
- Braces
- Full & Partial Dentures

**All In One**

- Periodontics
- Endodontics
- Orthodontics
- Oral Surgery

**For Your Convenience**

- Evening Hours
- Insurance Accepted
- Financing

1600 E. Atlantic Blvd.
Pompano Beach, FL 33060
(954) 782-1992
Fax: (954) 782-0425

**Marks intentions were only to help the disadvantaged, underprivileged and ignored out of a very poor living situation. Aiding these folks to acquire some degree of status and accomplishment was Mr. Roseman's only goal. Mark was trying to make a living for his family, never desiring it to be at anyone else's expense.**

**I respectfully submit this letter for your consideration, on behalf of my dear friend Mark Roseman. Thank you very much for your time.**

**Sincerely,**

**Philip A. Pine D.D.S.**

**Nat Chesal**
*Agency Compliance Officer*



**DBS Financial Group**
600 Corporate Drive  Suite 200
Ft Lauderdale  FL   33334-3603
Tel   (954) 938-8800
Fax  (954) 351-2468
Pager  (954) 521-5901
e-mail: nchesal@finsvcs.com

March 9, 2001

The Honorable Judge Paul C. Huck

Dear Judge,

We have known Mark for the past four years.  During this time we have shared much of our time in the synagogue with our families.

Mark is an intricate part of our community as well as an important part of our personal lives.  He is always ready to help.  Mark has always been very involved in the care of his children, representing stability and comfort.  It is tragic that under the circumstances it is his family that will suffer most.

Thank you for your consideration and the consideration that we are sure you will show Mark.

Respectfully submitted,

Nathan Chesal

Insurance Representative of Massachusetts Mutual Life Insurance Company and affiliated companies • Springfield MA 01111-0001
Registered Representative of and securities offered through MML Investors Services, Inc., a MassMutual subsidiary • Supervisory Office: 1414
Main Street • Springfield MA 01144-1013  (413) 737-8400 • DBS Financial Group, David B. Schulman, CLU, ChFC, General Agent

3/15/01


Louis F. Demarco
4420 NE 25 AVE
Ft Lauderdale
Fl 33308
Tel: (954) 771-1698


The Honorable Paul C. Huck


I have known Mark Roseman for approximately 12 years, initially as a private mortgage
lender and then socially. I met him through an introduction from my ex-real estate partner
Jack Kudron who was borrowing money from him. My knowledge of the facts of this
case and thoughts on sentencing are based entirely on my personal experiences and clear
understanding of the nature of Jack Kudron, in particular his headstrong ways and at
times willful disregard for other individuals and authority in general.

 I am a friend of Jack and am godfather to his children. We both grew up in Worcestre,
Mass, where Jack's father (John Kudron Snr.) was in real estate. When we both came to
South Florida, his father encouraged us to buy, fix-up and sell homes (he even partnered
us in several transactions). We did this for a few years, after which it became more and
more difficult to work with Jack…. You just couldn't tell him anything….his way was
the right way. He always did what he wanted to do, even his father on learning of his
growing recklessness advised and warned him to follow the honest path and not to try to
make a fortune too quickly. All of this turned out to no avail. As his "success", lust for
"money and prestige" grew, so did his ego and flaunting of authority.

Without my knowledge, Jack took from my home the title to a 1986 Mazda truck title
that I once owned (and had blown up) and forged my signature on various documents in
connection with the vehicle. These documents were then used in support of a loan
application for one of his buyers on a house he was selling. Simply put, if Jack would use
me, he would use anyone.

Having read the many press reports about this case I am baffled that Mark Roseman has
been portrayed as a 'ringleader' of this so-called conspiracy, or that he ever had any
influence over Jack Kudron's actions.

For Mark to receive a sentence in excess of that imposed on Jack  would seem to mock
the concept of justice (this thought is widely echoed throughout the "investor"
community). I am not suggesting Mark's complete innocence, but for sure would suggest
the inaccuracy of the "leader" idea.

Finally, I would like to inform you of a conversation that took place which I feel reflects the relative guilt in this case. I actually heard Jack say, "we don't tell Mark everything, you know how he worries".

I would respectfully request your honor to be absolutely sure that justice based on truth and equality is carried out.

Respectfully yours,

Louis Demarco

# BOCA REAL ESTATE INVESTMENT CLUB

*7040 West Palmetto Park Road, PMB 225*
*Boca Raton, Florida 33433*
**(561) 994-6999**
http://www.bocarealestate.net

Wednesday, March 14, 2001

To The Honorable Paul C. Huck

Honorable Sir:

I am writing to you on behalf of my personal friend and business associate Mark Roseman. I have known Mark on a business and personal level for approximately 7 years. As a leader in the real estate/investor and Realtor community, I am shocked at the perception of the press and the court cases regarding Mark.

In addition to doing business with him, I know of other real estate professionals who can vouch for Mark's character and integrity. He is honorable, ethical, and an astute businessman as well as a loving husband and father. I know Mark and his brother Paul have an excellent reputation in the real estate investor community. Nothing can be further from the truth than the way Mark has been portrayed in court and in the media.

As founder and President of the Boca Real Estate Investment Club, I can not filter out the unscrupulous practitioners who prey on either investor buyers or owner occupant buyers. I will tell you that the dishonest practices of Jack Kudron and James Lowe have been kept away from my organization. For over 3 years, they have been banned from attending any of our meetings.

I am deeply disturbed at the unfortunate set of circumstances surrounding Mark's case, and the anguish and expense that he has gone through. I appreciate your time concerning this matter.

Yours Truly,

David Dweck
President

To the Honorable Paul C. Huck

I met Mark Roseman in 1987. From the day I met him I have always liked and respected him. He is a well educated, conservative, soft spoken man that has an air of confidence about him that shows and needs no pretensions. Mark subsequently married and is now raising a wonderful family. I had the sorrowful experience of attending the funeral of both his father and mother.

As I am involved in a business similar to Mark (I invest in mortgages through a licensed mortgage lender on multi-million dollar commercial properties) I've had numerous conversations about the nature of his business. My impression from these conversations was that Mark's involvement was that of the lender to numerous real estate investors on low end housing.

When I met Jack Kudron in 1994 I was appalled at this mans behaviour. This was a loud, obnoxious foul mouthed showoff with a go-fast boat and sports car who publicly sexually harassed women at bars. Generally he was drunk in public. I recall him bragging about the money machine he had going selling low-end housing to minorities, and how he was burying money in Costa Rica. I was especially disturbed by his claim to have fathered a child and his decision not to marry the mother. This disregard for his actions really disturbed me.

To cast Jack Kudron and Mark Roseman in the same light seems somewhat unjust to me. It is hard to believe that Mark would have knowingly gotten involved in an illegal operation; he was well off to begin with and had too much to lose. It was however obvious to anyone that Jack Kudron came from, and belongs in, the gutter.

I beg the court to consider the nature of these two very different individuals when determining the degree of involvement in the alleged crime and the subsequent penalties to be administered.

You may feel free to contact me at any time by phone (954-240-4283).

I am respectfully yours,

Terrence Dineen.

**EQUITYMAX, INC.**
**6218 NORTH FEDERAL HIGHWAY**
**FT. LAUDERDALE, FL 33308**
**Licensed Real Estate Broker, Mortgage Lender, and Sales Finance Co.**
**Phone: (954) 267-9103; Page: (954) 878-1495; Fax: (954) 771-2407; E-mail: bemmer@iols.net**

March 14, 2001

The Honorable Judge Paul C. Huck

Your Honor,

I have known Mark Roseman for over 10 years. I met Mark shortly after I got started in the real estate and mortgage business in 1990. I am a licensed real estate broker and licensed mortgage lender. I always understood Mark to have predominantly been a direct lender of his own money and to have focused on lending money to real estate investors. Over the years Mark and I have had the opportunity to transact a few deals here and there. I was always dealt with fairly and honestly by Mark on every transaction, whether it involved buying, selling, brokering, or lending to a borrower whom Mark may have recommended. I am not personally aware of any wrongdoing in the business by Mark.

As with any industry, a person establishes a reputation sooner or later. Mark Roseman was one of the mortgage lenders and real estate investors in our community who was, unwaveringly, thought of by myself, and those that I did business with, as one of the "good guys". I'm confident beyond a shadow of a doubt that most borrowers, investors, and fellow real estate professionals who knew him felt similarly. Mark stands out as having been one of the few consistently straightforward, honest and forthwith people I have had the opportunity to deal with in our business.

Having read the newspapers in recent months, I have noticed where some investors have had some difficulties in the real estate and mortgage business. However, it's astoundingly inconceivable that Mark could been thought of as the "organizer" of the group of participants mentioned in the newspaper articles I have read. If Mark did make any mistakes in his dealings, I do not believe that they are reflective of his goodness and personality. I hope that Mark is not being unjustly singled out and made an example of. If there were misdeeds committed, it's difficult to believe that Mark Roseman led any of his borrowers down a path of wrongdoing that they wouldn't have gone down themselves, with or without him. As a matter of fact, once a lender makes a mortgage loan, it would seem to me that the lender would probably have very little contact at all with his borrower, assuming payments are made timely, and that the other terms of the mortgage are being adhered to. I would find it hard to believe that a lender, such as Mark, could be held accountable for any wrongful acts of his borrower, simply because he, as the lender, provided the borrower his financial means! If there were, indeed, any wrongful acts committed, I find it difficult to believe that Mark could have been more guilty of anything he has been accused of than any of his then borrowers or associates.

I had read where a number of people who bought homes from Mark's borrowers experienced foreclosures. Perhaps these people should never have been approved for mortgage loans to begin with. Was Mark Roseman *singularly* responsible for this? What about the bank loan officers, appraisers, title agents, etc., etc. i.e. everyone in the whole loan approval process. Was Mark, *alone*, responsible for the syndrome that the loan officers and everyone else dependant on the all-important closing were caught up in? Mark Roseman seems to have been burdened with shouldering the brunt of an entire industry, ever changing, and often confusing.

**EQUITYMAX, INC.**
~0218 NORTH FEDERAL HIGHWAY~
**FT. LAUDERDALE, FL 33308**
**Licensed Real Estate Broker, Mortgage Lender, and Sales Finance Co.**
**Phone: (954) 267-9103; Page: (954) 878-1495; Fax: (954) 771-2407; E-mail: bemmer@iols.net**

In 1996, as I recall, I was approached by a real estate investor for the purpose of making him mortgage loans. I knew of the investor, but had never done any business with him nor spoken to him previous to his request. However, I had heard that this investor was a borrower of Mark Roseman. Having had straightforward dealings with Mark before, I inquired with Mark as to why, oddly, I was called, "out-of-the-blue" by this individual, now, for a series of loans. Mark advised me, to my amazement, that the borrower was about to be investigated for drug trafficking. It was suggested to me that if I decided to lend to him, I might run the risk of having mortgage loans tied up on properties ultimately seized by the Federal Government. On the strength of this advice, I turned down the loan requests. I understand that Mark gave the same "warning" to at least one other hard equity lender who was approached as well. Furthermore, according to what Roseman told me, he himself held over $250,000 in mortgages from the same borrower at the time on these same properties. The loans that I was asked to make were for the purpose of refinancing these very same properties, thereby enabling Mark Roseman to be paid off in full, and become free from any risk of property "tie-up" due to any potential seizure. So why would Mark Roseman guide both me and another lender out of trouble to his very own detriment and continued potential liability? Why didn't Mark downplay any risk of these loans and try to mitigate his risk completely? Because Mark Roseman is not the type of person who would put someone else in jeopardy simply to further his own personal gain.

Mark Roseman is not a schemer, and not diabolical. He is not a criminal. He may have made some mistakes, and a penalty may be justified. But seven long years? For the sake of true and equal justice, I pray that the price our justice system has now imposed on Mark will be dramatically lessened.

Sincerely yours,

Bradford N. Emmer
President



# ZIMMERMAN ZEIGLER & CHAMBERLAIN, P.A.

*Certified Public Accountants*

1600 WEST OAKLAND PARK BLVD., SUITE 202
FT. LAUDERDALE, FLORIDA 33311
(954) 486-1995    FAX: (954) 486-2399

March 17, 2001

Re:  Mr. Mark Roseman

Dear Honorable Paul C. Huck:

I have been Mr. Roseman's accountant since 1990 and additionally his mother's until her passing two years ago.  During that time I have had the opportunity to know him and his family not only on a professional level but on a personal level as well.

As I became friendly with his family I saw him as a dedicated son to his ailing mother.  In all incidents his character was above reproach.  She was a fortunate mother.  I have seen him with his family at my Temple on many occasions.  Since we both have a young child we often exchange family stories.  I know him to be a wonderful family man, which he has demonstrated to me over the years.

Mark had established himself to be a excellent businessman.  Before and during the time Mark was involved with real estate development approximately 70% to 90% of his income came from interest income.  In my business involvement with Mark he has shown honesty and good character.

I feel Mark has much to offer in the community.  I would be deeply sorrowed should he not be able to parent his son during his formidable years.

I do not hesitate to recommend any leniency the courts may deem appropriate for Mark.

Sincerely,

Linda Zeigler

March 3,2001

To:The Honorable Judge Paul C.Huck,

I would like to take a little of your time to tell you about the Mark Roseman that I know. I met Mark over 10 years ago thru some good friends of mine .Our paths have crossed several times after that but I really came into contact with him about 5 years ago when I was looking for construction work and heard about a man named Jack Kudron who bought houses(repos) from HUD and needed them renovated for resale.I went to his office on Fed.hwy.and got a job from him.That's when I met Mark again.After rebuilding two houses for Jack,I wanted to start my own business of buying bank foreclosures,repairing them and selling them to families.I really didn't know the business of buying houses,who to get them from and where to go for funding etc.

That's when I called Mark and told him of my plans.He offered to help me though the whole process.He took me under his wing and together we looked at properties,we choose one and he helped me with the funding, and with this I was on my way.I have been doing this business ever since.I have just purchased my 17th house and have given 16 families the American Dream of owning their own home.

Mark&Lynn are loving parents and good people,I have been to their home many times and know them on a personal level.I would not be doing what I'm doing today if it wasn't for Mark Roseman's help.

Robert Bianco
5200 N.Fed.Hwy.
Suite 2
Ft.Laud.,Fla. 33308

March 12, 2001

Dear Judge Huck,

I am writing to you on behalf of Mark Roseman. I have known Mark for three years and was fortunate enough to have been the teacher of his only son, Ben, for two of those years. While I am often asked to write letters of recommendation or provide character references for my students, this is the first time I have been asked to do so for a parent. I can assure you however, I would still have been as eager to do so, because of all the student's parents that I have had in my classroom, Mark Roseman is by far one of the most extraordinary.

I have never had a parent take such an active interest in his child's education, whether it be his accessibility for parent/teacher conferences, school events or his eagerness to share Ben's joy of finishing a project. Mr. Roseman has always been the first to volunteer his time to attend school functions.

I wish that just once, you could see the look in the eyes of both father and son, when Mr. Roseman picks Ben up at school at 2:50 every afternoon. Ben lives for his father and the thought of the pain that Ben and our entire school's family might endure is an unbearable one for all of us. I have no father and child in my classroom who love each other more, and the example of love that they show for each other everyday, is one of the most positive lessons taken home by the other students and parents.

Your Honor, if there is any way you can consider the heart of this man in your decision making process, I know that you will have done something wonderful which ultimately outweighs the punishment the Roseman family has already endured.

If I can be of further help or if my words in person could be more convincing, please do not hesitate to contact me.

Sincerely and with Warmest Gratitude,

Margaret E. Ruy

(954) 565-8205

February 25, 2001

Honorable Judge Paul C. Huck:

I would like to tell you of my sincere feelings living along a side of Mark Roseman for the last several years. Mark and his son Ben have shared many fun and constructive times with my son Robert and me. My son and I being very active in our church and Marks' family being active in their own faith we enjoyed finding many ways to share and communicate the feelings of carring and understanding in our lives. The Roseman family have always demonstrated good values and love to my son and in turn appreciate the opportunity to write to you. Very few people have spent and are spending the time that Mark is with raising his son. We have shared trips with our sons together and many sincere talks about the love of our children and their need for our involvement with them. In ending I would like to say that Mr. Roseman as a person has made himself available to family and community and has been a wonderful neighbor.

Sincerely, Robert H. Rankin 938-8252

Little Flower Montessori School
519 NE 26th Street
Wilton Manors, FL 33305

March 14, 2001

Dear Judge Huck:

I am writing on behalf of Mark Roseman. I began teaching his son, Ben last September and recognized at once the close bond Ben had with his father. I have been fortunate to witness their mutual excitement every afternoon as Mark arrives to pick Ben up from school. Both pairs of eyes light up at the very sight of each other. Their admiration, respect and love for each other is obvious.

Ben regularly shares stories of weekend roller blading adventures with his dad, hockey games and fun family dinners. His dad is clearly the light of his life. Ben is a bright, sensitive and caring young man, due in no small part to his father's constant and consistent love and support. I sincerely hope that they will not have to spend too much time away from each other.

With warmest regards,

*Lisa Cassanelli*



**Little Flower Montessori**

519 NE 26th Street ~ Wilton Manors, Florida  33305 ~ Phone 565-8205 ~ Fax 568-4396

March 15, 2001

Dear Judge Huck,

I am writing this letter on behalf of Mr. Mark Roseman.  I have known Mr. Roseman for the past five years in my position as directress/teacher of his son's school.  In that time, he has proven himself to be a very concerned and involved parent.  He has shown great interest in all aspects of his son's development, both the academic and the emotional, and enjoys a very close relationship with his son as a result.  Ben is an extremely bright and sensitive child and I am saddened when I think of the impact a long separation from his father may have on him.

After so many years of teaching, I certainly have learned that well-rounded and emotionally secure children like Ben don't happen by chance, but rather are only created by consistent and loving parents.  Mr. Roseman has been diligent in his parental duties and I would hope that his separation from his son would be as short as possible in order to lessen the devastating emotional toll that it will have on Ben.

Sincerely,

Mary Byrd
Directress

**Arick Pinsk**
**2248 N.E. 30ᵗʰ Ct.**
**Lighthouse Point, FL 33064**
**Tel 954-784-1142 Fax 946-9467**

3/8/01

Honorable Paul C. Huck

Re: Mark Roseman

Dear  Judge Huck:

I have been a resident of South Florida for more than 20 years.  I met Mark Roseman in
1988 and shortly after that realized that Mark is a good and loyal friend who can be
counted on in all of life's circumstances.  Later on I had the privilege of witnessing Mark
becoming a great husband and father.  During the course of my working life, I have seen
many families and friendships that have been less than exemplary.    But, then, there was
always Mark that demonstrated the way a husband, a father, and a friend should really be.

I realize that during the course of recent events, Mark has made some errors in judgment
by his association with certain individuals, who I strongly believe have deceived him to a
great extent.  Your honor, I am not a legal scholar and am not familiar with the intricacies
of the legal system.  However, I must implore you to give serious consideration to the
type of individual Mark really is, and what will be destroyed by his incarceration, and the
damage to his family.

I do appreciate your consideration and attention in this matter.  I hope I will not suffer the
loss of a good a friend who can contribute so much to my life and to others.

Faithfully,

Arick Pinsk
Lighthouse Point, FL

Honorable Judge Paul C. Huck

My name is Jeffrey Blitman, I have lived in South Florida since 1972, have been married to Jill for eight years and have a two and a half year old daughter named Sydney. I sold my packaging distribution business, which employed approximately sixty people to a national company last year. I am 44 years old and have been self employed since I was 19. I have made my living as a plumber, a painter and as a salesman but my success was built on my ability to recognize value in people, recruit them and teach them to prosper. I have been right more often then I have been wrong about people and built a prosperous business.

I have known Mark Roseman for about 6 years and consider him a very close friend and in 44 years only a very few other people have attained that status- I choose them carefully! Mark is honest, trustworthy, bright and compassionate and I would not hesitate to partner with him in a business venture, Mark is an excellent father to his son Ben and daughter Natasha and there is not a person who knows Mark who can deny these facts except possibly for the two opportunists known as Jack Kudron and James Lowe.

I have had occasion to come into contact with these men at various social events and they bristle the hair on my neck. My instincts about these characters was dead on. My business is sizing up people and recognizing when I am being sold. Jack and James are reckless, uncaring and dishonest hooligans whose only goal was to enrich themselves at any cost and by any means, they should be selling aluminum siding or used cars.

I have a vague knowledge of Marks business and his relationship with Jack and James which I learned about through our friendship and my observations of their interaction. I believe that Marks inexperience in dealing with con artists of this magnitude and his basic honest nature absolutely prevented him from seeing what really was going on. Mark Roseman's only real mistake was in choosing bad business partners and I believe these guys saw him coming and took advantage of his trust. Many people in the real estate business who know Mark have the highest regard for him and his integrity and are shocked at how accountable he is being held for others actions, please do not set an example with him.

Your Honor I beg you to give this guy his life back.


Respectfully

Jeffrey W.Blitman

# JILL BLITMAN, ESQUIRE
### 2340 SE 8th Court
#### Pompano Beach, FL 33062

March 13, 2001

Honorable Paul C. Huck

Re:    Mark Roseman

Dear Judge Huck:

I graduated from Osgoode Hall Law School (Toronto) in 1986. I have resided in Broward County for approximately thirteen years. My current address is 2340 SE 8th Court, Pompano Beach, FL 33062. In addition to my legal career, I have been a translator (French, Spanish, German, Italian, Portuguese and Japanese) and a business owner (Global Expo., Inc.). I have been married to Jeffrey Blitman since May 1, 1994. In October 1997, I became pregnant and retired. Jeffrey and I have one daughter, Sydney Gabrielle, born June 13, 1998.

I have known Mark Rosenman for approximately ten years. He is one of the finest human beings I have ever had the privilege of calling a friend. He is kind, honest, empathetic and loyal. He is an exceptional father as is evidenced by his wonderful son Benjamin (9) and his beautiful stepdaughter Natasha (20).

Mark has the key to my home, the code to my alarm and I would trust him and his wife Lynda above virtually anyone I know, except my husband, with the care of my precious only child.

It is my experience that when a person has a trusting nature, as Mark has, he will trust others. I think this is true of Mark, specifically with regard to James Lowe and Jack Kudron. I have had numerous opportunities to observe these individuals socially and have witnessed reckless behavior and disrespect for anyone who they viewed as an obstacle to their immediate goals or gratification. I am **_convinced_** that they are responsible for **_any_** criminal activity, or malfeasance in the transactions which have given rise to the proceeding against Mark.

Mark is guilty only of poor character judgment. He is the last person to deserve any period of incarceration.

I am grateful for the opportunity to plead with your Honor to exercise discretion by a downward departure from the plea agreement and the government's recommendations. Please allow an exceptional husband, father and person to return to his home and continue his excellent work with his children.

It is my humble opinion that incarceration in this case would represent the worst abuse of the administration of justice I have ever witnessed.

Faithfully

Jill Blitman, Esquire
JB/ar
c:\wpdocs\wpdocs\alana\Jill.lt7

**IRV BLANDER**

21340 NE 23rd Court
N. Miami Beach, Fl. 33180
Telephone (305) 933-3152

March 5, 2001

Honorable Paul C. Huck

RE:    MARK ROSEMAN

Dear Sir,

I am writing this letter on behalf of Mark Roseman to ask the court for lenience in prescribing Mr. Roseman's sentence.

I've known Mr. Roseman for about six years, and during this time I know Mr. Roseman to be fair dealing in business and a person who keeps his word. He has a good reputation amongst his business associates. I also know him to be a good father and husband, and one who observes his religion.

I believe that Mr. Roseman and his family have already been punished living with the anxiety over the outcome of this trail. If in fact Mr. Roseman misstepped, I am sure he never will again. I hope you will find it in your heart to be lenient in your decision.

Respectfully,

Irv Blander

## P & F Realty, Inc.

*Steven Frank. President. Licensed Real Estate Broker*

March 8, 2001

Your Honor Justice Paul Huck.

Reference: Mr. Mark Roseman

By way of introduction, my name is Steven Frank. I'm a non-practicing member of the Florida Bar in good standing, a licensed Mortgage Broker, and licensed Real Estate Broker. For the past nine years I have been in the business of remodeling and reselling single family residences and I have known Mr. Roseman both personally and through his brother Mr. Paul Roseman for approximately fifteen years. I have always found Mark Roseman to be polite, courteous and generally respectful of others.

I'd like to make a comment with reference to the proposed sentences of two of the defendants in this case, Mr. Roseman and Mr. Jack Kudson. Though I have no direct personal knowledge of the actions and

next pg.

2787 E. Oakland Park Blvd., Suite 312. Ft. Lauderdale, FL 33306
(954) 563-4469 – office        (954) 492-9138 – res.        (954) 772-8126 – fax

events that I've precipitated these charges, I do know both of these individuals personally and it is hard to believe that Mr. Roseman has been characterized as the more serious and more culpable of the two transgressors in this matter. Based on my indirect knowledge of the actions and events that have led to these charges and my personal opinion of these two individuals, I believe strongly that Mr. Kudin is clearly the more culpable of the two and to avoid a sentencing misjustice, I believe Mr. Kudin should receive the more serious of the two respective sentences.

Respectfully Yours,

Kevin Frank



**RJ GRIFFITH-BROKER**
**954.537.7553 OFC**
**954.537.2065 FAX**
RJBARREALTY@AOL.COM

3/12/01

The Honorable Paul C. Huck,

I first met Mark Roseman in 1993 when I was a new agent working for Bar Realty, a company I now own. Mark was a customer of our office manager, Barbara Richey. I was always impressed how Mark was able to secure property at low "wholesale" prices and close them immediately. I was working with investors who simply could not compete with Mark's ability to negotiate and close immediately. During my early days as a Real Estate agent, I always strived to secure investors to work with who had the professionalism, work ethic and abilities Mark has.

In June of 1994, I sold a property that Mark was holding a mortgage on to James Lowe. James and Mark met for the first time at the closing of the property. Subsequently, James started buying property and borrowing money from Mark to complete the deals. I also met Jack Kudron at the same closing. James and Jack went on to work together buying some properties from Mark and using Mark as a lender.

In late 1996, Mark and I decided to enter into a working relationship and formed a corporation for the purpose of buying houses as well as non-performing mortgages. We worked together for about 3 years and completed several deals with great success. My experience working with Mark led to me having even more respect for his abilities and integrity.

Working with Mark, I had the good fortune to get to know his wife and family. Mark is a great husband and father. We have socialized in his home and in mine, it is wonderful to see the love and caring that exists with the Roseman family.

Over the past several years, I have personally borrowed money from mark to purchase Real Estate as well as referred several of my clients to him. Mark has made over 65 loans, to me and my clients, none of which have resulted in problems.

Mark has shared some of the facts of his situation with me. I have a difficult time understanding why Mark is being considered any differently than all of the other private lenders in this "niche" of the industry (investors buying and selling). Once a lender makes a loan to an investor, there is no further interaction with the deal other than collecting the mortgage payments and balance of the loan, it is inconceivable that a lender could be held responsible for the actions of a mortgagor.

In summary, Mark Roseman is a hard working family man of high moral substance.

Thank you,

RJ Griffith
Broker/Owner
Bar Realty

March 12, 2001

Dear Judge Huck,

I am writing to you on behalf of Mark Roseman. I have known Mark for three years and was fortunate enough to have been the teacher of his only son, Ben, for two of those years. While I am often asked to write letters of recommendation or provide character references for my students, this is the first time I have been asked to do so for a parent. I can assure you however, I would still have been as eager to do so, because of all the student's parents that I have had in my classroom, Mark Roseman is by far one of the most extraordinary.

I have never had a parent take such an active interest in his child's education, whether it be his accessibility for parent/teacher conferences, school events or his eagerness to share Ben's joy of finishing a project. Mr. Roseman has always been the first to volunteer his time to attend school functions.

I wish that just once, you could see the look in the eyes of both father and son, when Mr. Roseman picks Ben up at school at 2:50 every afternoon. Ben lives for his father and the thought of the pain that Ben and our entire school's family might endure is an unbearable one for all of us. I have no father and child in my classroom who love each other more, and the example of love that they show for each other everyday, is one of the most positive lessons taken home by the other students and parents.

Your Honor, if there is any way you can consider the heart of this man in your decision making process, I know that you will have done something wonderful which ultimately outweighs the punishment the Roseman family has already endured.

If I can be of further help or if my words in person could be more convincing, please do not hesitate to contact me.

Sincerely and with Warmest Gratitude,

Margaret E. Ruy

(954) 565-8205

B"H

# CHABAD LUBAVITCH

**FORT LAUDERDALE**

3500 N. Ocean Blvd. • Fort Lauderdale, FL 33308 • Tel: (954) 568-1190 • Fax: (954) 566-0450 • E-Mail: CHABADGALT@AOL.COM

> Rabbi Moishe Meir Lipszyc
> Chabad Lubavitch of Fort Lauderdale
> 3500 North Ocean Boulevard
> Fort Lauderdale, Florida 33308

March 14, 2001

Dear Judge Huck,

This letter is the hardest letter I ever had to write in my life, but because I know the real Mark I am going to try to write a letter regarding Mr. Roseman, a man I respect, a man I look up to, a man I love and Cherish his friendship and advice.

My name is Rabbi Moishe Meir Lipszyc, I am the Rabbi of Synagogue Ben Ish Chai, Executive Vice president of Chabad Lubavitch of Greater Fort Lauderdale, and Founder of Chabad Torah Center Downtown Fort Lauderdale.

I met Mark Roseman ten and a half years ago, the first week that I moved to Fort Lauderdale. When we met he was not keen on meeting me, not knowing what I wanted. He hesitated meeting me and by the time we walked out after a four and half hour meeting a lifelong friendship had started. One, which I cherish to this day.

I will not be able to go into all the details of the phenomenal person he is for three reasons:

1.  Words are limitations, what kind of great person he is.

2.  There is not enough paper in this world.

3.  He has asked me to promise him many years ago that all his work for a fellow human being should not be publicized.

So therefore I will only say one thing, there was never a time that I remember when he was asked to help somebody or to go visit elderly people in the old age home or people in the hospital or even to pick up a small thing the Synagogue needed or to drop off something to make a function nicer. He is always there even when everybody left he would always be the one to stay behind to make sure the place was spotless and ready for the next morning.
On a personal note he was always for me. When he found out I had a tumor and I have a very difficult time with my twins that are developmentally and physically delayed, he had an ear to listen and a shoulder to lean on. In short he is the kind of person you can't find these days.

---

**DIRECTOR**
Rabbi Moishe M. Lipszyc

**SPECIAL PROJECTS**
Mendy Wilhelm

# CHABAD LUBAVITCH

**FORT LAUDERDALE**

3500 N. Ocean Blvd. • Fort Lauderdale, FL 33308 • Tel: (954) 568-1190 • Fax: (954) 566-0450 • E-Mail: CHABADGALT@AOL.COM

I can keep going and going, never and end to what he does. I will just tell you there are many different types of people. There are those that when they do something they want their name all over, some give charity with no personal involvement, and those people that have personal involvement and give no money.

Mark Roseman is a person that does not look for honor. A person who stays behind the scenes, sits in the rear of the Temple, stays to help cleanup, helps people find a seat or whatever they need.

You cannot find a person like him. Based on that plus what the Bible tells us "an eye for an eye" punishment has to fit the crime. By putting him in an institution is not appropriate.

Based on that I am asking Your Honor, he should please be put on probation, plus make any financial restitution required. Plus due to the fact that he has helped thousand of people, all the good that he did in the world, a great husband that he is, a great father. He is needed at home to be a terrific father, a loving husband, to be a friend to whomever in need. To be the great mentor he is to All.

I therefore ask Your Honor, to give him probation, for there is no second person in the world like him.

Respectfully submitted

His Rabbi, His Friend His admirer
Someone who loves him and respects him

---

**DIRECTOR**
Rabbi Moishe M. Lipszyc

**SPECIAL PROJECTS**
Mendy Wilhelm

3/15/01


Louis F. Demarco
4420 NE 25 AVE
Ft Lauderdale
Fl 33308
Tel: (954) 771-1698


The Honorable Paul C. Huck


I have known Mark Roseman for approximately 12 years, initially as a private mortgage
lender and then socially. I met him through an introduction from my ex-real estate partner
Jack Kudron who was borrowing money from him. My knowledge of the facts of this
case and thoughts on sentencing are based entirely on my personal experiences and clear
understanding of the nature of Jack Kudron, in particular his headstrong ways and at
times willful disregard for other individuals and authority in general.

 I am a friend of Jack and am godfather to his children. We both grew up in Worcestire,
Mass, where Jack's father (John Kudron Snr.) was in real estate. When we both came to
South Florida, his father encouraged us to buy, fix-up and sell homes (he even partnered
us in several transactions). We did this for a few years, after which it became more and
more difficult to work with Jack.... You just couldn't tell him anything....his way was
the right way. He always did what he wanted to do, even his father on learning of his
growing recklessness advised and warned him to follow the honest path and not to try to
make a fortune too quickly. All of this turned out to no avail. As his "success", lust for
"money and prestige" grew, so did his ego and flaunting of authority.

Without my knowledge, Jack took from my home the title to a 1986 Mazda truck title
that I once owned (and had blown up) and forged my signature on various documents in
connection with the vehicle. These documents were then used in support of a loan
application for one of his buyers on a house he was selling. Simply put, if Jack would use
me, he would use anyone.

Having read the many press reports about this case I am baffled that Mark Roseman has
been portrayed as a 'ringleader' of this so-called conspiracy, or that he ever had any
influence over Jack Kudron's actions.

For Mark to receive a sentence in excess of that imposed on Jack would seem to mock
the concept of justice (this thought is widely echoed throughout the "investor"
community). I am not suggesting Mark's complete innocence, but for sure would suggest
the inaccuracy of the "leader" idea.

Finally, I would like to inform you of a conversation that took place which I feel reflects the relative guilt in this case. I actually heard Jack say, "we don't tell Mark everything, you know how he worries".

I would respectfully request your honor to be absolutely sure that justice based on truth and equality is carried out.

Respectfully yours,

*Louis DeMarco*

Louis Demarco

**EQUITYMAX, INC.**
**6218 NORTH FEDERAL HIGHWAY**
**FT. LAUDERDALE, FL 33308**
**Licensed Real Estate Broker, Mortgage Lender, and Sales Finance Co.**
**Phone: (954) 267-9103; Page: (954) 878-1495; Fax: (954) 771-2407; E-mail: bemmer@iols.net**

March 14, 2001

The Honorable Judge Paul C. Huck

Your Honor,

I have known Mark Roseman for over 10 years. I met Mark shortly after I got started in the real estate and mortgage business in 1990. I am a licensed real estate broker and licensed mortgage lender. I always understood Mark to have predominantly been a direct lender of his own money and to have focused on lending money to real estate investors. Over the years Mark and I have had the opportunity to transact a few deals here and there. I was always dealt with fairly and honestly by Mark on every transaction, whether it involved buying, selling, brokering, or lending to a borrower whom Mark may have recommended. I am not personally aware of any wrongdoing in the business by Mark.

As with any industry, a person establishes a reputation sooner or later. Mark Roseman was one of the mortgage lenders and real estate investors in our community who was, unwaveringly, thought of by myself, and those that I did business with, as one of the "good guys". I'm confident beyond a shadow of a doubt that most borrowers, investors, and fellow real estate professionals who knew him felt similarly. Mark stands out as having been one of the few consistently straightforward, honest and forthwith people I have had the opportunity to deal with in our business.

Having read the newspapers in recent months, I have noticed where some investors have had some difficulties in the real estate and mortgage business. However, it's astoundingly inconceivable that Mark could been thought of as the "organizer" of the group of participants mentioned in the newspaper articles I have read. If Mark did make any mistakes in his dealings, I do not believe that they are reflective of his goodness and personality. I hope that Mark is not being unjustly singled out and made an example of. If there were misdeeds committed, it's difficult to believe that Mark Roseman led any of his borrowers down a path of wrongdoing that they wouldn't have gone down themselves, with or without him. As a matter of fact, once a lender makes a mortgage loan, it would seem to me that the lender would probably have very little contact at all with his borrower, assuming payments are made timely, and that the other terms of the mortgage are being adhered to. I would find it hard to believe that a lender, such as Mark, could be held accountable for any wrongful acts of his borrower, simply because he, as the lender, provided the borrower his financial means! If there were, indeed, any wrongful acts committed, I find it difficult to believe that Mark could have been more guilty of anything he has been accused of than any of his then borrowers or associates.

I had read where a number of people who bought homes from Mark's borrowers experienced foreclosures. Perhaps these people should never have been approved for mortgage loans to begin with. Was Mark Roseman *singularly* responsible for this? What about the bank loan officers, appraisers, title agents, etc., etc. i.e. everyone in the whole loan approval process. Was Mark, *alone*, responsible for the syndrome that the loan officers and everyone else dependant on the all-important closing were caught up in? Mark Roseman seems to have been burdened with shouldering the brunt of an entire industry, ever changing, and often confusing.

**EQUITYMAX, INC.**
**6218 NORTH FEDERAL HIGHWAY**
**FT. LAUDERDALE, FL 33308**
**Licensed Real Estate Broker, Mortgage Lender, and Sales Finance Co.**
**Phone: (954) 267-9103; Page: (954) 878-1495; Fax: (954) 771-2407; E-mail: bemmer@iols.net**

In 1996, as I recall, I was approached by a real estate investor for the purpose of making him mortgage loans. I knew of the investor, but had never done any business with him nor spoken to him previous to his request. However, I had heard that this investor was a borrower of Mark Roseman. Having had straightforward dealings with Mark before, I inquired with Mark as to why, oddly, I was called, "out-of-the-blue" by this individual, now, for a series of loans. Mark advised me, to my amazement, that the borrower was about to be investigated for drug trafficking. It was suggested to me that if I decided to lend to him, I might run the risk of having mortgage loans tied up on properties ultimately seized by the Federal Government. On the strength of this advice, I turned down the loan requests. I understand that Mark gave the same "warning" to at least one other hard equity lender who was approached as well. Furthermore, according to what Roseman told me, he himself held over $250,000 in mortgages from the same borrower at the time on these same properties. The loans that I was asked to make were for the purpose of refinancing these very same properties, thereby enabling Mark Roseman to be paid off in full, and become free from any risk of property "tie-up" due to any potential seizure. So why would Mark Roseman guide both me and another lender out of trouble to his very own detriment and continued potential liability? Why didn't Mark downplay any risk of these loans and try to mitigate his risk completely? Because Mark Roseman is not the type of person who would put someone else in jeopardy simply to further his own personal gain.

Mark Roseman is not a schemer, and not diabolical. He is not a criminal. He may have made some mistakes, and a penalty may be justified. But seven long years? For the sake of true and equal justice, I pray that the price our justice system has now imposed on Mark will be dramatically lessened.

Sincerely yours,

Bradford N. Emmer
President

# BOCA REAL ESTATE INVESTMENT CLUB

*7040 West Palmetto Park Road, PMB 225*
*Boca Raton, Florida 33433*
**(561) 994-6999**
http://www.bocarealestate.net

Wednesday, March 14, 2001

To The Honorable Paul C. Huck

Honorable Sir:

I am writing to you on behalf of my personal friend and business associate Mark Roseman. I have known Mark on a business and personal level for approximately 7 years. As a leader in the real estate/investor and Realtor community, I am shocked at the perception of the press and the court cases regarding Mark.

In addition to doing business with him, I know of other real estate professionals who can vouch for Mark's character and integrity. He is honorable, ethical, and an astute businessman as well as a loving husband and father. I know Mark and his brother Paul have an excellent reputation in the real estate investor community. Nothing can be further from the truth than the way Mark has been portrayed in court and in the media.

As founder and President of the Boca Real Estate Investment Club, I can not filter out the unscrupulous practitioners who prey on either investor buyers or owner occupant buyers. I will tell you that the dishonest practices of Jack Kudron and James Lowe have been kept away from my organization. For over 3 years, they have been banned from attending any of our meetings.

I am deeply disturbed at the unfortunate set of circumstances surrounding Mark's case, and the anguish and expense that he has gone through. I appreciate your time concerning this matter.


Yours Truly,

David Dweck
President

March 7, 2001

The Honorable Judge Paul C. Huck

Dear Honorable Judge Paul C. Huck:

I have known Mark Roseman for almost 5 years, both personally and professionally. On a professional level, he has loaned me money for numerous properties with an interest rate of 18%. That was the scope of our business together. I did not have any problem with that nor any reason to question him. He was and still is to me, a professional man with the utmost integrity.

Last month when I learned of the predicament he was in and of the accusations regarding Mark, I was shocked! I had no idea that these events concerned the man I knew both personally and professionally. I still cannot believe it.

I cannot speak of the other people involved with Mark in his case, as I do not know them. I can only say that Mark Roseman was always very fair and treated me with much respect.

Sincerely,

Brad Rand



PHILIP A. PINE, D.D.S.
& ASSOCIATES

To Honorable Judge Paul C. Huck,                    March 22, 2001

**Re: Mark Roseman**

Dear Judge Huck,

My Name is Philip A. Pine. I have been a dentist in the Ft. Lauderdale area for 17 years. I am a loyal husband and devoted father of two beautiful children. I own my own home in Fort Lauderdale.

The reason I am writing to you today is on behalf of a dear friend of mine, Mark Roseman. I have personally known Mark and his family for over twelve years. I consider him to be the truest and dearest of friends, part of my own family. Mark possesses all the characteristics I strive to achieve; loyalty, devotion and compassion for others, just to name a few. His character and strengths are unparalleled.

I find it sad and ironic that Mark has arrived at a place, in his personal life, which has exposed him to much trouble and strife, because of his innate sense of fairness and loyalty, both in business and family life. These very honorable traits are indeed, the very same traits that have gotten him embroiled in legal hardships. He was trusting and a bit naïve, to believe that Jack Kudron and James Lowe would do the right thing, and act with the same honorable intentions as he.

Unfortunately, deceit and dishonor was their moral code, and it has all come down on Mark, with blame, finger pointing and scapegoating.

Over the years, I have witnessed many of Mark's philanthropic pursuits, always ready and willing to help others improve the quality of life, and more importantly their family's well being. Mark felt he was assisting these first time home buyers achieve the "American dream". Like a doctor working on a cure for an incurable disease, Mark was diligent and honorable in his pursuits. He felt the joy and elation that these first time buyers felt when they pulled up to their new home and unlocked their very own door, with their very own key. He felt he was "giving back" to those less fortunate and denied, for all that he himself had been blessed with. He felt a certain sense of pride and accomplishment with each new family he helped.

**Cosmetic & Family Dentistry**

- Preventive Care
- Crown & Bridge
- Veneers & Cosmetic Bonding
- Tooth Bleaching
- Implants
- Root Canals
- Braces
- Full & Partial Dentures

**All In One**

- Periodontics
- Endodontics
- Orthodontics
- Oral Surgery

**For Your Convenience**

- Evening Hours
- Insurance Accepted
- Financing

1600 E. Atlantic Blvd.
Pompano Beach, FL 33060
(954) 782-1992
Fax: (954) 782-0425



## PHILIP A. PINE, D.D.S. & ASSOCIATES

**Cosmetic & Family Dentistry**

- Preventive Care
- Crown & Bridge
- Veneers & Cosmetic Bonding
- Tooth Bleaching
- Implants
- Root Canals
- Braces
- Full & Partial Dentures

### All In One

- Periodontics
- Endodontics
- Orthodontics
- Oral Surgery

**For Your Convenience**

- Evening Hours
- Insurance Accepted
- Financing

1600 E. Atlantic Blvd.
Pompano Beach, FL 33060
(954) 782-1992
Fax: (954) 782-0423

Marks intentions were only to help the disadvantaged, underprivileged and ignored out of a very poor living situation. Aiding these folks to acquire some degree of status and accomplishment was Mr. Roseman's only goal. Mark was trying to make a living for his family, never desiring it to be at anyone else's expense.

I respectfully submit this letter for your consideration, on behalf of my dear friend Mark Roseman. Thank you very much for your time.

Sincerely,

Philip A. Pine D.D.S.

To the Honorable Paul C. Huck

I met Mark Roseman in 1987. From the day I met him I have always liked and respected him. He is a well educated, conservative, soft spoken man that has an air of confidence about him that shows and needs no pretensions. Mark subsequently married and is now raising a wonderful family. I had the sorrowful experience of attending the funeral of both his father and mother.

As I am involved in a business similar to Mark (I invest in mortgages through a licensed mortgage lender on multi-million dollar commercial properties) I've had numerous conversations about the nature of his business. My impression from these conversations was that Mark's involvement was that of the lender to numerous real estate investors on low end housing.

When I met Jack Kudron in 1994 I was appalled at this mans behaviour. This was a loud, obnoxious foul mouthed showoff with a go-fast boat and sports car who publicly sexually harassed women at bars. Generally he was drunk in public. I recall him bragging about the money machine he had going selling low-end housing to minorities, and how he was burying money in Costa Rica. I was especially disturbed by his claim to have fathered a child and his decision not to marry the mother. This disregard for his actions really disturbed me.

To cast Jack Kudron and Mark Roseman in the same light seems somewhat unjust to me. It is hard to believe that Mark would have knowingly gotten involved in an illegal operation; he was well off to begin with and had too much to lose. It was however obvious to anyone that Jack Kudron came from, and belongs in, the gutter.

I beg the court to consider the nature of these two very different individuals when determining the degree of involvement in the alleged crime and the subsequent penalties to be administered.

You may feel free to contact me at any time by phone (954-240-4283).

I am respectfully yours,

Terrence Dineen.



# ZIMMERMAN ZEIGLER & CHAMBERLAIN, P.A.

*Certified Public Accountants*

1600 WEST OAKLAND PARK BLVD., SUITE 202
FT. LAUDERDALE, FLORIDA 33311
(954) 486-1995    FAX: (954) 486-2399

March 17, 2001

Re: Mr. Mark Roseman

Dear Honorable Paul C. Huck:

I have been Mr. Roseman's accountant since 1990 and additionally his mother's until her passing two years ago. During that time I have had the opportunity to know him and his family not only on a professional level but on a personal level as well.

As I became friendly with his family I saw him as a dedicated son to his ailing mother. In all incidents his character was above reproach. She was a fortunate mother. I have seen him with his family at my Temple on many occasions. Since we both have a young child we often exchange family stories. I know him to be a wonderful family man, which he has demonstrated to me over the years.

Mark had established himself to be a excellent businessman. Before and during the time Mark was involved with real estate development approximately 70% to 90% of his income came from interest income. In my business involvement with Mark he has shown honesty and good character.

I feel Mark has much to offer in the community. I would be deeply sorrowed should he not be able to parent his son during his formidable years.

I do not hesitate to recommend any leniency the courts may deem appropriate for Mark.

Sincerely,

Linda Zeigler

March 3,2001

To:The Honorable Judge Paul C.Huck,

I would like to take a little of your time to tell you about the Mark Roseman that I know. I met Mark over 10 years ago thru some good friends of mine .Our paths have crossed several times after that but I really came into contact with him about 5 years ago when I was looking for construction work and heard about a man named Jack Kudron who bought houses(repos) from HUD and needed them renovated for resale.I went to his office on Fed.hwy.and got a job from him.That's when I met Mark again.After rebuilding two houses for Jack,I wanted to start my own business of buying bank foreclosures,repairing them and selling them to families.I really didn't know the business of buying houses,who to get them from and where to go for funding etc.

That's when I called Mark and told him of my plans.He offered to help me though the whole process.He took me under his wing and together we looked at properties,we choose one and he helped me with the funding, and with this I was on my way.I have been doing this business ever since.I have just purchased my 17th house and have given 16 families the American Dream of owning their own home.

Mark&Lynn are loving parents and good people,I have been to their home many times and know them on a personal level.I would not be doing what I'm doing today if it wasn't for Mark Roseman's help.

Robert Bianco
5200 N.Fed.Hwy.
Suite 2
Ft.Laud.,Fla. 33308

February 25, 2001

Honorable Judge Paul C. Huck:

I would like to tell you of my sincere feelings living along a side of Mark Roseman for the last several years. Mark and his son Ben have shared many fun and constructive times with my son Robert and me. My son and I being very active in our church and Marks' family being active in their own faith we enjoyed finding many ways to share and communicate the feelings of carring and understanding in our lives. The Roseman family have always demonstrated good values and love to my son and in turn appreciate the opportunity to write to you. Very few people have spent and are spending the time that Mark is with raising his son. We have shared trips with our sons together and many sincere talks about the love of our children and their need for our involvement with them. In ending I would like to say that Mr. Roseman as a person has made himself available to family and community and has been a wonderful neighbor.

Sincerely, Robert H. Rankin 938-8252

**Nat Chesal**
*Agency Compliance Officer*



**DBS Financial Group**
600 Corporate Drive  Suite 200
Ft Lauderdale  FL  33334-3603
Tel  (954) 938-8800
Fax  (954) 351-2468
Pager  (954) 521-5901
e-mail: nchesal@finsvcs.com

March 9, 2001

The Honorable Judge Paul C. Huck

Dear Judge,

We have known Mark for the past four years.  During this time we have shared much of our time in the synagogue with our families.

Mark is an intricate part of our community as well as an important part of our personal lives.  He is always ready to help.  Mark has always been very involved in the care of his children, representing stability and comfort.  It is tragic that under the circumstances it is his family that will suffer most.

Thank you for your consideration and the consideration that we are sure you will show Mark.

Respectfully submitted,

Nathan Chesal

Insurance Representative of Massachusetts Mutual Life Insurance Company and affiliated companies • Springfield MA 01111-0001
Registered Representative of and securities offered through MML Investors Services, Inc., a MassMutual subsidiary • Supervisory Office: 1414
Main Street • Springfield MA 01144-1013 (413) 737-8400 • DBS Financial Group, David B. Schulman, CLU, ChFC, General Agent

**Arick Pinsk**
**2248 N.E. 30th Ct.**
**Lighthouse Point, FL 33064**
**Tel 954-784-1142 Fax 946-9467**

3/8/01

Honorable Paul C. Huck

Re: Mark Roseman

Dear Judge Huck:

I have been a resident of South Florida for more than 20 years. I met Mark Roseman in 1988 and shortly after that realized that Mark is a good and loyal friend who can be counted on in all of life's circumstances. Later on I had the privilege of witnessing Mark becoming a great husband and father. During the course of my working life, I have seen many families and friendships that have been less than exemplary. But, then, there was always Mark that demonstrated the way a husband, a father, and a friend should really be.

I realize that during the course of recent events, Mark has made some errors in judgment by his association with certain individuals, who I strongly believe have deceived him to a great extent. Your honor, I am not a legal scholar and am not familiar with the intricacies of the legal system. However, I must implore you to give serious consideration to the type of individual Mark really is, and what will be destroyed by his incarceration, and the damage to his family.

I do appreciate your consideration and attention in this matter. I hope I will not suffer the loss of a good a friend who can contribute so much to my life and to others.

Faithfully,

Arick Pinsk
Lighthouse Point, FL

# JILL BLITMAN, ESQUIRE
2340 SE 8th Court
Pompano Beach, FL 33062

March 13, 2001

Honorable Paul C. Huck

Re:    Mark Roseman

Dear Judge Huck:

I graduated from Osgoode Hall Law School (Toronto) in 1986. I have resided in Broward County for approximately thirteen years. My current address is 2340 SE 8th Court, Pompano Beach, FL 33062. In addition to my legal career, I have been a translator (French, Spanish, German, Italian, Portuguese and Japanese) and a business owner (Global Expo., Inc.). I have been married to Jeffrey Blitman since May 1, 1994. In October 1997, I became pregnant and retired. Jeffrey and I have one daughter, Sydney Gabrielle, born June 13, 1998.

I have known Mark Rosenman for approximately ten years. He is one of the finest human beings I have ever had the privilege of calling a friend. He is kind, honest, empathetic and loyal. He is an exceptional father as is evidenced by his wonderful son Benjamin (9) and his beautiful stepdaughter Natasha (20).

Mark has the key to my home, the code to my alarm and I would trust him and his wife Lynda above virtually anyone I know, except my husband, with the care of my precious only child.

It is my experience that when a person has a trusting nature, as Mark has, he will trust others. I think this is true of Mark, specifically with regard to James Lowe and Jack Kudron. I have had numerous opportunities to observe these individuals socially and have witnessed reckless behavior and disrespect for anyone who they viewed as an obstacle to their immediate goals or gratification. I am _**convinced**_ that they are responsible for _**any**_ criminal activity, or malfeasance in the transactions which have given rise to the proceeding against Mark.

Mark is guilty only of poor character judgment. He is the last person to deserve any period of incarceration.

I am grateful for the opportunity to plead with your Honor to exercise discretion by a downward departure from the plea agreement and the government's recommendations. Please allow an exceptional husband, father and person to return to his home and continue his excellent work with his children.

It is my humble opinion that incarceration in this case would represent the worst abuse of the administration of justice I have ever witnessed.

Faithfully

Jill Blitman, Esquire
JB/ar
c:\wpdocs\wpdocs\alana\Jill.lt7

Honorable Judge Paul C. Huck

My name is Jeffrey Blitman, I have lived in South Florida since 1972, have been married to Jill for eight years and have a two and a half year old daughter named Sydney. I sold my packaging distribution business, which employed approximately sixty people to a national company last year. I am 44 years old and have been self employed since I was 19. I have made my living as a plumber, a painter and as a salesman but my success was built on my ability to recognize value in people, recruit them and teach them to prosper. I have been right more often then I have been wrong about people and built a prosperous business.

I have known Mark Roseman for about 6 years and consider him a very close friend and in 44 years only a very few other people have attained that status- I choose them carefully! Mark is honest, trustworthy, bright and compassionate and I would not hesitate to partner with him in a business venture, Mark is an excellent father to his son Ben and daughter Natasha and there is not a person who knows Mark who can deny these facts except possibly for the two opportunists known as Jack Kudron and James Lowe.

I have had occasion to come into contact with these men at various social events and they bristle the hair on my neck. My instincts about these characters was dead on. My business is sizing up people and recognizing when I am being sold. Jack and James are reckless, uncaring and dishonest hooligans whose only goal was to enrich themselves at any cost and by any means, they should be selling aluminum siding or used cars.

I have a vague knowledge of Marks business and his relationship with Jack and James which I learned about through our friendship and my observations of their interaction. I believe that Marks inexperience in dealing with con artists of this magnitude and his basic honest nature absolutely prevented him from seeing what really was going on. Mark Roseman's only real mistake was in choosing bad business partners and I believe these guys saw him coming and took advantage of his trust. Many people in the real estate business who know Mark have the highest regard for him and his integrity and are shocked at how accountable he is being held for others actions, please do not set an example with him.

Your Honor I beg you to give this guy his life back.

Respectfully

Jeffrey W.Blitman

**IRV BLANDER**

21340 NE 23rd Court
N. Miami Beach, Fl. 33180
Telephone (305) 933-3152

March 5, 2001

Honorable Paul C. Huck

RE:     <u>MARK ROSEMAN</u>

Dear Sir,

I am writing this letter on behalf of Mark Roseman to ask the court for lenience in prescribing Mr. Roseman's sentence.

I've known Mr. Roseman for about six years, and during this time I know Mr. Roseman to be fair dealing in business and a person who keeps his word. He has a good reputation amongst his business associates. I also know him to be a good father and husband, and one who observes his religion.

I believe that Mr. Roseman and his family have already been punished living with the anxiety over the outcome of this trail. If in fact Mr. Roseman misstepped, I am sure he never will again. I hope you will find it in your heart to be lenient in your decision.

Respectfully,

Irv Blander

## P & F Realty, Inc.

*Steven Frank, President. Licensed Real Estate Broker*

March 8, 2001

Your Honor Justice Paul Huck,
    Reference: Mr. Mark Roseman

        By way of introduction, my name
is Steven Frank. I'm a non-practicing member
of the Florida Bar in good standing, a licensed
Mortgage Broker, and licensed Real Estate
Broker. For the past nine years I have been
in the business of remodeling and reselling
single family residences and I have known
Mr. Roseman both personally and through his
brother Mr. Paul Roseman for approximately
fifteen years. I have always found Mark
Roseman to be polite, courteous and generally
respectful of others.
        I'd like to make a comment
with reference to the proposed sentences of
two of the defendants in this case, Mr. Roseman
and Mr. Jack Kudson. Though I have no
direct personal knowledge of the actions and

        next pg.

events that have precipitated these charges. I do know both of these individuals personally and it is hard to believe that Mr. Roseman has been characterized as the more serious and more culpable of the two transgressors in this matter. Based on my indirect knowledge of the actions and events that have led to these charges and my personal opinion of these two individuals, I believe strongly that Mr. Fedun is clearly the more culpable of the two and to avoid a sentencing misjustice, I believe Mr. Fedun should receive the more serious of the two respective sentences.

Respectfully Yours,

Steven Frank

2787 E. Oakland Park Blvd., Suite 312, Ft. Lauderdale, FL 33306
(954) 563-4469 – office        (954) 492-9138 – res.        (954) 772-8126 – fax

Little Flower Montessori School
519 NE 26th Street
Wilton Manors, FL 33305

March 14, 2001


Dear Judge Huck:

I am writing on behalf of Mark Roseman. I began teaching his son, Ben last September and recognized at once the close bond Ben had with his father. I have been fortunate to witness their mutual excitement every afternoon as Mark arrives to pick Ben up from school. Both pairs of eyes light up at the very sight of each other. Their admiration, respect and love for each other is obvious.

Ben regularly shares stories of weekend roller blading adventures with his dad, hockey games and fun family dinners. His dad is clearly the light of his life. Ben is a bright, sensitive and caring young man, due in no small part to his father's constant and consistent love and support. I sincerely hope that they will not have to spend too much time away from each other.


With warmest regards,

Lisa Cassanelli



**Little Flower Montessori**

519 NE 26th Street ~ Wilton Manors, Florida  33305 ~ Phone 565-8205 ~ Fax 568-4396

March 15, 2001

Dear Judge Huck,

I am writing this letter on behalf of Mr. Mark Roseman. I have known Mr. Roseman for the past five years in my position as directress/teacher of his son's school. In that time, he has proven himself to be a very concerned and involved parent. He has shown great interest in all aspects of his son's development, both the academic and the emotional, and enjoys a very close relationship with his son as a result. Ben is an extremely bright and sensitive child and I am saddened when I think of the impact a long separation from his father may have on him.

After so many years of teaching, I certainly have learned that well-rounded and emotionally secure children like Ben don't happen by chance, but rather are only created by consistent and loving parents. Mr. Roseman has been diligent in his parental duties and I would hope that his separation from his son would be as short as possible in order to lessen the devastating emotional toll that it will have on Ben.

Sincerely,

Mary Byrd

Mary Byrd
Directress