FILED by
MAY 0 3 2001
CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA.

SENTENCING MINUTES
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE # _OO-6117CR_

DEFENDANT _MARK ROSEMAN_

JUDGE __PAUL C. HUCK__

Deputy Clerk_ VALERIE THOMPKINS _

DATE _5-3 2001_

Court Reporter_ LARRY HERR _

USPO_____

AUSA _Jeffrey Kaplan_

Deft's Counsel _H. John William_

COUNTS DISMISSED_____

_____ Deft. Failed to Appear - Warrant to be Issued - Bond Forfeited.

_____ Sentencing cont'd until ___/___/___ at _____AM / PM

JUDGMENT AND SENTENCE

| Imprisonment | Years | Months | Counts | |
|---|---|---|---|---|
| | | 60 | I | |
| | | 24 | II | Consecutive to count I |

Supervised Release _3 years  Ct_

| Probation | Years | Months | Counts |
|---|---|---|---|
| | | | |

Comments_ Court advise defendant of his Right to Appeal _

Assessment $_100 co/xx  C+I
          5000/xx  C+II_     Fine $_0_

Restitution $_3,144,681.53 Joint and several_

CUSTODY

_____ Remanded to the Custody of the U. S. Marshal Service   _____ Release on bond pending appeal

__✓__ Voluntary Surrender to (designated institution or U. S. Marshal Service) on_6/1/2001_

Commitment Recommendation: _Designation in South Florida, Drug + Alcy Abuse Program while I.C_



```
CASE:       1:00-cv-04834
DOCUMENT: 23
DATE:       05/04/01

CLERK:      td
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division



| | | |
|---|---|---|
| DENNIS RIVERA and STEVEN FELDMAN, | ) | CASE NO. 00-4834 CIV HUCK |
| | ) | |
| Plaintiffs, | ) | ***SECOND AMENDED COMPLAINT*** |
| | ) | |
| vs. | ) | |
| | ) | |
| THE CHARTER CLUB, INC., a Florida | ) | |
| Corporation, and MARY T. DIAZ-GRANADOS, | ) | |
| Individually, ALLEN HASBUN, Individually, | ) | |
| and ALEIDA MENIR, Individually. | ) | |
| | ) | |
| Defendants. | ) | |

### NATURE OF THE ACTION

1.     This action arises under the common law of the State of Florida and Title VII of

the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, as amended ("Title VII"); 42 U.S.C. §

1981 ("section 1981"); § 760.10, Fla. Stat.; to correct defendants' unlawful employment

practices under federal and state anti-discrimination employment statutes, and Florida' s common

law, and to make plaintiffs whole, due to defendants' retaliation and harassment of plaintiffs

when they refused to participate in defendants' pattern and practice of discriminating against

non-white employees and when plaintiffs complained about such illegal behavior.

### JURISDICTION AND VENUE

2.     Jurisdiction of this court is invoked pursuant to 28 U.S.C. §§ 1331, 1337, 1343

1



and 1345; Title VII; Section 1981; and 42 U.S.C. § 1988.

3.    Venue is proper in the Southern District of Florida pursuant to 42 U.S.C. § 2000e-5(f)(3), 28 U.S.C. § 1391(b), and Southern District of Florida Local Rule 3.1(F), because plaintiffs' claims arose there.

4.    Plaintiffs' state law claims arise out of the identical transactions and occurrences as their federal claims.

### PARTIES

5.    Plaintiff Steven Feldman ("Mr. Feldman") is a citizen of the State of Florida and at all relevant times resided in Broward County, Florida.

6.    Plaintiff Dennis Rivera ("Mr. Rivera") is a citizen of the State of Florida and at all relevant times resided in Broward County, Florida.

7.    Defendant Charter Club, Inc. is a Florida Corporation authorized to do, and actually doing business, in the State of Florida.

8.    Defendant Charter Club is a condominium.

9.    Defendant Mary T. Diaz-Granados ("Diaz") is a citizen of the State of Florida, at all relevant times resided in Dade County, Florida, and at all relevant times was President of the Charter Club, had the capacity to hire and fire Charter Club employees, and acted as the managerial and supervisory head of Charter Club employees.

10.    At all relevant times, Ms. Diaz spent well over 40 hours a week supervising Charter Club employees and became the head manager and chief and/or director of security.

11.    Defendant Allen Hasbun ("Hasbun") is a citizen of the State of Florida, at all relevant times resided in Dade County, Florida, and at all relevant times was an officer and/or

2

director of the Charter Club who had the capacity to hire and fire Charter Club employees, acted as a manager and supervisor of Charter Club employees and is currently a manager at the Charter Club.

12.    Defendant Aleida Menir ("Menir") is a citizen of the State of Florida, at all relevant times resided in Dade County, Florida, at all relevant times was Mary T. Diaz-Granados' assistant and employee of the Charter Club, had the capacity to hire and fire Charter Club employees, and acted as a manager and supervisor of Charter Club employees including plaintiffs.

13.    At all relevant times, defendant Charter Club engaged in an industry affecting commerce with fifteen or more employees for each working day in each of twenty or more calendar weeks in each relevant calendar year and otherwise meets the definition of "employer" set forth in Title VII.

## CONDITIONS PRECEDENT

14.    Mr. Feldman and Mr. Rivera have exhausted all conditions precedent and administrative remedies prior to the filing of this lawsuit.

15.    Plaintiffs timely filed charges of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Florida Commission on Human Relations ("FCHR").

16. The EEOC issued to each plaintiff a Notice of a Right to Sue; plaintiffs have timely filed this lawsuit.

### COUNT I - DISCRIMINATORY RETALIATION UNDER TITLE VII
### AGAINST DEFENDANT CHARTER CLUB ONLY

17.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 to 16 and paragraphs 70, 73, and 74 of this Complaint with the same force and effect as if set forth herein.

18.     Mr. Rivera began working for the Charter Club on or about September of 1981.

19.     Mr. Rivera started as a security guard and was eventually promoted to Chief of Security.

20.     Mr. Rivera was a qualified security guard and qualified Chief of Security at The Charter Club.

21.     Mr. Feldman began working as a manager for the Charter Club on or about October 4, 1998 under a written contract dated September 15, 1998.

22.     Mr. Feldman was a qualified manager at The Charter Club.

23.     In January of 1999, Diaz became President of the Charter Club.

24.     All of the incidents referred to in this Second Amended Complaint, occurred between January of 1999 and October of 1999 ("the relevant time period").

25.     After Diaz became President, Diaz authorized Menir; formerly Mr. Feldman's secretary, and defendant Hasbun, to direct, supervise, and otherwise control the security personnel and manager of the Charter Club.

26.     When Diaz became President, she along with Menir and Hasbun, began a racial discrimination policy against Black employees of the Charter Club's security department; race discrimination became standard operating procedure.

4

27.    This policy of race discrimination extended to Black employees of subcontractors and independent contractors who did work at the Charter Club; for example, Diaz directed Mr. Rivera to prohibit a Black employee of a landscaping company to go inside a Charter Club building and use the rest room because, as Diaz stated: "Niggers are not allowed in this condominium."

28. Diaz told Mr. Rivera not to allow a plumbing company to bring "that Black guy Joe" onto the premises and told Mr. Rivera "I don't want niggers in this building at all."

29. In January of 1999, Diaz ordered Mr. Feldman and Mr. Rivera, in front of Hasbun, to unjustifiably fire a Black security guard, Kenneth Washington, because Diaz stated she wanted to get rid of that "nigger and all the niggers at the Charter Club."

30. After Mr. Feldman and Mr. Rivera refused to fire Mr. Washington; Diaz, Hasbun, and Menir stripped their job duties away from them as a direct result of their refusal to fire Kenneth Washington according to the race discrimination policy.  For example,

a.    Beginning on or about January 1999, Defendants Diaz, Hasbun and Menir took over the managerial duties of Plaintiffs Feldman and Rivera and gave directions directly to the security staff, circumventing plaintiffs' supervision of the building.

b.    On or about January 1999, Diaz, without Plaintiff Feldman's knowledge, hired un-licensed maintenance men to do landscape lighting.

c.    On or about January 1999 Diaz and Menir wrote purchase orders, which was Plaintiff Feldman's responsibility.

d.    On or about January 1999, Rivera was no longer permitted to make sure security personnel were running their posts, Diaz assigned Menir this task.

5

e. On or about January 1999, Rivera was no longer responsible for the security of the building, Diaz assigned Menir this task.

f. Beginning on or about January 1999, Rivera no longer patrolled the grounds, Diaz assigned Menir this task.

g. After January 1999, Diaz made sure all of Plaintiff Rivera's tasks and time were spent outside of the building.

h. Diaz, Hasbun and Menir directed Mr. Rivera to engage in menial activities such as picking up garbage, transporting luggage, and bringing down shopping carts.

i. On or about January 1999, Diaz told Plaintiff Rivera he was no longer Chief of Security, he was just a security guard and designated Menir as Chief of Security.

j. On April 5, 1999, the Charter Club locked Plaintiff Feldman out of his office.

31. During the relevant time period, Diaz, Menir, and Hasbun directed Mr. Feldman and Mr. Rivera to discriminate against the Black employees by telling them they had to write up bogus disciplinary reports of the Black employees or risk being fired, telling them to unjustifiably change Ms. Brewster' s shift or risk being fired, and telling them to get rid of all the "niggers."

32. Mr. Feldman and Mr. Rivera complained about the race discrimination policy to Diaz, Hasbun, the Charter Club's attorneys, and other board members of the Charter Club but nothing was done to remedy the discrimination.

33. Plaintiffs Feldman and Rivera refused to enforce the race discrimination policy.

34. After Mr. Rivera's complaints, and refusal to enforce the race discrimination policy, Diaz daily threatened Rivera, during the relevant time period, that if he did not do as she

6

instructed that he would be terminated

35. Diaz threatened Feldman frequently during the period of January 1999 until April 1999 that if he did not do as she instructed, that he would be terminated.

36. On or about January 1999, when Mr. Feldman opposed the race discrimination policy, Diaz ordered Mr. Rivera to refrain from speaking to Mr. Feldman under any circumstances.

37. On or about January 17, 1999, Rivera spoke to Hasbun and complained about the racial remarks coming from Menir and Diaz, and Hasbun responded, "Dennis, a nigger is a nigger."

38. On or about January 17, 1999, Hasbun stated to Rivera in response to Rivera's complaints of racial remarks, "if you want to be on our side, stay out, because if not you are going to be out the door."

39. On or about February or March of 1999, Hasbun stated to Rivera, "I thought Mary (Diaz) made it clear to you, she doesn't want any more niggers in the building, that shows me that your job performance is very low, you don' t know how to do your job."

40. On or about January 1999 Menir and Diaz asked plaintiffs Rivera and Feldman if they (Menir and Diaz) use the word "nigger;" plaintiff Rivera answered, "yes" and Diaz responded, "for that you are going to pay for it, you are going to get terminated, I'm dying to terminate you."

41. During the months of January through March 1999, Diaz, Hasbun and Menir, working in concert, isolated Mr. Feldman from the rest of the employees at the Charter Club; for example: a) Diaz, Hasbun and Menir would only speak in Spanish whenever they and Mr. Feldman were alone together, b) or unless they were ordering Mr. Feldman (lack of autonomy),

and c) not permitting him to speak to Rivera anymore.

42. Mr. Feldman was fired on April 5, 1999.

43. Nearly every day Diaz called Mr. Rivera a "nigger lover," was threatened with termination, and harassed because of his opposition to the race discrimination.

44. Mr. Rivera and Mr. Feldman engaged in statutorily protected activity when they filed charges of discrimination with the EEOC on or about April 12, 1999.

45. On or about June 1999, after Rivera filed initial charges of discrimination, Diaz actively sought and published notification that other security companies were being interviewed to replace Mr. Rivera and the other Black security personnel.

46. On or about May 25, 1999, Plaintiff Rivera engaged in statutorily protected activity when he filed a retaliation charge of discrimination against The Charter Club.

47. On or about July 22, 1999, Plaintiff Rivera received a memorandum from Diaz and Hasbun, signed by Diaz and Cecilia Cervera, Vice-President of The Charter Club, listing several false and misleading statements regarding his performance.

48. On or about August 17, 1999, Plaintiffs Rivera and Feldman, along with the other black security personnel who were subjected to the above-described race discrimination, engaged in statutorily protected activity when they filed an inter-related employment discrimination lawsuit, based on similar facts and circumstances and all arising from the race discrimination policy, against defendants in Federal Court.

49. On or about October 5, 1999, Rivera was terminated by Diaz in front of Hasbun at The Charter Club and was told by Diaz, "Because you didn't do what we told you,

you didn' t want to fire the niggers, I told you I would get even with you."

50. The Charter Club terminated Plaintiff Rivera on or about October 5, 1999 and Plaintiff Feldman on April 5, 1999 in retaliation for refusing to participate in racial discrimination, complaining about race discrimination, for filing EEOC charges and for filing this lawsuit.

51. The effect of the practices complained of above has been to deprive plaintiffs of equal employment opportunities and otherwise adversely affect their status as employees because of their engagement in statutorily protected activities.

52. As a direct and proximate result of these violations of their rights under Title VII, plaintiffs have suffered both past and future pecuniary and non-pecuniary damages, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of work, and humiliation.

53. The unlawful employment practices complained of above were committed with malice or reckless indifference to plaintiffs' federally protected rights.

54. Defendant engaged in willful misconduct and recklessness, and committed the above-referenced acts in bad faith or with a malicious purpose.

55. Defendant engaged in the above referenced conduct in such a manner as to exhibit wanton and wilful disregard of human rights.

WHEREFORE, plaintiffs respectfully request that this court:

a.        Grant a permanent injunction enjoining defendant, The Charter Club, its officers, successors, assigns, and all persons in active concert or participation with it, from engaging in any employment practice that discriminates on the basis of race.

9

b.    Order defendant to institute and carry out policies, practices, and programs which provide equal employment opportunities for qualified minority individuals, and which eradicate the effects of its past and present unlawful employment practices.

c.    Order defendant to make plaintiffs whole, by, among other things, providing appropriate back pay with prejudgment interest, in amounts to be proven at trial, the monetary value of lost employment benefits, and other appropriate affirmative relief necessary to eradicate the effects of its unlawful employment practices.

d.    Order defendant to make plaintiffs whole by providing compensation for future pecuniary losses, including front pay, in amounts to be proven at trial.

e.    Order defendant to make plaintiffs whole by providing compensation for non-pecuniary losses including emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of work and humiliation in amounts to be proven at trial.

f.    Order defendant to pay plaintiffs punitive damages for its malicious and/or reckless conduct, in amounts to be determined at trial.

g.    Grant such further relief as the court deems necessary and proper.

h.    Award plaintiffs their attorneys' fees and costs in this action.

## COUNT II - DISCRIMINATORY RETALIATION UNDER SECTION 1981 AGAINST THE CHARTER CLUB, DIAZ, HASBUN AND MENIR

56. Since the facts are the same but the remedies are different under discriminatory retaliation Section 1981, plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 to 16, paragraphs 18 to 50, and paragraphs 70, 73, and 74 of this Complaint with the same force and effect as if set forth herein.

10

57. The effect of the practices complained of above has been to deprive plaintiffs of equal employment opportunities and otherwise adversely affect their status as employees because of their engagement in statutorily protected activities.

58. As a direct and proximate result of these violations of their rights under section 1981, plaintiffs have suffered both pecuniary and non-pecuniary damages in the form of past and future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of work, and humiliation.

59. The unlawful employment practices complained of above were committed with malice or reckless indifference to plaintiffs' federally protected rights.

60. Defendants engaged in willful misconduct and recklessness, and committed the above-referenced acts in bad faith or with a malicious purpose.

61. Defendants engaged in the above referenced conduct in such a manner as to exhibit wanton and wilful disregard of human rights.

WHEREFORE, plaintiffs respectfully request that this court:

a.      Grant a permanent injunction enjoining defendants, its officers, successors, assigns, and all persons in active concert or participation with it, from engaging in any employment practice which discriminates on the basis of race.

b.      Order defendants to institute and carry out policies, practices, and programs which provide equal employment opportunities for qualified minority individuals, and which eradicate the effects of its past and present unlawful employment practices.

c.      Order defendants to make plaintiffs whole, by, among other things,

11

providing appropriate back pay with prejudgment interest, in amounts to be proven at trial, the monetary value of lost employment benefits, and other appropriate affirmative relief necessary to eradicate the effects of its unlawful employment practices.

      d.     Order defendants to make plaintiffs whole by providing compensation for future pecuniary losses, including front pay, in amounts to be proven at trial.

      e.     Order defendants to make plaintiffs whole by providing compensation for non-pecuniary losses including emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of work and humiliation in amounts to be proven at trial.

      f.     Order defendants to pay plaintiffs punitive damages for its malicious and/or reckless conduct, in amounts to be determined at trial.

      g.     Grant such further relief as the court deems necessary and proper.

      h.     Award plaintiffs their attorneys' fees and costs in this action.

### COUNT III – DISCRIMINATORY RETALIATION UNDER § 760.10, FLA. STAT. AGAINST DEFENDANT CHARTER CLUB ONLY

62. Since the facts are the same but the remedies are different under discriminatory retaliation Section Fla. Stat. 760.10, plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 to 16, paragraphs 18 to 50 and paragraphs 70, 73, and 74 of this Complaint with the same force and effect as if set forth herein.

63. The effect of the practices complained of above has been to deprive plaintiffs of equal employment opportunities and otherwise adversely affect their status as employees because of their engagement in statutorily protected activities.

64. As a direct and proximate result of these violations of their rights under section 760.10, Fla.

Stat., plaintiffs have suffered both pecuniary and non-pecuniary damages in the form of past and future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of work, and humiliation.

65. The unlawful employment practices complained of above were committed with malice or reckless indifference to plaintiffs' state protected rights.

66. Defendant engaged in willful misconduct and recklessness, and committed the above-referenced acts in bad faith or with a malicious purpose.

67. Defendant engaged in the above referenced conduct in such a manner as to exhibit wanton and wilful disregard of human rights.

WHEREFORE, plaintiffs respectfully request that this court:

a.     Grant a permanent injunction-enjoining defendant The Charter Club, its officers, successors, assigns, and all persons in active concert or participation with it, from engaging in any employment practice which discriminates on the basis of race.

b.     Order defendant to institute and carry out policies, practices, and programs which provide equal employment opportunities for qualified minority individuals, and which eradicate the effects of its past and present unlawful employment practices.

c.     Order defendant to make plaintiffs whole, by, among other things, providing appropriate back pay with prejudgment interest, in amounts to be proven at trial, the monetary value of lost employment benefits, and other appropriate affirmative relief necessary to eradicate the effects of its unlawful employment practices.

d.     Order defendant to make plaintiffs whole by providing compensation for future pecuniary losses, including front pay, in amounts to be proven at trial.

13

e.     Order defendant to make plaintiffs whole by providing compensation for non-pecuniary losses including emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of work and humiliation in amounts to be proven at trial.

f.     Order defendant to pay plaintiffs punitive damages for its malicious and/or reckless conduct, in amounts to be determined at trial.

g.     Grant such further relief as the court deems necessary and proper.

h.     Award plaintiffs their attorneys' fees and costs in this action.

## COUNT IV - RACIALLY HOSTILE WORK ENVIRONMENT UNDER TITLE VII AGAINST DEFENDANT CHARTER CLUB ONLY

68.  Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 to 16 and paragraphs 18 to 29, paragraph 31, paragraphs 34 to 42 and paragraph 49 of this Complaint with the same force and effect as if set forth herein.

69.  During the relevant time period, Diaz told Mr. Feldman and Mr. Rivera that she was going to designate one portion of the parking lot, where there were security cameras, as the only place Black employees could park and stated "I want these niggers on this side."

70.  The Charter Club humiliated plaintiffs by taking away Rivera and Feldman's job duties because of their opposition to defendant's directions to carry out race discrimination.

71.  The above conduct by defendant was unwelcome by plaintiffs.

72.  The harassment was so severe or pervasive as to alter the terms and conditions of plaintiffs' employment and created a discriminatorily abusive working environment.

73.  Plaintiffs complained about the racially hostile working environment to Diaz, Hasbun, and the Charter Club attorneys but nothing was done to remedy it.

14

74. On or about January 1999, Diaz told Dennis Rivera that she was going to "get rid of all the niggers" that were Charter Club employees.

75. On or about January, 1999 Menir told Rivera that he was a "nigger lover."

76. On or about February, 1999, Diaz stated to Rivera and Feldman, "This is what niggers do best, this is what they are, what they are throwing in this container."

77. On or about February, 1999 Diaz ordered Rivera in Spanish, "to check and see if any niggers are doing anything wrong."

78. On or about February 1999, when the air conditioner needed repair, Diaz stated, to Rivera and Feldman, "don't call Air Strong, all they bring is niggers and I don't want niggers in this building."

79. On or about February, 1999, Diaz stated to Rivera to let her know when "the niggers are working out [in the gym], I want to know because I don't want to come down here and smell this grease."

80. On or about January, 1999, with Rivera present, Diaz and Menir were watching window cleaners going up the side of building and pointed, "look at that, one little monkey, two little monkeys, they keep sending niggers out here."

81. On or about February, 1999, Diaz ordered Rivera and Feldman to "make a list of all the residents that are Black, make me a list of where they park their vehicles, I want to keep track of these niggers."

82. The effect of the practices complained of above has been to deprive plaintiffs of equal employment opportunities and otherwise adversely affect their status as employees.

83. As a direct and proximate result of these violations of their rights under Title VII, plaintiffs

15

have suffered both past and future pecuniary and non-pecuniary damages, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of work, and humiliation.

84. The unlawful employment practices complained of above were committed with malice or reckless indifference to plaintiffs' federally protected rights.

85. Defendant engaged in willful misconduct and recklessness, and committed the above-referenced acts in bad faith or with a malicious purpose.

86. Defendant engaged in the above referenced conduct in such a manner as to exhibit wanton and wilful disregard of human rights.

WHEREFORE, plaintiffs respectfully request that this court:

a. Grant a permanent injunction-enjoining defendant, its officers, successors, assigns, and all persons in active concert or participation with it, from engaging in any employment practice which discriminates on the basis of race.

b. Order defendant to institute and carry out policies, practices, and programs which provide equal employment opportunities for qualified minority individuals, and which eradicate the effects of its past and present unlawful employment practices.

c. Order defendant to make plaintiffs whole, by, among other things, providing appropriate back pay with prejudgment interest, in amounts to be proven at trial, the monetary value of lost employment benefits, and other appropriate affirmative relief necessary to eradicate the effects of its unlawful employment practices.

d. Order defendant to make plaintiffs whole by providing compensation for future pecuniary losses, including front pay, in amounts to be proven at trial.

e. Order defendant to make plaintiffs whole by providing compensation for

non-pecuniary losses including emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of work and humiliation in amounts to be proven at trial.

      f.      Order defendant to pay plaintiffs punitive damages for its malicious and/or reckless conduct, in amounts to be determined at trial.

      g.      Grant such further relief as the court deems necessary and proper.

      h.      Award plaintiffs their attorneys' fees and costs in this action.

## COUNT V - RACIALLY HOSTILE WORK ENVIRONMENT UNDER SECTION 1981 AGAINST DEFENDANTS THE CHARTER CLUB, DIAZ, HASBUN AND MENIR

87. Since the facts are the same but the remedies are different under discriminatory retaliation Section 1981, plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 to 16, paragraphs 18 to 29, paragraph 31, paragraphs 34 to 42, paragraph 49 and paragraphs 69 to 81 of this Complaint with the same force and effect as if set forth herein.

88. The effect of the practices complained of above has been to deprive plaintiffs of equal employment opportunities and otherwise adversely affect their status as employees.

89. As a direct and proximate result of these violations of their rights under section 1981, plaintiffs have suffered both past and future pecuniary and non-pecuniary damages, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of work, and humiliation.

90. The unlawful employment practices complained of above were committed with malice or reckless indifference to plaintiffs' federally protected rights.

91. Defendants engaged in willful misconduct and recklessness, and committed the above-referenced acts in bad faith or with a malicious purpose.

17

92. Defendants engaged in the above referenced conduct in such a manner as to exhibit wanton and wilful disregard of human rights.

WHEREFORE, plaintiffs respectfully request that this court:

a.      Grant a permanent injunction enjoining defendants, its officers, successors, assigns, and all persons in active concert or participation with it, from engaging in any employment practice which discriminates on the basis of race.

b.      Order defendants to institute and carry out policies, practices, and programs which provide equal employment opportunities for qualified minority individuals, and which eradicate the effects of its past and present unlawful employment practices.

c.      Order defendants to make plaintiffs whole, by, among other things, providing appropriate back pay with prejudgment interest, in amounts to be proven at trial, the monetary value of lost employment benefits, and other appropriate affirmative relief necessary to eradicate the effects of its unlawful employment practices.

d.      Order defendants to make plaintiffs whole by providing compensation for future pecuniary losses, including front pay, in amounts to be proven at trial.

e.      Order defendants to make plaintiffs whole by providing compensation for non-pecuniary losses including emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of work and humiliation in amounts to be proven at trial.

f.      Order defendants to pay plaintiffs punitive damages for its malicious and/or reckless conduct, in amounts to be determined at trial.

g.      Grant such further relief as the court deems necessary and proper.

18

     h.     Award plaintiffs their attorneys' fees and costs in this action.

## COUNT VI - RACIALLY HOSTILE WORK ENVIRONMENT - § 760.10, FLA. STAT. AGAINST DEFENDANT CHARTER CLUB ONLY

93.  Since the facts are the same  but the remedies are different under discriminatory retaliation

Section Fla. Stat. 760.10, plaintiffs repeat and reallege each and every allegation contained in

paragraphs 1 to 16, paragraphs 18 to 29, paragraph 31, paragraphs 34 to 42, paragraph 49 and

paragraphs 69 to 81 of this Complaint with the same force and effect as if set forth herein.

94.  The effect of the practices complained of above has been to deprive plaintiffs of equal

employment opportunities and otherwise adversely affect their status as employees.

95.  As a direct and proximate result of these violations of their rights under section 760.10, Fla.

Stat., plaintiffs have suffered both past and future pecuniary and non-pecuniary damages,

emotional pain, suffering, inconvenience, mental anguish, loss  of enjoyment of work, and

humiliation.

96.  The unlawful employment practices complained of above were committed with malice or

reckless indifference to plaintiffs' state protected rights.

97. Defendant engaged in willful misconduct and recklessness, and committed the above-

referenced acts in bad faith or with a malicious purpose.

98. Defendant engaged in the above referenced conduct in such a manner as to exhibit wanton

and wilful disregard of human rights.

     WHEREFORE, plaintiffs respectfully request that this court:

     a.     Grant a permanent injunction-enjoining defendant, its officers, successors,

assigns, and all persons in active concert or participation with it, from engaging in any

19

employment practice which discriminates on the basis of race.

b.      Order defendant to institute and carry out policies, practices, and programs which provide equal employment opportunities for qualified minority individuals, and which eradicate the effects of its past and present unlawful employment practices.

c.      Order defendant to make plaintiffs whole, by, among other things, providing appropriate back pay with prejudgment interest, in amounts to be proven at trial, the monetary value of lost employment benefits, and other appropriate affirmative relief necessary to eradicate the effects of its unlawful employment practices.

d.      Order defendant to make plaintiffs whole by providing compensation for future pecuniary losses, including front pay, in amounts to be proven at trial.

e.      Order defendant to make plaintiffs whole by providing compensation for non-pecuniary losses including emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of work and humiliation in amounts to be proven at trial.

f.      Order defendant to pay plaintiffs punitive damages for its malicious and/or reckless conduct, in amounts to be determined at trial.

g.      Grant such further relief as the court deems necessary and proper.

h.      Award plaintiffs their attorneys' fees and costs in this action.

## COUNT VII - FELDMAN'S BREACH OF EMPLOYMENT CONTRACT CLAIM AGAINST THE CHARTER CLUB

99. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 to 16, and paragraphs 21, 22, 25, 29, 30 (a), (b), (c), and (j), 31, 35, 41, 70, 78 and 81 of this Complaint with the same force and effect as if set forth herein.

100. On or about September 11, 1998, Mr. Feldman and the Charter Club entered into a written agreement wherein Mr. Feldman was hired to act as the Manager for the Charter Club; a copy of this agreement is attached as Plaintiffs' Exhibit "A" and made a part hereof.

101. A duty existed on behalf of The Charter Club to allow Mr. Feldman to be a manager at The Charter Club and not interfere with his duty.

102. The Plaintiff, Mr. Feldman has done all acts necessary to give rise to The Charter Club's obligation to fulfill their duty.

103. The Charter Club intentionally breached its duty to Plaintiff, Mr. Feldman.

104. As a consequence to Defendant's intentional breach, Plaintiff Feldman has incurred damages.

105. Subsequent to entering into this agreement, Mr. Feldman complained to the Charter Club, and the Charter Club was aware that Mr. Feldman did not approve of, the Charter Club's racially discriminatory policy and thereafter intentionally set about to breach its agreement with Mr. Feldman.

106. On or about Saturday, April 3, 1999, Del Rey's locksmith company was summoned by Diaz at The Charter Club to change the lock on Feldman's office door.

107. When Mr. Feldman arrived at work on Monday, April 5, 1999 as scheduled, Diaz notified him that he was terminated.

108. The Charter Club's actions included, but were not limited to materially interfering with his managerial duties, giving directions directly to staff, and locking Mr. Feldman out of his office.

109. The Charter Club terminated Mr. Feldman's employment without cause.

21

WHEREFORE, Mr. Feldman demands judgment against the Charter Club for the damages, interest, court costs and attorney' s fees as well as such other and further relief the court deems just and proper.

### *PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of this Complaint was served by U.S. mail to Patrick DeBlasio, Esq. Julie Waas, Esq., Jackson, Lewis, et al., 200 South Biscayne Blvd., Ste. 2600, Miami, FL 33131-2374 this 2nd day of May, 2001.

Respectfully submitted,


Ileen J. Cantor, Esq.
LAW OFFICE OF ILEEN J. CANTOR, P.A.
23061 Aqua View #2
Boca Raton, FL 33433
Tel. 561-620-7466
Fax 561-417-4833
FBN 977128
cantorlaw@adelphia.net
Attorney for Plaintiff Rivera

Michael B. Holden, Esq.
LAW OFFICES OF MICHAEL B. HOLDEN
212 Southeast 8th Street, Suite 103
Fort Lauderdale, FL 33316
Tel. (954) 522-0222
Fax: (954) 522-5819
FBN 435480
Attorney for Plaintiff Feldman

23



# The Charter Club
## on the bay

· 600 Northeast 36th Street, Miami, Florida 33137 • Phone (305) 576-6100 Fax (305) 573-8559

September 11, 1998

Steve Feldman
10486 S.W. 52nd St.
Cooper City, Fl. 33328

## AGREEMENT

Dear Steve:

This letter is intended to confirm our conversation of September 9, 1998 regarding the position of General Manager of The Charter Club.

We are pleased to outline herein our offer to you of the aforementioned position of General Manager of The Charter Club. This position involves the duties and responsibilities customarily associated with the position including but not limited to the following:

I. Manager understands that the function of the Association is maintenance, operation and management of the condominium which consists of 446 residential units, 12 commercial units and common elements appurtenant thereto.

II. The Manager shall, consistent with the operating budget, arrange to hire, supervise, discipline and terminate such permanent and part time employees as may be required. All such actions shall be wherever practicable, discussed and reviewed with the President or any other designee of The Board of Directors.

III. Manager shall establish a regular maintenance schedule for all machinery, equipment and facilities which are maintained by Charter Club staff. Whenever such maintenance is being contractually performed by outside vendors Manager shall see that such work is done properly and in accordance with the terms of the relevant contract.

IV. The Manager must conduct periodic inspections of the building to insure that the building, appurtenances and grounds are maintained according to standards acceptable to the Association.

V. The Manager shall not execute any contract or agreement which in the aggregate exceeds $500.00 without the approval of the President or the Board of Directors.

Exhibit "A"

page 2
Steve Feldman  Agreement
9-11-98

VI. The Manager shall properly investigate and make full written reports to the President of any accidents or claims for property damage or personal liability asserted against The Charter Club or likely to be asserted.

VII. The Manager shall, from the funds collected and deposited as hereinabove provided, cause to be disbursed all sums due and payable by the Association as operating expenses authorized under the terms of this Contract, or such other items which the Manager may be specifically directed to pay by the Board of Directors or its designated agent. Checks shall be prepared for signature by the appropriate Association officers and all check requests shall include appropriate support documentation including, but not limited to, purchase orders, invoices, and statements. These duties are to be performed in accordance with the procedures established from time to time by the Treasurer of the Association and the Board of Directors.

VIII. The Manager shall, in conjunction with the Budget Committee, prepare an operating Budget for the following Fiscal year.

IX. The Association in consideration of the Manager's duties, obligations and responsibilities under this Agreement, shall pay to the Manager as consideration for employment an annual salary of Fifty Two Thousand ($52,000.00) Dollars payable in weekly installments of One Thousand ($1,000.00) dollars. Manager shall not accept remuneration of any kind from any owner or resident in the building for special favors performed or to be performed by the Manager. (Manager will take reasonable steps to ensure that other employees do not receive such remuneration as well). Manager understands and agrees to be bound by the provisions of Section 718.111 (1) (a), Florida Statutes which preclude Manager from soliciting, offering to accept or accepting any thing or service for which consideration has not been provided for Manager's own benefit or that of Manager's immediate family, from any person providing or proposing to provide goods or services to the Association.

X. Manager shall be licensed as required by Florida Law and shall provide evidence of same upon execution of this Agreement. Manager shall maintain his license in good standing throughout the term of this Agreement.

XI. The Association does hereby agree to employ and retain, and the Manager hereby accepts such employment as the manager of The Charter Club. for a term of one (1) year beginning the 4th day of October, 1998 and terminating October 3rd, 1992 unless otherwise terminated as set forth herein.

page 3
Steve Feldman Agreement
9-11-98

XII. Irrespective of the above either party may terminate this agreement on 3 days notice for cause.

We believe that this agreement generally expresses our mutual understanding . If you agree please execute one copy and return to us.

Thank you,

Kal Shmueli
President

AGREED

STEVEN C. FELDMAN        DATE